# Exhibit B

DYNAMIC MARKETING, INC.
400 Cabot Drive Unit B
Hamilton Township, NJ 08690

May 31, 2019

YF Logistics LLC
5 Boxal Drive
Cranbury, New Jersey 08512

Attention Elie Fouerti

             Re:   Sublease of 400 Cabot Drive
                    Portion of Unit A
                    Hamilton, New Jersey 08690 (the "Premises")

Gentlemen:

This sublease agreement (the "Sublease"), when countersigned below by YF LOGISTICS LLC D/B/A 1 STOP CAMERA ("YF Logistics") where indicated, shall confirm the terms and conditions of the agreement between YF Logistics and DYNAMIC MARKETING, INC. ("DMI") pursuant to which YF Logistics shall sublease from DMI the Premises. In this regard, it is hereby acknowledged and agreed as follows:

    1.   **Parties**.
          Landlord:      ICON 400 CABOT OWNER POOL 4 NJ, LLC
          ("Landlord")
          Tenant:        DMI
          Subtenant:    YF Logistics

    2.   **Overlease**. This Sublease is subject to, and governed by, the terms and conditions of the overlease (the "Overlease") between DMI and Landlord for the property where Premises is located, a copy of which is annexed hereto and made part hereof as Exhibit A. YF Logistics confirms that is has reviewed the Overlease, and agrees to comply with the terms and conditions of the Overlease in all respects. Capitalized terms used herein but not defined shall have the same meaning as set forth in the Overlease.

    3.   **Premises**. 135,000 square feet of Unit A located at 400 Cabot Drive, Hamilton, New Jersey 08690, as more particularly described in Exhibit B, annexed hereto and made part hereof.

4.    _Term_.  This Sublease shall be for a term commencing the later of the Expansion Premises Commencement Date, as defined in the Overlease, or June 1, 2019, and terminating on April 30, 2020 ("the Expiration Date").   On the Expiration Date, this Sublease shall automatically renew for successive one year terms, until the earlier of: (i) one party providing thirty (30) days' prior written notice of its decision to not renew the Sublease, or (ii) April 30, 2024, the date on which the Overlease for the Expansion Premises expires, unless terminated earlier.  Notwithstanding the foregoing, YF Logistics or DMI may terminate this Sublease, for any reason, upon thirty (30) days' prior written notice to the other.

5.    _Rent and Security Deposit_.

(a)    Rent shall be an amount equal to seventy-one and 43/100 (71.43%) percent of the Expansion Premises Base Rent as set forth in the Overlease (Unit A only), plus seventy-one and 43/100 (71.43%) percent of any Taxes and Operating Expenses, Additional Charges or any other amounts due by DMI to Landlord in accordance with the Overlease relating to, and limited to, the Premises (Unit A).  It is the intention of the parties that DMI shall neither make a profit, nor incur a loss, on subleasing the Premises to YF Logistics, that DMI is charging YF Logistics the pro-rata rent and related charges associated with the Premises being subleased to YF Logistics.  Rent shall be due and payable by YF Logistics to DMI on or before the first (1st) day of each calendar month in advance, or as may be otherwise required under the Overlease.

(b)    Rent shall also include electricity and gas which shall be charged to YF Logistics by DMI on a monthly basis, which is in addition to the amounts set forth for rent in subsection 5 (a) above.  The aforementioned charge to YF Logistics for electricity and gas shall be in an amount equal to seventy-one and 43/100 (71.43%) percent of the monthly charge for electric and gas service to the Premises.  Rent shall not include telephone charges or any other utilities which are arranged by, and billed to YF Logistics separately.

(c)    There shall not be any security deposit.

6.    _Repairs and Maintenance_.  Pursuant to and as set forth in Section 9.1.1 of the Overlease (Multi-Tenant Industrial Triple Net Lease), YF Logistics shall be responsible for its allocable share, seventy-one and 43/100 (71.43%) percent of the Premises ("Allocable Share"), of the costs and expenses for keeping and maintaining all parts of the Premises, including the interior and exterior of the

2

Premises, in good, clean and safe order, condition and repair, including replacement (as necessary). In addition, as defined in and required by Section 9.1.2 of the Overlease, YF Logistics shall be responsible for its Allocable Share of the costs associated with entering into a Service Contract for servicing the HVAC System. Further, YF Logistics shall be responsible for its Allocable Share of any other costs and expenses that DMI is responsible for pursuant to the Overlease. The aforementioned costs and expenses shall be charged to YF Logistics by DMI, and payment from YF Logistics shall be due upon receipt of the bill, invoice or other notification from DMI.

7.  <u>Use of Premises</u>.  For the term of this Sublease, YF Logistics shall have the exclusive use and occupancy of its portion of the Premises.

8.  <u>Condition of Premises</u>.  During the term of this Sublease, YF Logistics shall be responsible for the condition of its portion of the Premises, and agrees to vacate it upon termination of this Sublease in the same condition as it was at the beginning of this Sublease, ordinary and normal wear and tear excepted.

9.  <u>Insurance</u>.
    (a)  YF Logistics shall provide, at its own expense, and maintain and keep in force during the Term:

    (1)  **Property Insurance** - "Special Causes of Loss Form" property insurance, including coverage for the perils of flood, windstorm, earthquake and mechanical/equipment breakdown, and providing coverage extensions for demolition and increased cost of construction, civil authority, and utility services interruption, with a limit in an amount at least equal to the full replacement cost of Subtenant's betterments, improvements, furniture, fixtures and merchandise on the Premises, and naming as insureds Subtenant, Tenant, and Landlord, as their respective interests may appear, and including business interruption insurance for any time during which the Premises are fully or partially not tenantable (and a further 180 days' extended period of indemnity) due to an occurrence covered by such insurance policy or access to the Premises is impaired by order of civil or military authority. Such business interruption insurance shall include Rental Value insurance in an amount equal to not less than the Base Rent, percentage rental and all other items of additional rent combined for a period of at least twelve (12) months. Landlord shall be named sole loss payee as respects such Rental Value insurance and

3

as respects Landlord's interest in Tenant's improvements and betterments. No coinsurance shall apply as to any coverage provided by such property and business interruption insurance.

(2) **Commercial General Liability** - A policy of commercial general liability insurance, including, without limitation, contractual liability coverage, for the benefit of Tenant, Landlord, Landlord's managing agent, and Landlord's mortgagee and/or ground lessor, if applicable, (collectively referred to as "Landlord Parties", each of which shall be named as additional insured under the policy), and Subtenant, as their respective interests may appear, and include the following minimum limits of insurance: General Aggregate (other than Products/Completed Operations) Limit $2,000,000; Products/Completed Operations Aggregate Limit $2,000,000; Each Occurrence Limit $1,000,000; Personal Injury and Advertising Injury Limit $1,000,000; Subtenants Legal Liability Limit $1,000,000; and, Medical Expenses Limit $10,000. Such insurance policy shall (i) be an occurrence basis policy; (ii) be primary to all insurance applicable to the Premises and operations on the Premises; and (iii) provide "first dollar" coverage. In the event that such insurance policy is subject to a general aggregate limit, such general aggregate shall apply "per location."

(3) **Automobile Liability** - A policy of automobile liability insurance, including coverage for hired and non-owned auto liability, with a combined single limit of not less than One Million ($1,000,000) Dollars or such other limit as meets the underlying insurance requirements of the umbrella insurance referred to in (2) above.

(4) **Workers' Compensation** - Insurance in accordance with the laws of the state in which the Premises are located, with Employer's Liability limits which meet the underlying insurance requirements of the Umbrella insurance referred to in (5) below.

(5) **Umbrella** - Umbrella form or Excess Liability insurance providing, at a minimum, "follow form" coverage over the insurance policies referred to in (2), (3) and (4) herein, with "per location" limits of not less than Five Million ($5,000,000) Dollars per occurrence and in the aggregate. Tenant and/or Landlord may require Subtenant to increase the limits of the Umbrella Liability insurance from time to time.

(6) Plate glass insurance, if applicable.

4

(7)   Such other insurance with such limits as Tenant and/or Landlord may from time to time reasonably require taking into consideration the loss exposures presented by Subtenant's use and occupancy of the Premises, including any additional insurance specified in any addendum or rider to this Lease.

(b)   All policies of insurance required to be provided and kept in force by Subtenant shall be with insurance companies having a Standard & Poor's "claims paying ability rating" of no less than "single A", or A.M. Best's Financial Strength Rating of "A-, X", and duly licensed and authorized to transact business in the state in which the Premises are located.   Each such insurance policy shall not be cancelable or subject to reduction or modification of coverage or limits without written notice to Landlord Parties received at least thirty (30) days prior to the date of such cancellation or reduction.   If any deductible or self-insured retention applies to any such insurance policy, such deductible or self-insured retention shall not apply as respects the Landlord Parties.   Coverage under all such policies of insurance shall apply on a primary basis and without regard to any other insurance maintained by or available to the Landlord Parties. Subtenant will request its insurance carriers to include an appropriate "Waiver of Rights of Recovery" endorsement in favor of the Landlord Parties. Subtenant agrees to deliver to Tenant and Landlord, prior to the commencement of the term, and thereafter no later than ten (10) days after request by Tenant and/or Landlord, a copy of each such insurance policy or a certificate of insurance as to any such policy of insurance (signed by an authorized agent of the insurance company), that has attached a copy of the applicable endorsement(s) naming each of the Landlord Parties as additional insureds as their interests may appear and further confirming that the insurance applicable to Landlord Parties shall be in conformity with the requirements of this Lease,   together with proof of payment of the initial or the renewal premiums therefore.   Failure of Subtenant to provide such evidence of insurance in the manner and within the time specified in this paragraph shall constitute an Event of Default under this Sublease.

(c)   Waiver of Rights of Recovery - With regard to the Premises, or any other property located thereon, with respect to any loss resulting:

(i)   from property damage liability, bodily injury liability, personal and advertising injury liability, and /or medical payments (as these terms are generally understood in

5

insurance policies then in effect covering automobile liability, commercial general liability, and/or workers compensation and employers liability), and/or,

(ii) from or for damage to Subtenant's own property, or to property under Subtenant's care, custody, or control (including any indirect or consequential loss arising from such damage to property), which loss is/are covered by any insurance then be carried by or for the benefit of Subtenant, Subtenant (and any person and/or entity claiming through Subtenant) releases and waives any claim, based on negligence or otherwise, Tenant and Landlord (and Tenant's and Landlord's parent, subsidiaries, real estate managers, affiliates, and their respective officers, directors and employees, and any other person and/or entity claiming through Tenant or Landlord, all of the above collectively called "Landlord Indemnitees") from any and all claims with respect to such loss, to the extent of the proceeds paid or payable with respect thereto under/by such insurance. This waiver of rights of recovery by Subtenant also applies to any job or work done, being done or to be done by, for, or on behalf of Subtenant by any contractor of Subtenant, and shall survive the termination and/or completion of such job or work.

(d) If, as a result of the business or method of operation of Subtenant, a risk rating is ascribed to the Premises by Tenant's and/or Landlord's insurers higher than the risk rating which would otherwise be applicable to the Premises, Subtenant shall pay all increased premiums payable by Tenant and/or Landlord as a result of such higher risk rating. Such payment shall be made within ten (10) days after Tenant's and/or Landlord's request therefore.

Appropriate insurance certificates shall be delivered to DMI prior to, or upon the commencement of, this Sublease.

10. <u>Indemnification by Subtenant</u>. Subtenant will defend, indemnify and save harmless each of the Landlord Parties from and against any and all damages, costs, attorney's fees, liability and expense arising from (i) Subtenant's use and occupancy of the Premises; (ii) any breach of this Lease by Subtenant; (iii) any other act or omission by Subtenant or by any other person or entity for whose acts or omissions the Subtenant is legally responsible, and (iv) any and all claims, action, complaints, allegations or suits instituted against Subtenant, its subtenants or its assignees, or against Tenant and/or Landlord, its agents, employees

6

or affiliates, by any person or entity, including, without limitation, customers, contractors, agents or employees of other tenants, licensees, concessionaires, or agents or employees of Subtenant, in connection with loss of life, bodily injury, personal injury, emotional or mental injury or distress, and/or damage to property occurring in, on or about, or arising out of the Subtenant's use of the Premises and/or the Premises, its entrance ways or its adjacent sidewalks or loading areas, and in addition, with respect to Subtenant's contractors, occurring anywhere on or about the Premises, regardless of whether caused in whole or in part by any negligent or intentional act or omission of Subtenant, its subtenants, assignees, agents, employees, licensees, concessionaires, customers and/or invitees, contractors, or any other person or entity. Without limiting the generality of the foregoing, Subtenant specifically acknowledges that the indemnity undertaking herein shall apply to claims in connection with or arising out of the use or consumption of any utilities in the Premises under Article 4 of the Overlease (Multi-Tenant Industrial Triple Net Lease, effective date August 2, 2013, any repairs or other work by or for Subtenant, and the transportation, use, storage, maintenance, generation, manufacturing, handling, disposal, release or discharge of any "Hazardous Material" as described in Article 12 (whether or not such matters shall have been theretofore approved by Tenant and/or Landlord). The indemnity undertaking herein by Subtenant shall not apply to the extent the loss, injury, or damage referred to herein is caused by or results from the sole negligence of the Landlord Party(ies), or where and to the extent such indemnification by Subtenant would be void by statute or under law. Subtenant's indemnification of each Landlord Party, with respect to any claim, action, complaint, allegation or suit instituted against any of the Landlord Parties by an employee of Subtenant or Subtenant's agent, shall apply fully as set forth herein above and without defense or setoff pursuant to any Workers' Compensation laws. This indemnification provision shall be interpreted to be enforced to the full extent permitted by law.

If any provision of this Subtenant's Indemnification paragraph were to be held invalid in its current form by the law of any jurisdiction under which it is construed, then such provision shall be amended to the minimum extent necessary to comply with such law, and the provision shall be deemed to have always existed in such amended form in such jurisdiction. Subtenant's obligations under this Indemnification paragraph shall survive the expiration, early termination or modification of this Lease. Each of the

Landlord Parties shall also be entitled to partial indemnification from Subtenant and/or contribution from Subtenant for the Landlord Party's pro rata share of liability, and/or any sums that the Landlord Party may be compelled to pay in excess of its pro rata share of liability, even where a loss arises from the joint negligence of a Landlord Party and another party.

11.  **Services and Furnishings**.
(a) YF Logistics may furnish and decorate its portion of the Premises as it deems fit, subject however to DMI's approval, which approval shall not be unreasonably withheld or delayed.  YF Logistics shall, at its own cost and expense, promptly remove its property from the Premises upon the termination of this Sublease.

(b) Subject to the provisions of the Overlease, including but not limited to Section 10 therein, YF Logistics may install Trade Fixtures and make Alterations (as the term is defined in Section 10), as it deems fit, subject however to DMI's approval, which approval shall not be unreasonably withheld or delayed, and the Landlord's approval, if required.  YF Logistics shall, at its own cost and expense, promptly remove any Alterations, and restore the Premises to the condition required pursuant to the terms of the Overlease, including but not limited to Sections 10 and 18.9.2 contained therein, upon the termination of this Sublease.

12.  **End of Term and Default**.  In the event YF Logistics fails to perform any of the terms or obligations of this Sublease, DMI shall have the right to terminate this Sublease if YF Logistics, after receiving notice of any such breach, fails to cure the same within five (5) days thereof.  YF Logistics shall promptly vacate the Premises at the end of the term of the Sublease.

13.  **Waiver**.  The failure or delay of either party in exercising any right hereunder shall not operate as a waiver of such right, nor shall a single or partial exercise of such right preclude any further exercise of such right.

14.  **Entire Understanding**. The terms and conditions set forth in this Sublease represent the entire agreement between the parties hereto, and may not be modified or amended unless in writing signed by all parties hereto.

8

15.  <u>Assignment</u>.  The rights, duties and obligations under this Sublease shall not be assigned, transferred, pledged or encumbered in any manner whatsoever, except by prior written agreement executed by all the parties hereto.

16.  <u>Binding</u>.  This Sublease, and each and all of the terms and provisions hereof, shall be binding upon, and shall inure to the benefit of the parties hereto, their respective heirs, representatives, executors, successors and/or assigns.

17.  <u>Governing Law</u>.  This Sublease shall be governed by, and construed in accordance with, the laws of the State of New Jersey.

18.  <u>General</u>.

(a)  The parties hereto agree that the terms and conditions of this Sublease are the result of lengthy, intensive, arm's length negotiations between the parties, and that this Sublease shall not be construed in favor of or against any party by reason of the extent to which any party or his, her, or its counsel participated in the drafting of the Sublease.

(b)  In any interpretation of this Sublease the masculine, feminine or neuter pronouns, respectively, shall include the other genders.

(c)  All notices sent to a party shall be sent by overnight or certified mail, return receipt requested to the following addresses:

      <u>For Tenant</u>:

      (Via Overnight Mail)
      Dynamic Marketing, Inc.
      400 Cabot Drive Unit B
      Hamilton Township, NJ 08690
      Attention Jorge Joskowicz, Executive Director

      (Via Certified Mail)
      Dynamic Marketing, Inc.
      P.O. Box 9990
      Trenton, New Jersey 08650-2990
      Attention Jorge Joskowicz, Executive Director

For Subtenant:

YF Logistics LLC
D/B/A 1 Stop Camera
5 Boxal Drive
Cranbury, New Jersey 08512
Attention Elie Fouerti

If the foregoing represents our mutual understanding and agreement with respect to the subject matter set forth herein, please sign this Sublease below where indicated and return to the undersigned.

Very truly yours,

DYNAMIC MARKETING INC.
Tenant

By: _____
Dominic Paul, Treasurer

ACCEPTED AND AGREED TO:

YF LOGISTICS LLC
D/B/A 1 STOP CAMERA
Subtenant

By: _____
Elie Fouerti, Vice President

10

# EXHIBIT A

<u>OVERLEASE</u>

1) First Amendment To Lease Agreement, entered 3/15/2019; and
2) Multi-Tenant Industrial Triple Net Lease, effective 8/2/2013

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (hereinafter referred to as this "Amendment") is made this **15** day of **March**, 2019, by and between ICON 400 CABOT OWNER POOL 4 NJ, LLC, a Delaware limited liability company ("Landlord"), and DYNAMIC MARKETING, INC., a New York corporation ("Tenant").

### WITNESSETH:

WHEREAS, Landlord (successor-in-interest to 400 Cabot Drive, LLC) and Tenant are party to that certain Multi-Tenant Industrial Triple Net Lease, dated as of August 2, 2013 (the "Lease", as may be further amended or modified from time to time), pursuant to which Landlord leases to Tenant certain premises consisting of approximately 396,510 rentable square feet with a common address of 400 Cabot Drive, Unit B, Hamilton Township, New Jersey 08690 as more particularly described in the Lease (the "Original Premises"), and located in the Project commonly known as Exit 7A Distribution Center #2. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed thereto in the Lease.

WHEREAS, Tenant desires to: (i) expand the Original Premises to include that certain portion of the Building which consists of approximately 189,000 rentable square feet with a common address of 400 Cabot Drive, Unit A, Hamilton Township, New Jersey 08690, as more particularly shown on Exhibit A attached hereto (the "Expansion Premises") such that the Premises for purposes of the Lease shall consist of approximately 585,510 rentable square feet, as also more particularly shown on Exhibit A, (ii) modify certain other terms and conditions of the Lease.

WHEREAS, Landlord has agreed to the requested changes set forth in the preceding recital, subject to the entry into this Amendment and the modification of the Lease terms and conditions as set forth herein.

### AGREEMENT:

NOW, THEREFORE, in consideration of ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, and the mutual covenants set forth herein, the parties hereto agree as follows:

1.     **Expansion Premises.** Subject to the terms and conditions of this Section 1, effective for the period from and after the date on which Landlord has Substantially Completed the Landlord's Work, as shown on Exhibit B (the "Expansion Premises Commencement Date"), (i) the "Premises" as defined in the Lease shall be deemed to include both the Original Premises and the Expansion Premises, and (ii) all of the terms and conditions of the Lease with respect to the Premises (including, without limitation, with respect to the Term) shall be deemed to apply to both the Original Premises and the Expansion Premises in all respects, except as otherwise set forth herein. For the avoidance of doubt, Landlord and Tenant acknowledge and agree that the Expansion Premises are currently occupied by a third party pursuant to a certain lease (as amended, the "Third Party Lease"). The Third Party Lease is scheduled to expire on March 31, 2019 and Landlord agrees to use commercially reasonable efforts to cause the third party to vacate the Expansion Premises on or before such date. Notwithstanding the foregoing, if Landlord is unable to deliver the Expansion Premises to Tenant on April 15, 2019, then the Lease shall remain in effect, Landlord shall not be subject to any liability for such delay, and the Expansion Premises Commencement Date shall be delayed until the date that Landlord tenders possession of the Expansion Premises to Tenant.

2.     **Base Rent.**

(a)     **Base Rent Schedule.** Effective as of, and solely with respect to the period from and after, the Expansion Premises Commencement Date, the Base Rent Schedule set forth in the Basic Lease Information of the Lease shall be of no further force and effect, and the monthly Base Rent for the Premises payable by Tenant to Landlord during the Term is as follows:

| From: | To: | Original Premises Base Rent (per month) | Expansion Premises Base Rent (per month) | Total Base Rent (per month) |
|---|---|---|---|---|
| Expansion Premises Commencement Date | April 30, 2019 | $111,241.85 | $92,137.50 | $203,379.35 |
| May 1, 2019 | April 30, 2020 | $114,022.90 | $92,137.50 | $206,160.40 |
| May 1, 2020 | April 30, 2021 | $116,873.47 | $95,445.00 | $212,318.47 |
| May 1, 2021 | April 30, 2022 | $119,795.31 | $97,807.50 | $217,602.81 |
| May 1, 2022 | April 30, 2023 | $122,790.09 | $100,642.50 | $223,432.59 |
| May 1, 2023 | April 30, 2024 | $125,859.95 | $103,635.00 | $229,494.95 |

Except as otherwise set forth in this Amendment, all other terms and conditions with respect to the payment of Base Rent, Operating Expenses, or any other sums due and payable by Tenant under the Lease shall remain as set forth thereunder.

(b)     **Expansion Premises Base Rent.** For the avoidance of doubt and notwithstanding the foregoing subsection (a), Tenant shall have no obligation for the payment of Base Rent on the Expansion Premises unless and until the occurrence of the Expansion Premises Commencement Date; provided, however, that Tenant's obligations with respect to the Original Premises shall continue in full force and effect as set forth herein. In the event the Expansion Premises Commencement Date occurs on a date other than the first day of a calendar month, the Base Rent for such month shall be prorated for the remaining number of days (including the Expansion Premises Commencement Date) in the calendar month in which the Expansion Premises Commencement Date occurs.

(c)     **Expansion Premises Base Rent Abatement Period.** Notwithstanding the foregoing subsection (a), Tenant's obligation to pay Base Rent for the Expansion Premises shall be conditionally abated during the period from the Expansion Premises Commencement Date to the date that is two (2) months thereafter (the "Expansion Premises Base Rent Abatement Period") and Tenant shall be responsible for the prorated portion of Base Rent for the Expansion Premises for the balance of the second (2nd) full calendar month of the Term, along with all other Rent due and payable, in accordance with the terms of the Lease. By way of example, if the Expansion Premises Commencement Date occurs on April 15, 2019, then the Expansion Premises Base Rent Abatement Period shall extend from April 15, 2019 through June 14, 2019 and Tenant shall be responsible for the payment of Base Rent for the Expansion Premises, in addition to all other Rent, for the period from June 15, 2019 through June 30, 2019. Such abatement shall apply to Base Rent for the Expansion Premises only and shall not apply to any other sums payable under the Lease including, without limitation, Operating Expenses, Real Property Taxes, and Base Rent for the Original Premises. The abatement of Base Rent for the Expansion Premises described above is expressly conditioned on Tenant's performance of its obligations under the Lease throughout the Term, and the amount of the abated Base Rent for the Expansion Premises is based in part on the amount of Base Rent for the Expansion Premises due under the Lease for the full Term. If Tenant defaults under the Lease, then Tenant shall immediately, on demand, pay to Landlord, in addition to all other amounts and damages to which Landlord is entitled, the amount of Base Rent for the Expansion Premises which would otherwise have been due and payable during the Expansion Premises Base Rent Abatement Period.

3.     **Tenant's Share.** Effective for the period from and after the Expansion Premises Commencement Date, (i) Tenant's Share of the Project shall be 100.00%, and (ii) Tenant's Share of the Building shall be 100.00%.

4.     **AS-IS Condition; Landlord's Work.**

(a)     **AS-IS Condition.** Tenant hereby acknowledges and agrees that it has accepted the Original Premises as of the date hereof, and will accept the Expansion Premises as of the Expansion Premises Commencement Date, in AS-IS, WHERE-IS condition without any representation or warranty of any kind made by Landlord in favor of Tenant.

(b)     **Landlord's Work.** Notwithstanding the foregoing subsection (a), Tenant may complete the work set forth on Exhibit B attached hereto in accordance with the terms and conditions set forth on such exhibit.

5.     **Insurance.** Tenant shall deliver to Landlord revised certificates of insurance for the Original Premises and the Expansion Premises as required pursuant to Section 8 of the Lease prior to the earlier of (i) any entry into or onto the Expansion Premises by Tenant or any employee, agent or contractor of Tenant and (ii) the Expansion Premises Commencement Date.

6.     **Notice.** Notwithstanding anything to the contrary contained in the Lease, Landlord's and Tenant's address for notice shall be as follows:

| | |
|---|---|
| Tenant: | Landlord: |
| Dynamic Marketing Inc. | |
| 400 Cabot Drive, Unit B, | c/o GLP US Management LLC |
| Hamilton Township, New Jersey 08690 | 2 N. Riverside Plaza, Suite 2350 |
| Attention: Alan Jaskowicz | Chicago, IL 60606 |
| | Attention: Lease Administration |
| With a copy to: | |
| | With a copy to: |
| Sexter & Warmflash PC | |
| 115 Broadway, 17th Floor | c/o GLP US Management LLC |
| New York, NY 10006 | 50 Old Ivy, Suite 250 |
| Attention: Jeremy Welfer, Esq. | Atlanta, GA 30342 |
| | Attention: Regional Director |

7.     **OFAC.** Tenant hereby represents and warrants that, to the best of its knowledge, neither Tenant, nor any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("OFAC"); (ii) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing representation is untrue at any time during the Term, an Event of Default will be deemed to have occurred, without the necessity of notice to the defaulting party.

8.     **Tenant's Broker.** Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction other than Cushman & Wakefield. Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

9.     **No Offer.** Submission of this Amendment by Landlord is not an offer to enter into this Amendment, but rather is a solicitation for such an offer by Tenant. Landlord shall not be bound by this Amendment until Landlord and Tenant have fully executed and delivered this Amendment.

10.     **Authority.** Tenant represents and warrants to Landlord that Tenant has been and is qualified to do business in the state in which the Premises is located, that the entity has the full right and authority to enter into this Amendment, and that all persons signing on behalf of the entity were authorized to do so by appropriate actions.

11.     **Severability.** If any clause or provision of this Amendment is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Amendment shall not be affected thereby. It is also the intention of the parties to this Amendment that in lieu of each clause or provision of this Amendment that is illegal, invalid or unenforceable, there be added, as a part of this Amendment, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

12.     **Counterparts and Delivery.** This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Amendment.

Execution copies of this Amendment may be delivered by facsimile or email, and the parties hereto agree to accept and be bound by facsimile signatures or scanned signatures transmitted via email hereto, which signatures shall be considered as original signatures with the transmitted Amendment having the binding effect as an original signature on an original document. Notwithstanding the foregoing, Tenant shall, upon Landlord's request, deliver original copies of this Amendment to Landlord at the address set forth in such request. Neither party may raise the use of a facsimile machine or scanned document or the fact that any signature was transmitted through the use of a facsimile machine or email as a defense to the enforcement of this Amendment.

13.     **Conflict; Ratification.** Insofar as the specific terms and provisions of this Amendment purport to amend or modify or are in conflict with the specific terms, provisions and exhibits of the Lease, the terms and provisions of this Amendment shall govern and control. Landlord and Tenant hereby agree that (a) this Amendment is incorporated into and made a part of the Lease, (b) any and all references to the Lease hereinafter shall include this Amendment, and (c) the Lease, and all terms, conditions and provisions of the Lease, are in full force and effect as of the date hereof, except as expressly modified and amended hereinabove.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly authorized, executed and delivered as of the day and year first set forth above.

TENANT:

LANDLORD:

DYNAMIC MARKETING, INC.,
a New York corporation

ICON 400 CABOT OWNER POOL 4 NJ, LLC,
a Delaware limited liability company

By: _____
Name: Albert Fouerti
Title: President

By:    GLP US Management LLC,
       a Delaware limited liability company,
       as agent for Landlord

By: _____
Name: Thomas W. Cherry
Title: EVP - Leasing

EXHIBIT A

ORIGINAL PREMISES AND EXPANSION PREMISES



EXHIBIT B

WORK LETTER

(a)      **AS-IS Condition.** Tenant shall lease the Premises from Landlord on an "AS-IS" basis, without any representation or warranty of any kind made by Landlord in favor of Tenant and without change or modification thereto of any kind other than the work described in this exhibit.

(b)      **Landlord's Work.** Notwithstanding the foregoing subsection (a), Landlord agrees to perform or cause to be performed that certain construction, repair, maintenance, or those certain improvements to the Premises as specified below (the "Landlord's Work"), without warranty and using Landlord's standard building materials and finishes:

      1.      Create three (3) 12' x 14' openings in the existing demising wall in the warehouse portion of the Premises; and

      2.      Deliver the HVAC System, and all material electrical, plumbing and mechanical systems in good working order.

(c)      **Substantial Completion.** The Landlord's Work shall be deemed substantially completed ("Substantially Completed" or "Substantial Completion") when, in the opinion of the construction manager (whether an employee or agent of Landlord or a third party construction manager, the "Construction Manager"), the Landlord's Work is substantially completed except for punch list items which do not prevent in any material way the use of the Premises for the purposes for which they were intended. In the event Tenant, its employees, agents, or contractors cause, directly or indirectly, the construction or completion of the Landlord's Work to be delayed, then the date of Substantial Completion shall be deemed to be the date that, in the opinion of the Construction Manager, Substantial Completion would have occurred if such delays or impairments had not taken place. Without limiting the foregoing, Tenant shall be solely responsible for delays caused by Tenant's request for any changes in the plans, Tenant's request for long lead items, Tenant's failure to provide Landlord with reasonable access to the Premises to undertake the Landlord's Work, and/or Tenant's interference with the construction of the Landlord's Work, and such delays shall not entitle Tenant to any abatement of rent or other rights of any kind. Landlord may, but shall not be obligated to, send Tenant a written notice confirming (i) the date the Landlord's Work is Substantially Completed and (ii) the Expansion Premises Commencement Date, and Tenant shall sign and acknowledge any such notice within ten (10) days of receipt thereof. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use.

(d)      **Access.** From and after the Expansion Premises Commencement Date, Tenant shall provide Landlord with all necessary access to the Premises, and shall cooperate with Landlord in all respects, to undertake and complete the Landlord's Work, it being understood that Tenant shall not be entitled to any abatement of rent or claims of any kind against Landlord in connection with any inconvenience or accommodations which are required by Landlord, or in connection with any interference with Tenant's business operations or damage to any of Tenant's property, as part of the completion of the Landlord's Work. Tenant, at its sole cost and expense and prior to the commencement of the Landlord's Work, shall promptly remove all personal property, trade fixtures, equipment, office furniture and/or other similar items, if any, as may be required by Landlord for Landlord to undertake and complete the Landlord's Work.

DMI Additional Comments to Amendment to Lease Agreement:

DMI requests the ability, within ten (10) business days, after the Expansion Premises Commencement Date AND DMI being given actual possession of the Expansion Premises, that GLP agrees that DMI shall have the opportunity to have the Expansion Premises inspected by an engineer, or similar professional.  Within ten (10) business days after the aforementioned inspection, DMI shall provide a list of required repairs, if any, pertaining to any of the items listed in subsection (2) of the Amendment to Lease Agreement, with understanding GLP agrees to perform repair to return found issues back to good working order.

Thank you,
Albert Fouerti

3/15/19

*august.*

## MULTI-TENANT INDUSTRIAL TRIPLE NET LEASE

Effective Date: ~~July~~ 2nd, 2013

BASIC LEASE INFORMATION

| | |
|---|---|
| Landlord: | 400 CABOT DRIVE, LLC,<br>a New Jersey limited liability company |
| Landlord's Address For Notice: | c/o IndCor Properties, Inc.<br>Two North Riverside Plaza, Suite 2350<br>Chicago, IL 60606<br>Attn: Lease Administration |
| With a Copy To: | c/o IndCor Properties, Inc.<br>7887 East Belleview Avenue, Suite 325<br>Denver, CO 80111<br>Attn: Chuck Sullivan |
| Landlord's Address<br>For Payment of Rent. | ACH/Wire Payments:<br>Bank Name: Wells Fargo Bank, N.A.<br>Bank Address: 420 Montgomery Street, San Francisco, CA 94104<br>ABA #: ▮<br>Account #: ▮<br>Account Name: Brazos Property Trust<br><br>Lockbox via US Mail:<br>Brazos Property Trust<br>Lockbox #774714<br>4714 Solutions Center<br>Chicago, IL 60677-4007 |
| Tenant: | DYNAMIC MARKETING, INC.,<br>a New York corporation |
| Tenant's Address<br>For Notice and Tenant's<br>Representative: | 102-50 Foster Avenue<br>Brooklyn, New York 11236<br>Attn: Hank Van Beuzekom<br>Telephone: (347) 729-7013<br>Email: Hank@dmicrg.com<br>Fax: (347) 729-7036 |
| Tenant's NAICS Code: | 423620 |
| Project: | Exit 7A Distribution Center #2 |
| Land: | The parcel(s) of land upon which the Building and improvements are located and which comprise the property. |
| Building: | An industrial building located on the Land and containing approximately 585,510 rentable square feet, generally depicted in attached Exhibit A. |
| Premises: | Approximately 396,510 rentable square feet located within the Building and such other areas as generally shown in Exhibit A. |
| Premises Address:<br>Street:<br>City and State: | Exit 7A Distribution Center #2<br>400 Cabot Drive, Unit B<br>Hamilton Township, New Jersey 08690 |
| Commencement Date: | The earlier of: (i) the date on which Landlord has Substantially Completed (as defined in Exhibit B attached hereto) the Landlord's Work (as defined in Exhibit B attached hereto), or (ii) November 1, 2013. |
| Term: | A period of approximately one hundred twenty-six (126) months beginning on the Commencement Date and ending on the last day of the 126th full calendar month after the Commencement Date. |

Base Rent:

| From: | To: | Base Rent<br>(per month) |
|---|---|---|
| Commencement Date | Month 6 | $100,779.63*** |
| Month 7 | Month 18 | $100,779.63 |
| Month 19 | Month 30 | $103,299.12 |
| Month 31 | Month 42 | $105,881.60 |
| Month 43 | Month 54 | $108,528.64 |

| Month 55 | Month 66 | $111,241.85 |
| Month 67 | Month 78 | $114,022.90 |
| Month 79 | Month 90 | $116,873.47 |
| Month 91 | Month 102 | $119,795.31 |
| Month 103 | Month 114 | $122,790.09 |
| Month 115 | Month 126 | $125,859.95 |

***See Section 3.1.2 for Base Rent Abatement

Initial Estimated Operating Expenses and Real Property Taxes (subject to adjustment in accordance with the terms of the Lease):

| Item: | Estimate (per month): |
| --- | --- |
| Real Property Taxes | $25,773.15 |
| Insurance | $2,643.40 |
| Other Expenses | $13,547.25 |
| TOTAL | $41,963.80 |

Tenant's Share:

Building:  67.72%
Project:   67.72%

Letter of Credit Amount:

$604,677.78 (subject to reduction in accordance with the terms and conditions of Section 3.2 herein)

Tenant's Broker:

NAI James E. Hanson

Landlord's Broker:

CBRE, Inc.

Permitted Uses:

Warehouse and distribution of consumer electronics and appliances, with ancillary office uses, subject to Section 1.2 below.

ADDENDUM
1.    Renewal Option
2.    Early Access

EXHIBITS
A.      Site Plan/Premises Depiction
A-1.    Exclusive Parking Area and Trailer Storage Area
B-1.    Work Letter
B-2.    Tenant's Work
C.      Prohibited Uses
D.      Rules and Regulations
E.      Minimum HVAC System Service Contract Requirements
F.      Requirements for Improvements or Alterations by Tenant
G.      Estoppel Certificate
H.      Move-Out Conditions
I.      Form of Letter of Credit

The Basic Lease Information set forth above and the Addendum, Exhibits and Schedules attached hereto are incorporated into and made a part of the following lease (the "Lease"). Each reference in this Lease to any of the Basic Lease Information shall mean the respective information above. In the event of any conflict between the Basic Lease Information and the provisions of the Lease, the provisions of the Lease shall control.

LANDLORD    CES    AND TENANT    Ver    AGREE.
            Initial                  Initial

-2-

1.    **PREMISES/USE**

1.1    Premises. Subject to the terms and conditions of this Lease, Landlord hereby leases to Tenant the Premises. Tenant has determined that the Premises are acceptable for Tenant's use and Tenant acknowledges that, except as may be expressly set forth in the Work Letter attached hereto as Exhibit B (the "Work Letter"), if any, neither Landlord nor any broker or agent has made any representations or warranties in connection with the physical condition of the Premises or their fitness for Tenant's use upon which Tenant has relied directly or indirectly for any purpose. By taking possession of the Premises, Tenant accepts the Premises "AS-IS" and waives all claims of defect in the Premises, except as may be expressly set forth in Lease herein and in the Work Letter. Tenant hereby acknowledges that the area of the Premises and the Building set forth in the Basic Lease Information is approximate only, and Tenant accepts and agrees to be bound by such figure for all purposes in this Lease. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes.

1.2    Use. The Premises shall be used only for the Permitted Uses and for no other uses without Landlord's prior written consent. Tenant shall use the Premises in compliance with and subject to all applicable laws, statutes, codes, ordinances, orders, rules, regulations, conditions of approval and requirements of all federal, state, county, municipal and governmental authorities and all administrative or judicial orders or decrees and all permits, licenses, approvals and other entitlements issued by governmental entities, and rules of common law, relating to or affecting the Project, the Premises or the Building or the use or operation thereof, whether now existing or hereafter enacted, including, without limitation, the Americans with Disabilities Act of 1990, 42 USC 12111 et seq. (the "ADA"), as any of the foregoing may be amended from time to time, all Environmental Laws (as defined in Section 12.1), and any covenants, conditions and restrictions encumbering the Land and/or the Project ("CC&Rs") or any supplement thereto recorded in any official or public records with respect to the Project or any portion thereof ("Applicable Laws"). Tenant shall be responsible for obtaining any permit, business license, or other permits or licenses required by any governmental agency permitting Tenant's use or occupancy of the Premises. Because compliance with the ADA is dependent upon Tenant's specific use of the Premises, Landlord makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation and, notwithstanding anything to the contrary contained herein, Landlord shall have no obligation to bring the Premises into compliance with ADA, nor any obligation with respect to the Common Areas; provided, however, that notwithstanding the foregoing, Landlord shall make any alterations, improvements or additions to the Premises required by Applicable Laws pursuant to any written order or directive of any applicable governmental authority and under the express condition that such alterations, improvements, or additions are not related to Tenant's specific operations within the Premises, provided that the cost of any such compliance shall be (i) borne by Landlord with respect to any requirements which relate to compliance obligations which exist as of the date upon which Tenant is first provided with access to the Premises in accordance with the terms of this Lease, and (ii) borne by Tenant as an Operating Expense with respect to any requirements which relate to compliance obligations for any period from and after the date set forth in subclause (i) above. In the event that Tenant's use of the Premises requires modifications or additions to the Premises or the Common Areas in order to be in ADA compliance, Tenant agrees to make any such necessary modifications and/or additions at its sole cost and expense and in accordance with the terms of Section 10 herein. In no event shall the Premises be used for any of the prohibited uses set forth on Exhibit C attached hereto. Tenant shall comply with the rules and regulations attached hereto as Exhibit D, together with such additional rules and regulations as Landlord may from time to time prescribe ("Rules and Regulations"). Landlord shall not be responsible or liable to Tenant for the non-performance of any other tenant or occupant of the Building or Project of any such Rules and Regulations or for any interference or disturbance of Tenant by such other tenant or occupant. Tenant shall not commit waste, overload the floors or structure of the Building, subject the Premises, the Building, the Common Area or the Project to any use which would damage the same or increase the risk of loss, violate, or invalidate any insurance coverage, permit any unreasonable odors, smoke, dust, gas, substances, noise or vibrations to emanate from the Premises, take any action which would constitute a nuisance or would disturb, obstruct or endanger any other tenants, take any action which would abrogate any warranties, or use or allow the Premises to be used for any unlawful purpose.

1.3    Limited Representation. Notwithstanding anything to the contrary in this Lease or otherwise, Landlord represents that, as of the date hereof, it has not received any written notice of any existing violations of Applicable Laws which are directly related to the Premises. For purposes of the foregoing representation actual knowledge shall mean the actual knowledge of Leslie Lanne, as of the date of this Lease, without investigation or inquiry of any kind.

2.    TERM. The Term of this Lease shall commence on the Commencement Date and this Lease shall continue in full force and effect for the period of time specified as the Term provided that if the last day of the Term would not otherwise be the last day of a calendar month, then the Term shall be extended to the last day of the calendar month.

3.    RENT

3.1    Rent.

3.1.1    Terms of Payment. Tenant shall pay to Landlord, at Landlord's Address for Payment of Rent designated in the Basic Lease Information (or such other address provided by Landlord from time to time), or as otherwise directed by Landlord, the Base Rent, Operating Expenses (as defined in Section 6.2) and Real Property Taxes (as defined in Section 5.1), without notice, demand, offset or deduction, in advance, on the first day of each calendar month. All payments required to be paid by Tenant to Landlord shall be made by Tenant by check or by electronic fund transfer of immediately available federal funds before 11:00 a.m. Eastern Time. Upon the

execution of this Lease, Tenant shall pay to Landlord the seventh full calendar month of Base Rent and the first monthly installment of Estimated Expenses (as defined in Section 7.1). If the Term commences (or ends) on a date other than the first (or last) day of a month, Base Rent shall be prorated on the basis of a thirty (30) day month. All sums other than Base Rent which Tenant is obligated to pay under this Lease shall be deemed to be additional rent due hereunder ("Additional Rent"), whether or not such sums are designated Additional Rent and, together with the Base Rent, shall be due and payable to Landlord commencing on the Commencement Date. The term "Rent" means the Base Rent and all Additional Rent payable hereunder. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If any monthly installment of Base Rent, Estimated Expenses or other sum due and payable under this Lease remains unpaid for more than five (5) days beyond the date when due, Tenant shall pay to Landlord on demand a late charge equal to ten percent (10%) of such delinquent sum, and such delinquent sum shall also bear interest from the date such amount was due until paid in full at the lesser of (i) fifteen percent (15%) per annum; or (ii) at the maximum rate permitted by law ("Applicable Interest Rate"); provided, however, that Tenant shall not be obligated to pay the late charge and any default interest until Landlord has given Tenant five (5) business days written notice of the delinquent payment (which may be given at any time during the delinquency); provided, further, however, that such notice shall not be required more than once in any 12-month period. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty.

3.1.2    Rent Abatement. Tenant's obligation to pay Base Rent shall be conditionally abated during the period from the Commencement Date through the date that is six (6) months from the Commencement Date (the "Base Rent Abatement Period") and Tenant shall be responsible for the prorated portion of the Base Rent for such sixth month, along with all other Rent due and payable, in accordance with the terms of this Lease. By way of example, if the Commencement Date occurs on October 15, 2013, then the Base Rent Abatement Period shall extend from October 15, 2013 to April 14, 2014 and Tenant shall be responsible for the payment of Base Rent, in addition to all other Rent, for the period from April 15, 2014 to April 30, 2014. Such abatement shall apply to Base Rent only and shall not apply to any other sums payable under the Lease including, without limitation Operating Expenses and Real Property Taxes. The abatement of Base Rent described above is expressly conditioned on Tenant's performance of its obligations under the Lease throughout the Term, and the amount of the abated Base Rent is based in part on the amount of Base Rent due under the Lease for the full Term. If Tenant defaults under the Lease, then Tenant shall immediately, on demand, pay to Landlord, in addition to all other amounts and damages to which Landlord is entitled, the remaining portion of the Base Rent which would otherwise have been due and payable during the Base Rent Abatement Period if amortized on a straight-line basis over the final one-hundred twenty (120) months of the Term.

3.2    Letter of Credit. Concurrently with Tenant's execution and delivery of this Lease, Tenant shall deliver to Landlord, at Tenant's sole cost and expense, an unconditional, irrevocable, standby letter of credit (the "Letter of Credit") with an expiration date no earlier than one (1) year after the execution date of this Lease in the amount of Six Hundred Four Thousand, Six Hundred Seventy-Seven Dollars and Seventy-Eight Cents ($604,677.78) (the "Letter of Credit Amount"), in the form attached hereto as Exhibit I or in such other form as is reasonably acceptable to Landlord. The Letter of Credit shall secure the full and faithful performance of each provision of this Lease to be performed by Tenant pursuant to the following terms and conditions. Notwithstanding the foregoing, Landlord expressly acknowledges and agrees that Tenant shall be entitled to a reduction in the Letter of Credit Amount on or after May 1, 2019 (the "Burn-Off Date") as follows and subject to the satisfaction of the express terms set forth in this Section 3.2:

| Burn-Off Date: | Burn-Off Amount | Remaining Letter of Credit Amount |
|---|---|---|
| May 1, 2019 | $302,338.89 | $302,338.89 |

On or after the Burn-Off Date, Tenant shall have the right to request that Landlord reduce the Letter of Credit Amount in accordance with the foregoing and Landlord agrees to provide a written notice or instruction letter to the issuer of the Letter of Credit authorizing such reduction of the Letter of Credit Amount; provided, however, that Tenant shall not be entitled to a reduction in the Letter of Credit Amount in the amount set forth above on or after the Burn-Off Date unless, as of the Burn-Off Date, (a) Tenant is the Tenant originally named herein or a permitted assignee, (b) Tenant actually occupies all of the Premises originally demised under the Lease and any premises added to the Premises, and (c) no default or event which but for the passage of time in the giving of notice, or both, would constitute a default has occurred and is continuing. For the avoidance of doubt, if there is an Event of Default under the Lease at any time prior to the actual burn-off, then the Letter of Credit Amount shall be fixed at the Letter of Credit Amount for the remaining Term.

3.2.1    The Letter of Credit shall state on its face that, notwithstanding the stated expiration date, the term of the Letter of Credit shall be automatically renewed for successive, additional one (1) year periods unless, at least ninety (90) days prior to any such date of expiration, the issuing bank shall have given written notice to Landlord, by certified mail, return receipt requested at the Landlord's Address stated in the Basic Lease Information or such other address as Landlord shall have given to the issuing bank, that the Letter of Credit will not be renewed. The failure of Tenant to cause the Letter of Credit to be renewed or reissued at least sixty (60) days prior to the expiration thereof shall constitute an Event of Default under this Lease.

3.2.2    The Letter of Credit shall be issued by a financial institution reasonably acceptable to Landlord, which financial institution shall be a bank that accepts deposits, maintains accounts, will negotiate letters of credit, and whose deposits are insured by the FDIC. The Letter of Credit must be presentable in Chicago, Illinois or such other United States location reasonably acceptable to Landlord. If the financial institution that issues the

-4-

Letter of Credit makes a general assignment for the benefit of creditors, or commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property, or loses or has its charter revoked, goes into receivership, or is otherwise taken over by any regulatory agency which oversees such issuer, then Tenant shall, promptly, but in no event later than ten (10) days after the occurrence of such event, deliver a replacement Letter of Credit to Landlord in the full Letter of Credit Amount and otherwise in accordance with the requirements set forth in this Section 3.2, and promptly upon Landlord's receipt of the replacement Letter of Credit, Landlord shall return to Tenant the Letter of Credit being replaced.

3.2.3     If Tenant fails to perform fully and timely all or any of Tenant's covenants and obligations set forth in this Lease, including, without limitation, Tenant's failure to renew the Letter of Credit at least ninety (90) days prior to the expiration thereof, or if Tenant has filed a voluntary petition under the federal bankruptcy code or an involuntary petition has been filed against Tenant under the federal bankruptcy code, Landlord may, without notice to Tenant, execute one or more drafts on the Letter of Credit and apply all or any portion of the Letter of Credit toward fulfillment of Tenant's unperformed covenants and/or obligations, including any Rent payable by Tenant that is not paid when due; provided, however, that a failure of Tenant to renew the Letter of Credit in accordance with this Section 3.2 shall entitle Landlord to execute a draft for the entire amount of the Letter of Credit and such proceeds shall be deemed the property of Landlord until such time as Tenant delivers a replacement Letter of Credit to Landlord in the full Letter of Credit Amount and otherwise in accordance with the requirements set forth in this Section 3.2, and within a commercially reasonable period of time upon Landlord's receipt of the replacement Letter of Credit, Landlord shall return to Tenant the balance of the proceeds drawn from the issuing bank upon Tenant's failure to renew the Letter of Credit. Any proceeds drawn shall constitute the property of Landlord and need not be segregated from Landlord's other assets. If, as a result of any application or use by Landlord of all or any part of the Letter of Credit, the amount of the Letter of Credit shall be less than the Letter of Credit Amount, Tenant shall, within ten (10) days thereafter, provide Landlord with additional letter(s) of credit in an amount equal to the deficiency, and any such additional (or replacement) letter of credit shall comply with all of the provisions of this section and if Tenant fails to comply with the foregoing, notwithstanding anything to the contrary contained in the Lease, the same shall constitute an immediate Event of Default by Tenant.

3.2.4     Ninety (90) days after Tenant vacates the Premises, upon the expiration or sooner termination of this Lease, if Tenant is not then in default, Landlord shall return to Tenant the Letter of Credit (and any unapplied cash balance of the Letter of Credit that had been previously drawn upon); provided that Landlord may retain the Letter of Credit (or previously drawn proceeds therefrom) until such time as any Rent and Additional Rent due from Tenant for known defaults in accordance with this Lease has been determined and paid in full by Tenant

3.2.5     In no event or circumstance shall the Letter of Credit or any renewal thereof or any proceeds thereof be deemed to be or treated, or intended to serve as a "security deposit" within the meaning of any applicable law or statute. Tenant hereby waives the provisions of any Applicable Law which establishes the time frame by which Landlord must refund collateral or security for performance of a tenant's obligations under a lease. Tenant agrees and acknowledges that Tenant has no property interest whatsoever in the Letter of Credit or the proceeds thereof and that, in the event Tenant becomes a debtor under any chapter of the Federal Bankruptcy Code, neither Tenant, any trustee, nor Tenant's bankruptcy estate shall have any right to restrict or limit Landlord's claim and/or rights to the Letter of Credit and/or the proceeds thereof by application of Section 502(b)(6) of the federal bankruptcy code or otherwise.

3.2.6     Should the Permitted Uses be amended to accommodate a change in the business of Tenant or to accommodate a subtenant or assignee, Landlord shall have the right to increase the Letter of Credit to the extent necessary, in Landlord's reasonable judgment, to account for any increased risk to the Premises or increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Tenant occurs during the Lease and following such change the financial condition of Tenant is, in Landlord's reasonable judgment, materially reduced, Tenant shall deposit such additional monies with Landlord as shall be sufficient to cause the Letter of Credit to be at a commercially reasonable level based on said change in financial condition.

3.2.7     Tenant acknowledges that Landlord has the right to sell, mortgage or otherwise convey its interests in the Land and the Building and in this Lease. Tenant agrees that in the event of any such sale, mortgage or other transfer, Landlord shall have the right to transfer, assign and/or endorse the Letter of Credit to Landlord's master lessors, ground lessors, mortgagees or other transferees or assignees and, so long as such master lessors, ground lessors, mortgagees or other transferees or assignees are given physical possession of the Letter of Credit and assume the obligations of Landlord under this Lease with respect to same. Tenant shall look solely to such parties for the return of the Letter of Credit in accordance with the terms of this Lease. Tenant agrees further that, upon Landlord's written request, it shall have the Letter of Credit issued, at Tenant's sole cost and expense, in favor of Landlord's master lessor, ground lessor, mortgagee or other transferee or assignee to be held by any such party in accordance with the terms of this Lease

4.     UTILITIES.  Tenant shall be responsible for and pay when due all charges for heat, water, gas, electricity, telephone, internet, telecommunications, and any other utilities used on or provided to the Premises, along with any taxes, penalties, and surcharges related thereto and any maintenance and facility charges in connection with the provisions of such utilities. Landlord shall not be liable to Tenant for interruption in or curtailment of any utility service, nor shall any such interruption or curtailment constitute constructive eviction or grounds for rental abatement. Landlord represents that the Premises is, as of the date hereof, separately metered for gas and Landlord covenants to complete the separate metering of electricity for the Premises as part of the Landlord's Work (as

hereinafter defined).  In the event the Premises is not separately metered for utilities other than gas and electric, Tenant shall have the option, subject to Landlord's prior written consent and the terms of this Lease, to cause the Premises to be separately metered at Tenant's sole cost and expense.  If Tenant does not elect to cause the Premises to be separately metered, Tenant shall pay, upon demand, a reasonable proration of utilities, as determined by Landlord.

5.   TAXES.

5.1   Real Property Taxes.  Tenant shall pay to Landlord Tenant's Share of all taxes, assessments, supplementary taxes, possessory interest taxes, levies, fees, exactions or charges and other governmental charges, together with any interest, charges, fees, and penalties in connection therewith, which are assessed, levied, charged, conferred or imposed by any public authority upon the Land, the Building, or any other improvements, fixtures, equipment, or other property located at or on the Land (collectively, "Real Property Taxes") for each full or partial calendar year during the Term in accordance with the terms and provisions of Sections 6 and 7 below; provided, however, that Tenant shall only be responsible for interest, charges, and penalties to the extent such charges arise from Tenant's failure to pay the Estimated Expenses to Landlord pursuant to the terms hereof.  Landlord may, but is not obligated to, contest by appropriate legal proceedings the amount, validity, or application of any Real Property Taxes or liens thereof.  All capital levies or other taxes assessed or imposed on Landlord upon the rents payable to Landlord under this Lease and any franchise tax, any excise, use, margin, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents from the Premises and/or the Project or any portion thereof shall be paid by Tenant to Landlord in advance on a monthly basis in estimated installments or upon demand, at the option of Landlord, as additional rent; provided, however, in no event shall Tenant be liable for any net income taxes imposed on Landlord unless such net income taxes are in substitution for any Real Property Taxes payable hereunder.

5.2   Tenant's Property Taxes.  Prior to delinquency, Tenant shall pay all taxes and assessments, together with any interest, charges, fees, and penalties in connection therewith, levied upon trade fixtures, alterations, additions, improvements, inventories, equipment, and other personal property located at, or installed at or on, the Premises by Tenant (the "Tenant's Property Taxes").  Tenant shall, promptly upon payment thereof, provide Landlord with copies of receipts for payment of all Tenant's Property Taxes.  To the extent any such taxes are not separately assessed or billed to Tenant, Tenant shall pay to Landlord, on demand, the amount thereof as invoiced by Landlord.

6.   OPERATING EXPENSES

6.1   Operating Expenses.  Tenant shall pay to Landlord Tenant's Share of Operating Expenses for each full or partial calendar year during the Term, as provided in Section 7 below.  It is intended that this Lease be a "triple net lease" and that the Rent to be paid hereunder by Tenant will be received by Landlord without any deduction or offset whatsoever by Tenant, foreseeable or unforeseeable.  Except as expressly provided to the contrary in this Lease, Landlord shall not be required to make any expenditure, incur any obligation, or incur any liability of any kind whatsoever in connection with this Lease or the ownership, construction, maintenance, operation or repair of the Premises or the Project.  To the extent the Building shares certain items or services with other buildings, including neighboring buildings or other buildings which comprise a complex, Landlord shall reasonably allocate items or services between such buildings and/or users.

6.2   Definition of Operating Expenses.  "Operating Expenses" means the total costs and expenses incurred by Landlord in the ownership, operation, maintenance, repair and management of the Building, the Land and/or the Common Area (as defined in Section 18.19), including, but not limited to:  (1) repair, replacement, maintenance, utility costs, and landscaping of the Common Area, including, but not limited to, any and all costs of maintenance, repair and replacement of all parking areas (including bumpers, sweeping, striping and slurry coating), common driveways, loading and unloading areas, trash areas, outdoor lighting, sidewalks, walkways, landscaping (including tree trimming), irrigation systems, fences and gates and other costs which are allocable to the Building, the Common Area, and/or the Land; (2) non-structural maintenance and repair (but not replacement) of the roof (and roof membrane), skylights and exterior walls of the Premises (including exterior painting); (3) the costs relating to the insurance maintained by Landlord as described in Section 8.1 below, including, without limitation, Landlord's cost of any deductible or self-insurance retention (subject to the limitations set forth in Section 8.1); (4) maintenance contracts for, and the repair and replacement of, the elevators, if any, and all heating, ventilation and air-conditioning (HVAC) systems, but only to the extent maintained by Landlord or to the extent used in common with other occupants of the Building or otherwise serving any Common Area; (5) maintenance, repair, replacement, monitoring and operation of all mechanical, electrical and plumbing systems, but only to the extent maintained by Landlord or to the extent used in common with other occupants of the Building or otherwise serving any Common Area; (6) maintenance, repair, replacement, monitoring and operation of the fire/life safety and sprinkler system (to the extent Landlord is obligated to do so pursuant to Section 9.2); (7) Common Area landscaping, trash removal, and snow removal; (8) capital improvements or capital replacements (excluding the roof structure) made to, or capital assets acquired for, the Building, the Project, or the Land after the Commencement Date that are (a) intended to reduce Operating Expenses, (b) are reasonably necessary for the health and safety of the occupants of the Building, or (c) are required under any governmental law or regulation, in each case which capital costs, or an allocable portion thereof, shall be amortized over the period determined by Landlord, together with interest on the unamortized balance at ten percent (10%); (9) commercially reasonable reserves set aside for maintenance and repair; and (10) any other costs incurred by Landlord related to the Building and/or the Land including, but not limited to, paving, parking areas, roads, driveways, alleys, railroad facilities, heating and ventilation, systems, and other similar items.  If Landlord determines that any item hereunder comprises a capital expense in accordance with generally accepted accounting principles ("GAAP"), then Landlord agrees to amortize such item over its useful life as determined by Landlord in accordance with GAAP and Tenant shall only be responsible for any portion of such

-6-

capitalized expenses which relate to any period during the Term. Operating Expenses shall also include assessments, association fees and all other costs assessed or charged under the CC&Rs, if any, that are attributable to the Land and/or the Building in connection with any property owners or maintenance association or operator. Notwithstanding any provision to the contrary contained in this Lease, Tenant shall pay to Landlord a fee for the management of this Lease, the Premises, the Building and/or the Land including the cost of those services which are customarily performed by a property management services company, whether performed by Landlord or by an affiliate of Landlord or through an outside management company or any combination of the foregoing. Operating Expenses shall not include (i) replacement of or structural repairs to the roof or the exterior walls, (ii) repairs to the extent covered by insurance proceeds, or paid by Tenant or other third parties, and actually received by Landlord, (iii) alterations solely attributable to tenants of the Project other than Tenant, (iv) marketing expenses for leasing at the Project, and (v) any cost or expense associated with compliance with any laws, ordinances, rules or regulations regarding any condition existing in the Building or on the Land solely to the extent such condition existed prior to the Commencement Date.

6.3     Limitation on Inclusion of Roof Repair and Maintenance Expenses. Notwithstanding the terms set forth in Section 6.2, until such time as Landlord replaces the roof and roof membrane in accordance with Section 9.2.2 herein, Landlord agrees that it shall not pass through the costs and expenses of repair and maintenance to the roof and roof membrane as part of Operating Expenses; provided, however, that such limitation shall not apply to, and Tenant shall be responsible for in accordance with Section 9.1.1, any costs or expenses for repairs or maintenance which Landlord incurs as a result of any damage caused by Tenant or any Tenant Party

7.    ESTIMATED EXPENSES

7.1     Payment. "Estimated Expenses" for any particular year shall mean Landlord's estimate of Operating Expenses and Real Property Taxes for a calendar year. Tenant shall pay Tenant's Share of the Estimated Expenses with installments of Base Rent in monthly installments of one-twelfth (1/12th) thereof on the first day of each calendar month during such year. If at any time Landlord determines that Operating Expenses and/or Real Property Taxes are projected to vary from the then Estimated Expenses, Landlord may, by notice to Tenant, revise such Estimated Expenses, and Tenant's monthly installments for the remainder of such year shall be adjusted so that by the end of such calendar year Tenant has paid to Landlord Tenant's Share of the revised Estimated Expenses for such year. Until such time as Landlord delivers a written notice of revised Estimated Expenses, the then current amount of Estimated Expenses shall continue to be applicable as the amount of Estimated Expenses to be paid by Tenant in accordance herewith. For the avoidance of doubt, the Estimated Expenses set forth in the Basic Lease Information shall be deemed to be the current Estimated Expenses for purposes of this Lease as of the date of execution hereof

7.2     Adjustment. "Operating Expenses and Real Property Taxes Adjustment" (or "Adjustment") shall mean the difference between Tenant's Share of Estimated Expenses, on the one hand, and Tenant's Share of Operating Expenses and Real Property Taxes, collectively, on the other hand, for any calendar year. After the end of each calendar year, Landlord shall deliver to Tenant a statement of Tenant's Share of Operating Expenses and Real Property Taxes for such calendar year, accompanied by a computation of the Adjustment (an "Actual Statement"). If Tenant's payments are less than Tenant's Share, then Tenant shall pay the difference within twenty (20) days after receipt of such statement. Tenant's obligation to pay such amount shall survive the expiration or termination of this Lease. If Tenant's payments exceed Tenant's Share, then Landlord shall credit such excess amount to the next due installment(s) of Rent; provided, however, that if Tenant is in default, Landlord may, in addition to the rights set forth in Section 15 herein and at its election, credit such amount to any past due Rent or sums owed to Landlord.

7.3     Audit Right. In the event of any dispute as to the amount of Tenant's Share of Operating Expenses and Real Property Taxes, Tenant may, by prior written notice ("Audit Notice") given twenty (20) days following receipt of the Actual Statement ("Audit Period"), audit Landlord's accounting records with respect to Operating Expenses and Real Property Taxes relative to the year to which such Actual Statement relates. The audit shall be conducted by, or an accounting firm engaged by, Tenant and reasonably satisfactory to Landlord (billing hourly and not on a contingency fee basis) and shall be conducted at the office of Landlord at which its records are kept or, at Landlord's election, the office of Landlord's property manager (if any) or Landlord may elect to provide electronic copies of such records. The audit shall be conducted at reasonable times during normal business hours. In no event will Landlord or its property manager be required to (i) photocopy any accounting records or other items or contracts, (ii) create any ledgers or schedules not already in existence, (iii) incur any costs or expenses relative to such inspection, or (iv) perform any other tasks other than making available such accounting records as aforesaid. Neither Tenant nor its auditor may leave the office of Landlord with originals of any materials supplied by Landlord unless Landlord has supplied electronic copies of such records to Tenant. Tenant must pay Tenant's Share of Operating Expenses and Real Property Taxes when due pursuant to the terms of this Lease and may not withhold payment of Operating Expenses, Real Property Taxes or any other rent pending results of the audit or during a dispute regarding Operating Expenses and Real Property Taxes. The audit must be completed within forty-five (45) days of the date of Tenant's Audit Notice and the results of such audit shall be delivered to Landlord within sixty (60) days of the date of Tenant's Audit Notice. If Tenant does not comply with any of the aforementioned time frames, then such Actual Statement will be conclusively binding on Tenant. If such audit or review correctly reveals that Landlord has overcharged Tenant, then within thirty (30) days after the results of such audit are made available to Landlord, the amount of such overcharge shall be deducted from the installments of Tenant's Share of Operating Expenses and Real Property Taxes next becoming due. If the audit reveals that Tenant was undercharged, then within thirty (30) days after the results of the audit are made available to Tenant, Tenant agrees to reimburse Landlord the amount of such undercharge. Tenant agrees to keep the results of the audit confidential and will cause its agents, employees and contractors to keep such results confidential. To that end, Landlord may require Tenant and its auditor to execute a commercially reasonable confidentiality agreement provided by Landlord.

-7-

8.    **INSURANCE**

8.1    <u>Landlord</u>. Landlord shall maintain insurance through individual or blanket policies insuring the Building against fire and extended coverage (including, if Landlord elects, "all risk" or "special cause of loss form" coverage, earthquake/volcanic action, flood and/or surface water insurance) for the full replacement cost of the Building, with deductibles and endorsements of such coverage as selected by Landlord, together with, at Landlord's option, business interruption insurance against loss of Rent in an amount equal to the amount of Rent for a period of at least twelve (12) months commencing on the date of loss. Landlord may also carry such other commercially reasonable insurance as Landlord may deem prudent or advisable, including, without limitation, liability insurance in such amounts and on such terms as Landlord shall determine. Tenant shall pay to Landlord, as a portion of the Operating Expenses, the costs of the insurance coverages described herein, including, without limitation, Landlord's cost of any self-insurance deductible or retention; provided, however, that Tenant's share of any self-insurance deductible or retention shall not exceed $50,000 per occurrence.

8.2    <u>Tenant</u>. Tenant shall, at Tenant's expense, obtain and keep in force at all times the following insurance (and any other commercially reasonable form(s) of insurance Landlord may reasonably require from time to time) in the following coverage amounts, which coverage amounts Landlord may reasonably increase from time to time upon reasonable advance written notice to Tenant:

8.2.1    <u>Commercial General Liability Insurance (Occurrence Form)</u>. A policy of commercial general liability insurance ("CGL Policy") (occurrence form) having a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate per location (if Tenant has multiple locations) (and not more than Twenty-Five Thousand Dollars ($25,000) self-insured retention/deductible) and an umbrella liability policy or excess liability policy having a limit of not less than Three Million Dollars ($3,000,000.00) (which policy shall be in "following form" and shall provide that if the underlying aggregate is exhausted, the excess coverage will drop down as primary insurance), providing blanket contractual liability for contracts, premises and operations, products/completed operations, and with an "Additional Insured-Managers Endorsement". The CGL Policy shall delete the exclusion for operations within fifty (50) feet of a railroad track (railroad protective liability), if applicable, and if applicable, and, if necessary, Tenant shall provide for restoration of the aggregate limit. The CGL shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease to the extent insurable;

8.2.2    <u>Automobile Liability Insurance</u>. Business automobile liability insurance having a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence and insuring Tenant against liability for claims arising out of ownership, maintenance, or use of any owned, hired or non-owned automobiles;

8.2.3    <u>Workers' Compensation and Employer's Liability Insurance</u>. Workers' compensation insurance having limits not less than those required by applicable statutes, and covering all persons employed by Tenant, including volunteers, in the conduct of its operations on the Premises, together with employer's liability insurance coverage in the amount of at least One Million Dollars ($1,000,000) each accident for bodily injury by accident; One Million Dollars ($1,000,000) each employee for bodily injury by disease; and One Million Dollars ($1,000,000) policy limit for bodily injury by disease;

8.2.4    <u>Property Insurance</u>. "All risk" or "special cause of loss form" property insurance including coverage for vandalism, malicious mischief, sprinkler leakage and, if applicable, boiler and machinery comprehensive form, insuring (1) Tenant's fixtures, furniture, equipment (including electronic data processing equipment, if applicable), merchandise, inventory, and all other personal property and other contents contained within the Premises, including Tenant's Trade Fixtures and Alterations (collectively "Tenant's Property"), and (2) the Alterations (as defined in Section 10.1) (including Leasehold Improvements installed by or for the benefit of Tenant, whether pursuant to this Lease or pursuant to any prior lease or other agreement to which Tenant was a party). Such insurance shall be written on all risk or special cause of loss form for physical loss or damage, for the full replacement cost value (subject to reasonable deductible amounts) new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance, and shall include coverage for damage or other loss caused by fire or other peril, including vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year. Landlord shall be designated as a loss payee with respect to Tenant's property insurance on any Tenant-insured improvements.

8.3    <u>General</u>

8.3.1    <u>Insurance Companies</u>. Insurance required to be maintained by Tenant shall be written by companies licensed to do business in the state in which the Premises are located and having a "Financial Strength Rating" of at least "A-; VIII" (or such higher rating as may be required by a lender having a lien on the Premises) as determined by A.M. Best Company.

8.3.2    <u>Certificates of Insurance</u>. Tenant shall deliver to Landlord certificates of insurance for all insurance required to be maintained by Tenant in the form of ACORD 28 (Evidence of Property Insurance) and ACORD 25 (Certificate of Liability Insurance) (or in a form acceptable to Landlord in its sole discretion), no later than seven (7) days after the execution date of this Lease (but in any event prior to any entry onto the Premises by Tenant or any employee, agent or contractor of Tenant, if such entry is any earlier than such seven (7)-day period). Upon request, Tenant shall also provide to Landlord a true, correct and complete copy of the actual insurance policy for all insurance required to be maintained by Tenant hereof. Tenant shall, prior to expiration of any required coverage, furnish Landlord with certificates of renewal or "binders" thereof. Each policy shall expressly provide that such policies shall not be cancelable except after thirty (30) days prior written notice to the parties named as

-8-

additional insureds in this Lease (except in the case of cancellation for nonpayment of premium in which case cancellation shall not take effect until at least ten (10) days' notice has been given to Landlord). Acceptance by Landlord of delivery of any certificates of insurance does not constitute approval or agreement by Landlord that the insurance requirements in Section 8.2 have been met, and failure of Landlord to demand such evidence of full compliance with these insurance requirements or failure of Landlord to identify a deficiency from evidence provided will not be construed as a waiver of Tenant's obligation to maintain such insurance. If Tenant fails to maintain any insurance required in this Lease, Tenant shall be liable for all losses and costs suffered or incurred by Landlord (including litigation costs and attorneys' fees and expenses) resulting from said failure.

        8.3.3    Additional Insureds; Primary Coverage. Landlord, Landlord's lender, if any, and any property management company of Landlord for the Premises shall be named as additional insureds ("Additional Insureds") under Insurance Services Office ("ISO") endorsement CG 2010 or equivalent under all of the policies required by Sections 8.2.1 and such endorsement shall be included with the certificates to be provided to Landlord pursuant to Section 8.3.2 above. The policies carried or required to be carried by Tenant pursuant to Sections 8.2.1 shall provide for severability of interest and shall be primary as respects the Additional Insureds, and any insurance maintained by the Additional Insureds shall be excess and non-contributing. Landlord is to be insured as its interests may appear and is to be designated as a loss payee on the insurance required to be maintained by Tenant pursuant to Section 8.2.4.

        8.3.4    Limits of Insurance. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease, except as expressly provided in Section 8.3.5 below.

        8.3.5    Mutual Waiver of Subrogation. Whenever (1) any loss, cost, damage or expense resulting from fire, explosion or any other casualties incurred by either Landlord or Tenant or by anyone claiming by, through or under Landlord or Tenant in connection with the Premises, and (2) such party is covered in whole or in part by property or business interruption insurance (or would have been covered but for such party's failure to maintain the property or business interruption coverage required in this Section 8; or would have been covered but for such party's election to self-insure as expressly permitted hereunder, if applicable) with respect to such loss, cost, damage or expense, then the party so insured (or so required) hereby waives (on its own behalf and on behalf of its insured) any claims against and releases the party from any liability said other party may have on account of such loss, cost, damage or expense. All insurance which is carried by either party to insure against damage or loss to property shall include provisions denying to each respective insurer rights of subrogation and recovery against the other party.

        8.3.6    Notification of Incidents. Tenant shall notify Landlord within twenty-four (24) hours after the occurrence of any accidents or incidents in the Premises, the Building, Common Areas or the Project which could give rise to a claim under any of the insurance policies required under this Section 8.

        8.4    Indemnity. Tenant shall indemnify, protect, defend (by counsel reasonably acceptable to Landlord) and hold harmless Landlord and all of Landlord's affiliated entities, and each of their respective members, managers, partners, directors, officers, employees, shareholders, investors, investment manager, trustees, lenders, agents, contractors, and representatives, and each of their respective successors and assigns (individually and collectively, "Indemnitees") from and against any and all claims, demands, judgments, settlements, causes of action, damages, penalties, fines, encumbrances, liens, liabilities, taxes, costs, losses, and expenses, including all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon, arising at any time after the execution hereof, during the Term, or after the Term as a result (directly or indirectly) of or in connection with (1) any default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or (2) Tenant's use of the Premises, the conduct of Tenant's business or any activity, work or things done, permitted or suffered by Tenant or any Tenant Party (as defined in Section 12.1) in or about the Premises, the Building, the Common Area or other portions of the Project, except to the extent caused by Landlord's negligence or willful misconduct. In the event Landlord reasonably determines that there is a conflict of interest between Landlord and Tenant with respect to such counsel, then Landlord reserves the right to retain counsel for its defense, in which case Tenant shall be responsible for the costs of such defense. The obligations of Tenant under this Section 8.4 shall survive the termination of this Lease with respect to any claims or liability arising prior to such termination.

        8.5    Exemption of Landlord from Liability. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property including, but not limited to, Tenant's Property and all Alterations in, upon or about the Premises, the Building, the Land, the Common Area or other portions of the Project arising from any cause, whether such damage is caused by fire, steam, electricity, gas, water or rain, or from the breakage, leakage or other defects of sprinklers, wires, appliances, ventilation, plumbing, air conditioning or lighting fixtures, or from any other cause, and whether said damage, results from conditions arising upon the Premises, upon other portions of the Building or from other sources or places, and regardless of whether the cause of such damage or the means of repairing the same is inaccessible to Tenant; and Tenant hereby expressly releases Landlord and waives all claims in respect thereof against Landlord; provided, however, subject to Section 8.3.5, the foregoing release and waiver shall not apply to the extent such claims are caused by Landlord's negligence or willful misconduct. Further, Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of illness or injury to persons in, upon or about the Premises, the Building, the Land, the Common Area or other portions of the Project arising from any cause; and Tenant hereby expressly releases Landlord and waives all claims in respect thereof against Landlord; provided, however, the foregoing release and waiver shall not apply to the extent such claims are caused by Landlord's negligence or willful misconduct. Notwithstanding any provision to the contrary in this Lease, Tenant hereby agrees that Landlord shall not be liable for injury to Tenant's business or any loss of income therefrom under any circumstances. Without limiting the generality of the foregoing, Landlord shall not be liable for any damages

arising from any act, omission, or neglect of any contractor or other tenant, if any, of the Building or the Project or Landlord's failure to enforce the terms of any agreements with parties other than Tenant.

9.    REPAIRS AND MAINTENANCE

9.1    Tenant.

9.1.1    Tenant, at Tenant's sole cost and expense, shall keep and maintain all parts of the Premises, including the interior and exterior of the Premises, in good, clean and safe order, condition and repair, including replacement (as necessary), including, without limitation, the following: loading docks, roll up doors and ramps; floors, subfloors and floor coverings; walls and wall coverings (excluding painting of exterior walls); doors, door frames, locks and other locking devices, windows, glass and plate glass; ceilings, skylights, and lighting systems; all plumbing, electrical and mechanical equipment and systems inside or exclusively serving the Premises; all heating, ventilating and air conditioning equipment and systems inside, outside, or exclusively serving the Premises (subject to Landlord's rights described below); all fixtures installed by or for Tenant at the Premises; all trash facilities utilized by Tenant (including such trash container/dumpster as permitted pursuant to Section 18.22 herein); and wiring, appliances and devices using or containing refrigerants, or otherwise attached to or part of Tenant's trade-fixtures and/or equipment. Without limiting the foregoing, Tenant shall, at Tenant's sole expense, (i) immediately replace all broken glass in the Premises with glass aesthetically satisfactory to Landlord, which glass shall be equal to or in excess of the specification and quality of the original glass, and (ii) repair any area damaged by Tenant or any Tenant Party, including any damage caused by any roof or roof membrane penetration, whether or not such penetration was approved by Landlord. All repairs and replacements by Tenant shall be made and performed: (1) at Tenant's cost and expense and at such time and in such manner as Landlord may designate, (2) by contractors or mechanics approved by Landlord, (3) so that same shall be at least equal in quality, value and utility to the original work or installation, (4) in a manner and using equipment and materials that will not interfere with or impair the operations, use or occupation of the Building or any of the mechanical, electrical, plumbing or other systems in the Building or the Project, and (5) in accordance with the Rules and Regulations and all Applicable Laws.

9.1.2    Tenant shall enter into a regularly scheduled preventive maintenance/service contract ("Service Contract") with a maintenance contractor reasonably acceptable to Landlord for servicing all heating, ventilation, and air conditioning systems and equipment inside, outside, or exclusively serving the Premises (collectively, the "HVAC System"). The Service Contract shall require the maintenance contractor to complete the minimum service requirements set forth on Exhibit E attached hereto. Tenant shall deliver proof of coverage required by the Service Contract to Landlord within one hundred twenty (120) days after the later of (i) the Commencement Date, and (ii) the Landlord's completion of the HVAC Project (as defined in Exhibit B). Notwithstanding the foregoing, Landlord may, if Tenant fails to maintain the Service Contract and after providing Tenant with thirty (30) days prior written notice of same, elect to maintain the Service Contract respecting the HVAC System, in which case Tenant shall reimburse Landlord within thirty (30) days after Landlord's demand for the cost of the Service Contract and for any payments due in connection therewith. Tenant, in all cases, shall promptly undertake and complete the repairs and/or replacements recommended by such maintenance contractor during the Term of this Lease.

9.1.3    In the event Tenant fails, in the reasonable judgment of Landlord, to maintain the Premises in accordance with the obligations under this Lease, which failure is not cured within thirty (30) days following delivery of written notice to Tenant stating the nature of the failure, or in the case of an emergency immediately without prior notice, Landlord shall have the right to enter the Premises and perform such maintenance, repairs or refurbishing at Tenant's sole cost and expense (including a sum for overhead to Landlord equal to ten percent (10%) of the costs of maintenance, repairs or refurbishing). Tenant shall maintain written records of maintenance and repairs, as required by any Applicable Law, and shall use certified technicians to perform such maintenance and repairs, as so required.

9.2    Landlord.

9.2.1    Landlord shall, subject to the following limitations, repair damage to structural portions of the roof, foundation and load-bearing portions of walls (excluding wall coverings, painting, glass and doors) of the Building at its sole cost and expense (and not subject to pass-through as an Operating Expense); provided, if such damage is caused by an act or omission of Tenant, or any Tenant Party, then such repairs shall be at Tenant's sole expense. Except as otherwise set forth herein, Landlord may, at Tenant's expense as an Operating Expense as provided in Section 6.2, maintain, repair and replace those portions of the Building, the Land and/or the Building Common Area described in Section 6.2(1) through (10). Landlord shall not be required to make any repair resulting from (1) any alteration or modification to the Building or to mechanical equipment within the Building performed by, for or because of Tenant or to special equipment or systems installed by, for or because of Tenant, (2) the installation, use or operation of Tenant's property, fixtures and equipment, (3) the moving of Tenant's property in or out of the Building or in and about the Premises, (4) Tenant's use or occupancy of the Premises in violation of Section 11 of this Lease or in the manner not contemplated by the parties at the time of the execution of this Lease, (5) the acts or omissions of Tenant or any Tenant Party, (6) fire and other casualty, except as provided by Section 13 of this Lease, or (7) condemnation, except as provided in Section 14 of this Lease. Landlord shall have no obligation to make repairs under this Section 9.2 until a reasonable time after receipt of written notice from Tenant of the need for such repairs. There shall be no abatement of Rent during the performance of such work. Landlord shall not be liable to Tenant for injury or damage that may result from any defect in the construction or condition of the Premises, or for any damage that may result from interruption of Tenant's use of the Premises during any repairs by Landlord. Tenant waives any right to repair the Premises, the Building, and/or the Common Area at the expense of Landlord under any Applicable Laws.

9.2.2    Landlord covenants to replace the roof and roof membrane of the Building which is above the Premises and which exists as of the date of execution hereof on or prior to July 31, 2015, subject to delay for Force Majeure and other matters beyond the reasonable control of Landlord.

9.3    Rail Use. Subject to the following terms and conditions contained in this Section 9.3, Tenant shall have the non-exclusive right to utilize the interior rail track and the exterior rail spur and related improvements serving the Premises (collectively, the "Rail Track System"). Landlord makes no representations or warranties as to the condition of the Rail Track System or any tracks located on the Project and Tenant hereby expressly acknowledges and agrees that the Rail Track System is in "AS IS" condition "WITH ALL FAULTS" and that there are no implied warranties, including, without limitation, warranties of suitability or fitness for a particular purpose, regarding the Rail Track System and/or the right to utilize same. Tenant hereby releases and/or relieves Landlord from any liability whatsoever in connection with the Rail Track System. For the avoidance of doubt, Tenant's indemnities (including those set forth in Section 8.4 and 12.3), waivers (including Section 8.5), limitations of liability, and other similar matters set forth in this Lease shall expressly extend to the Rail Track System and Tenant's or any Tenant Party's use thereof. In the event that Tenant elects to utilize the Rail Track System, then Tenant shall be solely responsible for, at Tenant's sole cost and expense, any and all maintenance, repair and replacement of the Rail Track System, including, without limitation, both the normal and customary maintenance thereof and any standard and/or above-standard maintenance, repairs and replacements required in connection with Tenant's use of the Rail Track System; provided, however, that all maintenance, repair and replacement work shall be completed in accordance with Section 10 herein. In the event that Tenant elects not to use the Rail Track System, then Tenant shall be responsible for general maintenance of any portion of the Rail Track System which is located within the Premises without any obligation to maintain such portion of the Rail Track System in any condition other than the same condition as received, ordinary wear and tear excepted. Notwithstanding the two preceding sentences, Tenant expressly acknowledges and agrees that, regardless of its actual use of the Rail Track System, Tenant shall be responsible for any damage, and the cost and expense to repair same, to the Rail Track System which is caused by Tenant or any Tenant Party. Under no circumstances shall Tenant undertake its obligations or exercise its rights hereunder in a manner that would interfere with Landlord, any party acting on behalf of Landlord, or any tenant, licensee, or occupant of Landlord or be in violation of any laws, covenants, conditions, restrictions, easements, or other similar encumbrances which relate to the Rail Track System. Tenant shall be required, prior to utilizing any of the Rail Track System, to obtain any permits, authorizations, agreements, or other licenses in order to use the Rail Track System, including under any applicable law or from any rail service provider. Tenant shall not (a) do or permit anything to be done, nor bring or keep anything in or around the Rail Track System, that will increase the risk of fire or other loss (including by way of example, bringing explosives onto the Rail Track System), (b) place any signs on or around the Rail Track System, (c) commit or suffer any waste upon or about the Rail Track System, or (d) permit any obstruction that might adversely affect or damage the Rail Trail System or cause injury or harm to any person thereon. Tenant's placement on and along the Rail Track System of rail cars, machinery, goods, inventory, equipment, and other personalty thereon shall be at Tenant's sole risk and liability and Landlord shall have no responsibility therefor. Tenant agrees not to limit or otherwise impair or interfere with the rights of any other tenants at the Project with respect to any portion of the Rail Track System and agrees to cooperate with such other tenants in the use of the Rail Track System; provided, however, that Landlord shall not be responsible for enforcing Tenant's rights for the usage of the Rail Track System by Tenant against any third parties (including other tenants).

10.    ALTERATIONS

10.1    Trade Fixtures; Alterations. Subject to limitations set forth in this Lease, Tenant may install reasonably necessary trade fixtures, equipment, cabling/wiring, and furniture ("Tenant's Trade Fixtures") in the Premises, provided that all such installations and/or work is done in compliance with Exhibit F and such items are installed and are removable without structural or material damage to the Premises, the Building, and the Common Area. Tenant shall not construct, or allow to be constructed, any alterations, physical additions, improvements, or partitions in, about, or to the Premises ("Alterations") without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, provided such approval is expressly conditioned upon Tenant's compliance with the provisions of Exhibit F and any other applicable reasonable requirements of Landlord regarding construction of improvements and alterations. Notwithstanding the foregoing, provided that Tenant complies with Sections 2 and 3 (to the extent such project requires a building permit), 4(a), 6, 10, 11, and 12 of Exhibit F, Tenant shall have the right, at its sole cost and expense, without Landlord's consent, to make any non-structural Alteration to the Premises that costs (in the aggregate for all materials, equipment, and contractors performing work in connection therewith) less than $10,000.00 (the "Permitted Non-Structural Alterations"); provided, that (a) Tenant shall provide Landlord with ten (10) Business Days prior written notice of the commencement of any such alteration which requires a building permit, (b) such alteration shall not diminish the quality, the useful life or the operating capacity of the Building's electrical, mechanical, HVAC systems or any other structural part of the Building or the Premises, (c) such alteration shall not decrease the value of the Premises or the Building, (d) such alteration shall not require any floor, roof, or exterior wall penetrations or interior wall penetrations that are structural, (e) such alteration shall be performed in a workmanlike manner and in accordance with all Applicable Laws, and (f) upon completion of any such alteration, if prepared by Tenant, Tenant shall provide Landlord with a copy of Tenant's "as built" plans for such alteration. If Landlord does not respond to a written request from Tenant made in accordance with Exhibit F within ten (10) Business Days, then Landlord shall be deemed to disapprove such request. In the event Tenant makes any alterations to the Premises that trigger or give rise to a requirement that the Building or the Premises come into compliance with any governmental laws, ordinances, statutes, orders and/or regulations (such as ADA requirements), Tenant shall be fully responsible for complying, at its sole cost and expense, with same. Tenant shall file a notice of completion after completion of such work and provide Landlord with a copy thereof.

10.2    Damage; Removal. Tenant shall repair and be responsible for all damage to the Premises, the Building, the Common Area or the Project caused by the installation or removal of Tenant's Property. Upon the

-11-

expiration or earlier termination of this Lease, Tenant shall remove any or all Tenant's Property made or installed by, or on behalf of, Tenant and restore the Premises to the condition required pursuant to Section 18.9.2 herein; provided, however, Landlord has the absolute right to require Tenant to retain, preserve, and/or leave in place all or any portion of such Alterations designated by Landlord, in which event such items shall be and become the property of Landlord upon the expiration or earlier termination of this Lease. Should Tenant make any Alterations without the prior written approval of Landlord, Landlord may require that Tenant remove any or all of such Alterations and repair any damage to the Premises, the Building, the Common Area or the Project resulting from the installation and/or removal of such Alterations at any time and from time to time. All such removals and restoration shall be accomplished in a good and workmanlike manner and so as not to cause any damage to the Premises, the Building, the Common Area or the Project whatsoever.

      10.3    Liens. Tenant shall not do any act which shall in any way encumber the title of Landlord in and to the Premises, the Building, the Land, and or the Project. Tenant shall promptly pay and discharge all invoices and claims for labor performed, supplies furnished and services rendered for or at the request of Tenant and shall keep the Premises free of all mechanics', materialmen's, or other similar liens in connection therewith. For all Alterations which require consent hereunder (expressly excluding Permitted Non-Structural Alterations), Tenant shall provide at least ten (10) days prior written notice to Landlord before any labor is performed, supplies furnished or services rendered on or at the Premises for or at the request of Tenant and Landlord shall have the right to post on the Premises notices of non-responsibility. If any lien is filed as a result of any labor performed, supplies furnished and services rendered for or at the request of Tenant (regardless of the validity of such lien), Tenant shall cause such lien to be released and removed (or insured and/or bonded over to the satisfaction of Landlord in its sole and absolute discretion) within fifteen (15) days after the date of filing, and if Tenant fails to do so, Landlord may take such action as may be necessary to remove such lien and Tenant shall promptly pay Landlord such amounts expended by Landlord in connection therewith, including, without limitation, reasonable attorneys' fees and expenses, together with interest thereon at the Applicable Interest Rate from the date of expenditure. Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under the lien laws of the State of New Jersey.

      10.4    Standard of Work. All work to be performed by or for Tenant pursuant hereto shall be performed diligently and in a first class, workmanlike manner, and in compliance with the provisions of Exhibit F, all Applicable Laws, and Tenant and Landlord's insurance carriers. Landlord shall have the right, but not the obligation, to inspect periodically the work on the Premises and Landlord may require changes in the method or quality of the work.

11.    LANDLORD'S RIGHTS. Landlord reserves the right to enter the Premises for any reason at reasonable times and upon reasonable notice to Tenant (or without notice in case of an emergency) and/or to undertake the following all without abatement of rent or liability to Tenant:  inspect the Premises and/or the performance by Tenant of the terms and conditions hereof; make such alterations, repairs, improvements or additions to the Premises as required or permitted hereunder; change boundary lines of the Land so long as such change does not materially and adversely impact Tenant's use of the parking area and/or access to the Premises without reasonable substitution, replacement, or accommodation; install, use, maintain, repair, alter, relocate or replace any pipes, ducts, conduits, wires, equipment and other facilities in the Common Area or the Building (including within the Premises); install, maintain and operate conduit cabling within the utility and/or conduit ducts and risers within the Building, as well as grant lease, license or use rights to third parties and to utilize the foregoing easements or licenses on the Land and/or the Project; dedicate for public use portions of the Land and/or the Project; and enter into and/or record covenants, conditions and restrictions affecting the Land and/or the Project and/or amendments to existing CC&Rs which do not unreasonably interfere with use of the Premises for general warehouse and distribution purposes or impose additional material monetary obligations on Tenant; change the name of the Building and/or the Project; affix reasonable signs and displays on the Building and/or the Land; show the Premises, the Building, and/or the Project to prospective purchasers and investors, ground lessees, and existing and prospective lenders; and, during the last nine (9) months of the Term, place signs for the rental of, and show the Premises to prospective tenants.

12.    ENVIRONMENTAL MATTERS.

      12.1    Hazardous Materials. Tenant shall not cause, permit, or allow any of Tenant's or Tenant's affiliates' employees, agents, customers, visitors, invitees, licensees, contractors, assignees, or subtenants (individually, a "Tenant Party" and collectively, "Tenant's Parties") to cause or permit, any Hazardous Materials (as defined herein) to be brought upon, stored, manufactured, generated, blended, handled, recycled, treated, disposed or used on, under, or about the Premises, the Building, the Common Area, or the Project, except for amounts of office and janitorial supplies in usual and customary quantities for the reasonable use of the Premises for general office and reasonable building operation purposes, as subject to the requirement to store, use, and dispose of all of the foregoing in a safe and reasonable manner and in accordance with all applicable Environmental Laws. As used herein, the term "Environmental Laws" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following:  the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq.; the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the Site Remediation Reform Act, N.J.S.A. 58:10C-1 et seq.; the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.; the New Jersey Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 et seq.; the Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq.; the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq.; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Laws, asbestos, petroleum, including crude oil or any fraction or derivative thereof, natural gas

liquids, liquefied natural gas, synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas), and explosives, flammables, or radioactive substances of any kind. As defined in Environmental Laws, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant or any Tenant Party, and the wastes, by-products, or residues generated, resulting, or produced therefrom. Tenant shall cause Tenant and the Tenant Parties to comply with all Environmental Laws and shall not allow or permit the Land or the Building to become contaminated with any Hazardous Materials. Tenant shall immediately give Landlord a copy of any statement, report, notice, registration, application, permit, license, claim, action, or proceeding given to, or received from, any governmental authority or private party, or persons occupying the Premises concerning the presence, spill, release, discharge of, or exposure to, any Hazardous Materials or contamination in, on, or about the Premises or the improvements or the soil or groundwater thereunder. At all times, Landlord shall have the right to enter upon and inspect the Premises and to conduct tests, monitoring and investigations. If such tests indicate the presence of any Environmental Condition caused or exacerbated by Tenant or any Tenant Party or arising during Tenant's or any Tenant Party's occupancy (and not clearly caused by Landlord), Tenant shall reimburse Landlord for the cost of conducting such tests. The phrase "Environmental Condition" shall mean any adverse condition relating to any Hazardous Materials or the environment, including surface water, groundwater, drinking water supply, land, surface or subsurface strata or the ambient air and includes air, land and water pollutants, noise, vibration, light and odors. In the event of the existence of any such Environmental Condition, Tenant shall promptly notify both the property manager and the Landlord and shall promptly take any and all steps necessary to rectify the same to the satisfaction of the applicable agencies and Landlord, or shall, at Landlord's election, reimburse Landlord, upon demand, for the cost to Landlord of performing work. The reimbursement shall be paid to Landlord in advance of Landlord's performing such work, based upon Landlord's reasonable estimate of the cost thereof; and upon completion of such work by Landlord, Tenant shall pay to Landlord any shortfall promptly after receipt of Landlord's bills therefor or Landlord shall promptly refund to Tenant any excess deposit, as the case may be. Notwithstanding anything to the contrary in this Section 12.1, Tenant shall not be liable to Landlord for the existence of any Hazardous Materials or Environmental Condition which are in or on the Premises prior to the Commencement Date provided, however, that such limitation on liability shall not apply if there is a release of any such Hazardous Materials that is caused or exacerbated by Tenant or its agents, employees, contractors, subtenants, assignees, invitees, or other similar parties.

12.2    Indemnification. Tenant shall indemnify, protect, defend (by counsel acceptable to Landlord) and hold harmless Landlord and each Indemnitee from and against any and all claims, demands, judgments, settlements, causes of action, damages, penalties, fines, encumbrances, liens, taxes, costs, liabilities, losses and expenses (including, all costs, attorneys' fees, expenses, and court costs) arising at any time from and after the date of execution hereof as a result (directly or indirectly) of or in connection with (1) Tenant's and/or any Tenant Party's breach of this Section 12 or any Environmental Law, or (2) an Environmental Condition and/or the presence of Hazardous Materials on, under or about the Premises or other property as a result (directly or indirectly) of Tenant's and/or any Tenant Party's activities, or failure to act, in connection with the Premises. Landlord reserves the right to retain counsel for its defense, in which case Tenant shall be responsible for the cost of such defense. This indemnity shall include, without limitation, the cost of any required, desirable, or necessary repair, cleanup or detoxification, and the preparation and implementation of any closure, monitoring or other required plans, whether such action is required, desirable, or necessary prior to or following the termination of this Lease. Neither the written consent by Landlord to the presence of Hazardous Materials on, under or about the Premises, nor the strict compliance by Tenant with all Environmental Laws, shall excuse Tenant from Tenant's obligation of indemnification pursuant hereto. Tenant's obligations pursuant to the foregoing indemnity shall survive the expiration or termination of this Lease.

12.3    Mold Prevention. Tenant acknowledges the necessity of housekeeping, ventilation, and moisture control (especially in kitchens, janitor's closets, bathrooms, break rooms, and around outside walls) for mold prevention. Tenant agrees to notify Landlord promptly if it observes mold/mildew and/or moisture conditions (from any source, including leaks), and allow Landlord to evaluate and make recommendations and/or, in spite of having no obligation whatsoever to do so under this Lease, take appropriate corrective action. Tenant waives any claim against Landlord from any liability for and bodily injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the Premises. Execution of this Lease constitutes acknowledgement by Tenant that control of moisture and mold prevention in the Premises are integral to its Lease obligations.

12.4    Industrial Site Recovery Act Compliance. Tenant shall, at Tenant's sole cost and expense, comply with the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. and the regulations promulgated thereunder ("ISRA"), if and to the extent Tenant's use is an industrial establishment, as such term is defined in ISRA and as set forth below. Tenant represents and warrants to Landlord that Tenant's NAICS code as set forth in the Basic Information Section of the Lease is accurate; Tenant shall not change its NAICS code or the use of the Premises to any NAICS code that would constitute an industrial establishment under ISRA without Landlord's prior written consent. Tenant shall, at Tenant's sole cost and expense, make all submissions to, provide all information to, and comply with all requirements of, the New Jersey Department of Environmental Protection ("NJDEP"). If any spill or discharge of Hazardous Materials occurs during the Term and is caused directly or indirectly by Tenant or any of the Tenant Parties, then Tenant shall, at Tenant's sole cost and expense, hire a Licensed Site Remediation Professional ("LSRP") and conduct a full investigation and remediation pursuant to all applicable Environmental Laws. Such remediation shall be in accordance with the NJDEP requirements for the use of the Property and Tenant's remediation may not preclude or prohibit the continued use of the Property and Premises for industrial and warehouse purposes. Tenant's obligations under this Section shall also arise if there is any closing, terminating or transferring of operations by any person or entity of an industrial establishment at the Property pursuant to ISRA, including without limitation a sale, transfer or conveyance of the Property by Landlord; a closure, termination or transfer by a subtenant; or an assignment or subletting by Tenant. At no expense to Landlord, Tenant shall promptly

provide all information requested by Landlord for preparation of affidavits required by law and shall promptly sign such affidavits when requested by Landlord.

12.5    Forklift Usage. For the avoidance of doubt, Landlord acknowledges and agrees that, subject to the other terms and conditions of this Lease, Tenant shall be entitled to use forklifts in connection with Tenant's ordinary course of operation at the Premises; provided, however, that if Tenant desires to use forklifts which are powered by any type of Hazardous Material, then (i) any such usage shall be undertaken in full compliance with Applicable Law, (ii) Tenant shall follow the standards established by the National Fire Protection Agency, and best practices for the detection, minimization, and mitigation of any release of Hazardous Materials which may occur as a result thereof, which may require, without limitation, the use of bollards and other segregation devices/installations, secondary containment, and other similar preventative measures, (iii) Tenant shall be required to obtain the prior written consent for the storage of such Hazardous Materials at the Premises in connection therewith, and (iv) Tenant shall follow any such additional requirements as Landlord may deem appropriate or advisable. For the avoidance of doubt, the preceding carveout is not to be deemed as a consent to the use of any specific Hazardous Materials or an acknowledgment that any release of Hazardous Materials is permitted or otherwise acceptable to Landlord.

13.    DAMAGE AND DESTRUCTION. If at any time during the Term the Premises are damaged by a fire or other casualty such that Tenant may not continue operations in the Building, Landlord shall notify Tenant within sixty (60) days after Landlord becomes aware of such damage as to the amount of time Landlord reasonably estimates it will take to substantially complete a restoration of the Premises. If the restoration time is estimated to exceed nine (9) months from the issuance of all permits, Landlord or Tenant may elect to terminate this Lease provided that, with respect to Tenant's termination option, such termination shall be Tenant's sole remedy and such termination notice must be delivered to Landlord on or before thirty (30) days after receipt of Landlord's notice describing the estimated restoration time. If neither party elects to terminate this Lease as provided above or if Landlord estimates that restoration will take nine (9) months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly commence to materially restore the Premises, excluding the improvements installed by, or on behalf of, Tenant, subject to delays arising from the collection of insurance proceeds, Force Majeure events, and any Tenant caused delay. If this Lease is not terminated by Landlord or Tenant in accordance with this section, Tenant shall be responsible for and shall pay to Landlord Tenant's Share of any deductible or retention amount payable under the property insurance for the Building following any such casualty, subject to the limitations set forth in Section 8.1 hereof. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last year of the Term and Landlord reasonably estimates that it will take more than three (3) months to repair such damage. Base Rent and Operating Expenses shall be abated for the period of repair and restoration commencing on the date of such casualty event until the date Landlord tenders possession of the Premises (or the affected portion thereof) back to Tenant as repaired or restored, in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate this Lease by reason of damage or casualty loss.

14.    CONDEMNATION. If any part of the Premises, the Building, or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking could be reasonably expected to materially interfere with or impair Landlord's ownership or operation of the Project (as determined by Landlord), then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. In the event more than twenty-five percent (25%) of the square footage of the Premises is involved in a Taking as described in this Section 14, and if the Taking, in Tenant's reasonable judgment, would materially interfere with or impair Tenant's operations at the Premises, then Tenant shall have the right to terminate this Lease by giving written notice of termination to Landlord within fifteen (15) days of such Taking. If part of the Premises or the Building shall be Taken and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Term shall be reduced to such extent as Landlord reasonably determines under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures.

15.    DEFAULT

15.1    Events of Default. The occurrence of any of the following events shall, at Landlord's option, constitute an "Event of Default":

15.1.1    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of five (5) days from the date Landlord provides written notice to Tenant that such payment is past due; provided, however, that Landlord shall not be required to provide Tenant with any further written notice of Tenant's delinquency if Tenant has been delinquent on more than two (2) occasions during the Term of the Lease (and in such event, Landlord may declare an Event of Default hereunder if Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due and such failure shall continue for a period of five (5) days from the date such payment was due).

15.1.2   Tenant or any guarantor or surety of Tenant's obligations hereunder shall (1) make a general assignment for the benefit of creditors; (2) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively, a "Proceeding for Relief"); (3) become the subject of any Proceeding for Relief which is not dismissed within sixty (60) days of its filing or entry; or (4) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

15.1.3   Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

15.1.4   Tenant shall not occupy or shall vacate the Premises whether or not Tenant is in monetary or other default under this Lease.  Tenant's vacating of the Premises shall not constitute an Event of Default if, prior to vacating the Premises, Tenant has made arrangements reasonably acceptable to Landlord to (1) ensure that Tenant's insurance for the Premises will not be voided or cancelled with respect to the Premises as a result of such vacancy, (2) ensure that the Premises are secured and not subject to vandalism, (3) ensure that the Premises will be properly maintained after such vacation, including, but not limited to, keeping the heating, ventilation and cooling systems maintenance contracts required by this Lease in full force and effect, and (4) satisfy such other requirements as Landlord may require.  During any such period of vacation, Tenant shall inspect the Premises at least once each month and report monthly in writing to Landlord on the condition of the Premises.

15.1.5   Tenant shall attempt or there shall occur any Transfer (as hereinafter defined) except as otherwise permitted in this Lease.

15.1.6   Tenant shall fail to discharge (or insure and/or bond over to the satisfaction of Landlord in its sole and absolute discretion) any lien placed upon the Premises as a result of any labor performed, supplies furnished and services rendered for or at the request of Tenant (regardless of the validity of such lien) in violation of Section 10.3 of this Lease.

15.1.7   Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 15.1, and except as otherwise expressly provided herein, such default shall continue for more than thirty (30) days after Landlord shall have given Tenant written notice of such default; provided, however, that such thirty (30) day period shall automatically be extended if Tenant has made diligent efforts to cure such default within the thirty (30) day period and thereafter proceeds continuously and diligently to cure such default within a commercially reasonable time not to exceed sixty (60) days in total from the date of such default (or such longer period as Landlord may permit in its sole discretion).

15.2   Landlord's Remedies.

15.2.1   Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election: (1) terminate this Lease or Tenant's right of possession (but Tenant shall remain liable as hereinafter provided), (2) cure such default at Tenant's sole expense, and/or (3) pursue any other remedies at law or in equity.  No right or remedy conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing by agreement, Applicable Law, or in equity.  Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom.  If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, at Tenant's risk of loss and sole costs and expense, all of the furniture, fixtures and equipment at the Premises.

15.2.2   If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: all Base Rent and all other amounts accrued hereunder to the date of such termination; the cost of reletting the whole or any part of the Premises, including without limitation brokerage fees and/or leasing commissions incurred by Landlord, and costs of removing and storing Tenant's or any other occupant's property, repairing, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and the excess of the then present value of the Base Rent and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease, over the present value of any net amounts which Tenant establishes Landlord can reasonably expect to recover by reletting the Premises for such period, taking into consideration the availability of acceptable tenants and other market conditions affecting leasing.  Such present values shall be calculated at a discount rate equal to the ninety (90)-day U.S. Treasury bill rate at the date of such termination.

15.2.3   If Landlord terminates Tenant's right of possession (but not this Lease), Landlord may, but shall be under no obligation to, relet the Premises for the account of Tenant for such rent and upon such terms as shall be satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant.  For the purpose of such reletting Landlord is authorized, at Tenant's sole cost and expense, to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems

-15-

reasonably necessary or desirable. If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the rental reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including attorneys' fees and costs of suit), the unpaid Base Rent and other amounts accrued hereunder at the time of repossession, and the costs incurred in any attempt by Landlord to relet the Premises. If the Premises are relet and a sufficient sum shall not be realized from such reletting (after first deducting therefrom, for retention by Landlord, the unpaid Base Rent and other amounts accrued hereunder at the time of reletting, the cost of recovering possession (including attorneys' fees and costs of suit), all of the costs and expense of repairs, changes, alterations, and additions, the expense of such reletting (including without limitation brokerage fees and leasing commissions) and the cost of collection of the rent accruing therefrom) to satisfy the rent provided for in this Lease to be paid, then Tenant shall immediately satisfy and pay any such deficiency. Any such payments due Landlord shall be made upon demand therefor from time to time and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

15.2.4     If Landlord elects to cure such default by Tenant, Landlord may, at Landlord's option, enter into and upon the Premises and correct the same without being deemed in any manner guilty of trespass, eviction or forcible entry and detainer and without incurring any liability for any damage or interruption of Tenant's business resulting therefrom and Tenant agrees to pay Landlord an amount equal to one hundred ten percent (110%) of any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease.

15.2.5     Exercise by Landlord of any one (1) or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one (1) or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

16.     ASSIGNMENT AND SUBLETTING.

16.1     Assignment and Subletting. Tenant shall not assign, sublet, license, or otherwise transfer ("Transfer"), whether voluntarily or involuntarily or by operation of law, the Premises or any part thereof without Landlord's prior written approval, which shall not be unreasonably withheld; provided, however, Tenant agrees it shall be reasonable for Landlord to disapprove of a requested Transfer if (a) the financial condition of the proposed subtenant, assignee, or transferee is not satisfactory to Landlord, (b) the subtenant, assignee, or transferee desires to change the use within the Premises, or (c) the subtenant, assignee, or transferee is a governmental or quasi-governmental party or any party by whom any suit or action could be defended on the ground of sovereign immunity or diplomatic immunity. A "Transfer" shall be deemed to include any of the following: (i) the merger of Tenant with any other entity, (ii) the transfer of any direct or indirect controlling or managing ownership or beneficial interests in Tenant, or (iii) the assignment or transfer of a substantial portion of the assets of Tenant, whether or not located at the Premises; provided, however, that notwithstanding the foregoing, a "Transfer" shall not be deemed to include, and Landlord consent shall not be required in connection with, an individual transfer of a direct membership unit in Tenant so long as (w) no more than ten percent (10%) of the direct membership units in Tenant are transferred in any given calendar year, (x) such transfers, individually or in the aggregate, do not result in a change of control of Tenant, (y) any such transfers are not principally for the purpose of transferring Tenant's leasehold estate, and (z) any such transfers do not adversely affect the legal existence of the Tenant hereunder. If Tenant desires to undertake a Transfer, Tenant shall give Landlord prior written notice thereof with copies of all related documents and agreements associated with the Transfer, including without limitation, the financial statements of any proposed assignee, subtenant, or transferee, at least forty-five (45) days prior to the anticipated effective date of the Transfer. Tenant shall pay Landlord's reasonable attorneys' and financial consultant's fees incurred in the review of such documentation whether or not a Transfer is consummated or approval is granted. Where Landlord consent is required hereunder, Landlord shall have a period of fifteen (15) business days following receipt of such notice and all related documents and agreements to notify Tenant in writing of Landlord's approval or disapproval of the proposed Transfer. If Landlord fails to notify Tenant in writing of such election, Landlord shall be deemed to have disapproved such Transfer. This Lease may not be assigned by operation of law. Any purported assignment or subletting contrary to the provisions hereof shall be void and shall constitute an Event of Default hereunder.

16.2     If consent to a Transfer is required by Tenant and such Transfer is for substantially the remainder of the Term, Landlord may, at its option, terminate this Lease (or in the case of a partial sublease, terminate this

Lease with respect to the portion of the Premises proposed to be subject to the sublease) by giving written notice to Tenant within such thirty (30) day review period set forth in the preceding subsection. If Tenant receives rent or other consideration for any such transfer in excess of the Rent, or in the case of a sublease of a portion of the Premises, in excess of such Rent that is fairly allocable to such portion, after appropriate adjustments to assure that all other payments required hereunder are appropriately taken into account, Tenant shall pay Landlord sixty percent (60%) of the difference between each such payment of rent or other consideration and the Rent required hereunder, after Tenant's recovery of its actual and reasonable attorney's fees, brokerage commissions and improvement allowances or improvement costs incurred directly in connection with such assignment or subletting. Tenant shall continue to be liable as a principal and not as a guarantor or surety to the same extent as though no assignment had been made. No permitted assignment shall be effective until there has been delivered to Landlord a counterpart of the assignment instrument in which the assignee agrees to be and remain jointly and severally liable with Tenant for the payment of Rent pertaining to the Premises and for the performance of all of the terms and provisions of this Lease relating thereto arising on or after the date of the Transfer. Notwithstanding anything to the contrary herein or otherwise, Tenant shall not collaterally assign, mortgage, pledge, hypothecate or otherwise encumber this Lease or any of Tenant's rights hereunder without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion.

17.    ESTOPPEL, ATTORNMENT AND SUBORDINATION

17.1    Estoppel. Within ten (10) days after written request by Landlord, Tenant shall deliver an estoppel certificate duly executed (and acknowledged, if required by any lender or by Landlord), in the form attached hereto as Exhibit G (with such modifications as Tenant deems necessary for such statements therein to be true and accurate at such time), or in such other form as may be acceptable to any such lender, which form may include some or all of the provisions contained in Exhibit G, to any proposed lender, ground lessee, purchaser or Landlord. Tenant's failure to deliver said statement in such time period shall be an Event of Default hereunder and shall be conclusive upon Tenant that (1) this Lease is in full force and effect, without modification except as may be represented by Landlord; (2) there are no uncured defaults in Landlord's performance and Tenant has no right of offset, counterclaim or deduction against Rent hereunder; and (3) no more than one month's Base Rent has been paid in advance. If any financier should require that this Lease be amended (other than in the description of the Premises, the Term, the Permitted Use, the Rent or as will substantially, materially or adversely affect the rights of Tenant), Landlord shall give written notice thereof to Tenant, which notice shall be accompanied by a Lease supplement embodying such amendments. Tenant shall, within ten (10) days after the receipt of Landlord's notice, execute and deliver to Landlord the tendered Lease supplement.

17.2    Subordination. This Lease shall unconditionally be and at all times remain subject and subordinate to all ground leases, master leases and all mortgages and deeds of trust which now or hereafter affect the Premises or the Project or Landlord's interest therein (including any modifications, renewals or extensions thereof and all amendments thereto), all without the necessity of Tenant's executing further instruments to effect such subordination. If requested, Tenant shall execute and deliver to Landlord within ten (10) days after Landlord's request whatever documentation that may reasonably be required to further effect the provisions of this paragraph including a Subordination, Nondisturbance and Attornment Agreement ("SNDA") in the form required by the applicable lender. Notwithstanding anything contained in this Lease to the contrary, (1) the obligation for commissions under Section 18.7 shall not be binding on, and will not be enforceable against, any of Landlord's lenders or any party that holds a mortgage or other security interest in the Property, and (2) such commission obligation shall be unconditionally subordinate to the lien of any mortgage or other security interest in the Property, and any commissions otherwise payable under this Lease shall not be due or payable after an event of default under any such mortgage or other security interest. Notwithstanding anything to the contrary contained in this Section 17.2, the holder of any such mortgage may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of executing, delivery or recording and in the event such holder shall have the same rights with respect to this Lease as though this Lease has been executed prior to the executing, delivery and recording of such mortgage and had been assigned to such holder.

17.3    Attornment. Tenant hereby agrees that Tenant will recognize as its landlord under this Lease and shall attorn to any person succeeding to the interest of Landlord in respect of the land and the buildings governed by this Lease upon any foreclosure of any mortgage or deed of trust upon such land or buildings or upon the execution of any deed in lieu of foreclosure in respect to such deed of trust. Tenant shall pay all rental payments required to be made pursuant to the terms of this Lease for the duration of the term of this Lease. Tenant's attornment shall be effective and self-operative without the execution of any further instrument immediately upon Landlord's lender succeeding Landlord's interest in this Lease and giving written notice thereof to Tenant. If requested, Tenant shall execute and deliver an instrument or instruments confirming its attornment as provided for herein; provided, however, that no such beneficiary or successor- in-interest shall be bound by any payment of Base Rent for more than one (1) month in advance, or any amendment or modification of this Lease made without the express written consent of such beneficiary where such consent is required under applicable loan documents. Landlord's lender shall not be liable for, nor subject to, any offsets or defenses which Tenant may have by reason of any act or omission of Landlord under this Lease, nor for the return of any sums which Tenant may have paid to Landlord under this Lease as and for security deposits, advance rentals or otherwise, except to the extent that such sums are actually delivered by Landlord to Landlord's lender. If Landlord's lender, by succeeding to the interest of Landlord under this Lease, should become obligated to perform the covenants of Landlord hereunder, then, upon, any further transfer of Landlord's interest by Landlord's lender, all such obligations shall terminate as to Landlord's lender.

18.    MISCELLANEOUS

18.1    General.

18.1.1  Entire Agreement.  This Lease, Addenda, Exhibits and Schedules set forth all the agreements between Landlord and Tenant concerning the Premises; and there are no agreements either oral or written other than as set forth herein.

18.1.2  Time of Essence.  Time is of the essence of this Lease.  For all purposes herein, a "Business Day" shall be defined to mean any day other than a Saturday or Sunday or other day on which commercial banks are authorized by Applicable Law to be closed in New Jersey.

18.1.3  Attorneys' Fees; Jury Trial Waiver.  In any dispute arising out of the terms and conditions of this Lease or in any action or proceeding which either party brings against the other to enforce its rights hereunder, the non-prevailing party shall pay all costs incurred by the prevailing party, including reasonable attorneys' fees and costs.  Any judgment or order entered in any final judgment may contain a specific provision providing for the recovery of all costs and expenses of suit, including reasonable attorneys' fees (collectively "Costs") incurred in enforcing, perfecting and executing such judgment.  For the purposes of this paragraph, Costs shall include, without limitation, attorneys' fees, costs and expenses incurred in (1) post-judgment motions, (2) contempt proceeding, (3) garnishment, levy, and debtor and third party examination, (4) discovery, and (5) bankruptcy litigation.  LANDLORD AND TENANT ALSO EACH HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE.

18.1.4  Severability.  If any provision of this Lease or the application of any such provision shall be held by a court of competent jurisdiction to be invalid, void or unenforceable to any extent, the remaining provisions of this Lease and the application thereof shall remain in full force and effect and shall not be affected, impaired or invalidated.

18.1.5  Law.  This Lease shall be construed and enforced in accordance with the laws of the state in which the Premises are located.

18.1.6  No Option.  Submission of this Lease to Tenant for examination or negotiation does not constitute an option to lease, offer to lease or a reservation of, or option for, the Premises; and this document shall become effective and binding only upon the execution and delivery hereof by Landlord and Tenant.

18.1.7  Successors and Assigns.  This Lease shall be binding upon and inure to the benefit of the successors and assigns of Landlord and, subject to compliance with the terms of Section 16, Tenant.

18.1.8  Third Party Beneficiaries.  Nothing herein is intended to create any third party beneficiary.

18.1.9  Memorandum of Lease.  Tenant shall not record this Lease or a short form memorandum hereof.

18.1.10  Agency, Partnership or Joint Venture.  Nothing contained herein nor any acts of the parties hereto shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture by the parties hereto or any relationship other than the relationship of landlord and tenant.

18.1.11  Merger.  The voluntary or other surrender of this Lease by Tenant or a mutual cancellation thereof or a termination by Landlord shall not work a merger and shall, at the option of Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such subtenancies.

18.1.12  Headings.  Section headings have been inserted solely as a matter of convenience and are not intended to define or limit the scope of any of the provisions contained therein.

18.1.13  Security Measures.  Tenant hereby acknowledges that Landlord shall have no obligation to provide a guard service or other security measures whatsoever.  Tenant assumes all responsibility for the protection of the Premises, Tenant, and any Tenant Party, and their respective property from third parties or otherwise.

18.1.14  No Press Release.  Any press release or other similar public statement regarding Tenant's occupancy of the Premises or this Lease shall require the prior written approval of Landlord.

18.1.15  Reserved.

18.1.16  Survival.  All obligations of Tenant under this Lease not fully performed as of the expiration or earlier termination of the Term shall survive the expiration or earlier termination of the Term.

18.1.17  Quiet Use and Enjoyment.  If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

18.2  Signs.  All signs and graphics of every kind which Tenant desires to install at the Building, the Common Areas, or the exterior of the Premises and which are visible in or from public view or corridors, the

-18-

Common Areas or the exterior of the Premises (whether located inside or outside of the Premises) shall be subject to Landlord's prior written approval (not to be unreasonably withheld) and shall be subject to the CC&Rs, the Rules and Regulations, and any applicable governmental laws, ordinances, and regulations and in compliance with Landlord's signage program (if any). Tenant, at its sole cost and expense, shall remove all signs installed by, or on behalf of, Tenant prior to the termination of this Lease and such installations and removals shall be made in such manner as to avoid injury or defacement of the Premises. In furtherance of Section 18.9.2, Tenant shall repair any damage, injury, or defacement, including without limitation, discoloration caused by such installation or removal.

18.3     Waiver.  No waiver of any default or breach hereunder shall be implied from any omission to take action on account thereof, notwithstanding any custom and practice or course of dealing.  No waiver by either party of any provision under this Lease shall be effective unless in writing and signed by such party.  No waiver shall affect any default other than the default specified in the waiver and then such waiver shall be operative only for the time and to the extent therein stated.  Waivers of any covenant shall not be construed as a waiver of any subsequent breach of the same.

18.4     Financial Statements.  Tenant shall provide, and cause each Guarantor, if applicable, to provide, no more than twice in any calendar year, to any lender, any purchaser of the Building, the Land, and/or the Project, or Landlord or its affiliates or property manager, within ten (10) business days after request, a current, accurate, audited financial statement for Tenant and Guarantor and Tenant's and Guarantor's business and financial statements for Tenant and Guarantor and Tenant's and Guarantor's respective business for each of the three (3) years prior to the current financial statement year prepared under generally accepted accounting principles consistently applied and certified by an officer of the Tenant and Guarantor as being true and correct.  Tenant shall also provide, or cause Guarantor to provide, within said ten (10) business day period such other financial information or tax returns as may be reasonably required by Landlord, any purchaser of the Building, the Land, and/or the Project or any lender of any of the foregoing.  Tenant hereby authorizes Landlord to obtain one (1) or more credit reports on Tenant and/or Guarantor at any time, and shall execute such further authorizations as Landlord may reasonably require in order to obtain a credit report.

18.5     Limitation of Liability.  The obligations of Landlord under this Lease are not personal obligations of the individual partners, members, managers, directors, officers, trustees, investment managers, shareholders, agents, or employees of Landlord.  Tenant shall look solely to Landlord's interest in the Building for satisfaction of any liability of Landlord and shall not look to other assets of Landlord nor seek recourse against the assets of the individual partners, members, managers, directors, officers, trustees, investment managers, shareholders, agents, or employees of Landlord.  Whenever Landlord transfers its interest, Landlord shall be automatically released from further performance under this Lease and from all further liabilities and expenses hereunder and the transferee of Landlord's interest shall assume all liabilities and obligations of Landlord hereunder from the date of such transfer.

18.6     Notices.  All notices to be given hereunder shall be in writing and mailed postage prepaid by certified or registered mail, return receipt requested, or delivered by personal or courier delivery (such as FedEx, UPS, or similar courier service), to Landlord's Address and Tenant's Address, or to such other place as Landlord or Tenant may designate in a written notice given to the other party.  Notices shall be deemed served upon the first attempted delivery by the U.S. Postal Service, the courier, or a recognized delivery service prior to 5 p.m. central time on any Business Day, or, if after 5 p.m. central time, on the next Business Day.

18.7     Brokerage Commission.  Tenant warrants to Landlord that Tenant's sole contact with Landlord or with the Premises in connection with this transaction has been directly with Landlord, Landlord's Broker and Tenant's Broker specified in the Basic Lease Information, and that no other broker or finder can properly claim a right to a commission or a finder's fee based upon contacts between the claimant and Tenant.  Tenant represents that it has an exclusive brokerage agreement with NAI James E. Hanson for properties located in the State of New Jersey.  Landlord's lenders are not liable for or responsible for any commissions payable under this Lease.  Subject to the foregoing, Tenant agrees to indemnify and hold Landlord harmless from any claims or liability, including reasonable attorneys' fees, in connection with a claim by any person for a real estate broker's commission, finder's fee, or other compensation based upon any statement, representation or agreement of, or claim by or through, Tenant.

18.8     Authorization.  Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Premises is located, that the entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the entity were authorized to do so by appropriate actions.  If requested by Landlord, Tenant agrees to deliver to Landlord, simultaneously with the delivery of this Lease, a corporate resolution, proof of due authorization by partners, opinion of counsel or other appropriate documentation reasonably acceptable to Landlord evidencing the due authorization of Tenant to enter into this Lease.

18.9     Holding Over; Surrender.

18.9.1     Holding Over.  If Tenant holds over the Premises or any part thereof after the expiration or earlier termination of the Lease, such holding over shall, at Landlord's option, constitute a month-to-month tenancy, at a rent equal to two hundred percent (200%) of the Rent in effect immediately prior to such holding over and shall otherwise be on all the other terms and conditions of this Lease.  This section shall not be construed as Landlord's permission for Tenant to hold over and Landlord shall have the right to immediately terminate any continued possession of the Premises by Tenant at any time upon such holding over.  Acceptance of Rent by Landlord following expiration or termination shall not constitute a renewal of this Lease or extension of the Term except as specifically set forth above.  If Tenant fails to surrender the Premises upon expiration or earlier termination of this Lease, Tenant shall be liable for any and all damages and hereby indemnifies and holds Landlord harmless from and against all loss or liability resulting from or arising out of Tenant's failure to surrender the

-19-

Premises, including, but not limited to, any amounts required to be paid to any tenant or prospective tenant who was to have occupied the Premises after the expiration or earlier termination of this Lease and any related attorneys' fees and brokerage commissions.

18.9.2    Surrender.  On or before the expiration or earlier termination of this Lease, Tenant shall surrender the Premises, together with all keys and security codes, to Landlord in accordance with the move-out procedures set forth in Exhibit H attached hereto and in broom clean condition and in as good a condition as when received, ordinary wear and tear and damage by fire or casualty excepted, such obligation to expressly include repairing any damage to and restoring the condition of the Premises in accordance with Section 10.2. Conditions existing because of Tenant's failure to perform maintenance, repairs or replacements shall not be deemed "reasonable wear and tear." Tenant shall also remove all of Tenant's Property and shall repair all damage to the Premises, the Building, the Common Area, and the Project caused by the installation or removal of Tenant's Property or in any way in connection with the surrender of the Premises. Such repairs or restoration shall include, without limitation, the repair, patching, and filling of all holes in the floors, walls roof, and other improvements within or without the Premises and all penetrations of the roof shall be resealed to a water tight condition. In no event shall Tenant remove from the Building any mechanical or electrical systems or any wiring or any other aspect of any systems within the Premises, unless Landlord specifically permits such removal in writing.

18.10    Joint and Several.  If Tenant consists of more than one person, the obligation of all such persons shall be joint and several.

18.11    Covenants and Conditions.  Each provision to be performed by Tenant hereunder shall be deemed to be both a covenant and a condition.

18.12    Consents.  Except as otherwise provided elsewhere in this Lease, Landlord's actual reasonable costs and expenses (including, but not limited to, architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Tenant for any Landlord consent, including but not limited to, consents to a Transfer or the presence or use of a Hazardous Material, shall be paid by Tenant upon receipt of an invoice and supporting documentation therefor.

18.13    Force Majeure.  "Force Majeure" as used in this Lease means delays resulting from causes beyond the reasonable control of Landlord, including, without limitation, any delay caused by any action, inaction, order, ruling, moratorium, regulation, statute, condition or other decision of any private party or governmental agency having jurisdiction over any portion of the Project, over the construction anticipated to occur thereon or over any uses thereof, or by delays in inspections or in issuing approvals by private parties or permits by governmental agencies, or by fire, flood, inclement weather, strikes, lockouts or other labor or industrial disturbance , failure or inability to secure materials, supplies or labor through ordinary sources, earthquake, or other natural disaster, or any cause whatsoever beyond the reasonable control (excluding financial inability) of the Landlord, or any of its contractors or other representatives, whether or not similar to any of the causes hereinabove stated.

18.14    Mortgagee Protection.  Tenant agrees to give any holder of any mortgage or deed of trust secured by the Premises or the Project, by registered or certified mail or nationally recognized overnight delivery service, a copy of any notice of default served upon the Landlord by Tenant concurrently with delivery to Landlord, provided that, prior to such notice, Tenant has been notified in writing (by way of service on Tenant of a copy of assignment of rents and leases or otherwise) of the address of such holder of a mortgage or deed of trust. Tenant further agrees that if Landlord shall have failed to cure such default within thirty (30) days after such notice to Landlord (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if Landlord has commenced within such thirty (30) day period and is diligently pursuing the remedies or steps necessary to cure or correct such default), then the holder of any mortgage or deed of trust shall have an additional sixty (60) days within which to cure or correct such default (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if such holder of any mortgage or deed of trust has commenced within such sixty (60) day period and is diligently pursuing the remedies or steps necessary to cure or correct such default). Notwithstanding the foregoing, in no event shall any holder of any mortgage or deed of trust have any obligation to cure any default of the Landlord.

18.15    OFAC.  Tenant hereby represents and warrants that, to the best of its knowledge, Tenant is not, nor any persons or entities holding any legal or beneficial interest whatsoever in such party, are (1) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("OFAC"); (2) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (3) named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons." If the foregoing representation is untrue at any time during the Term, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

18.16    Roof Use by Landlord.  Landlord reserves the right to use the surface of the roof in any manner which does not materially interfere with Tenant's use of the Premises including, but not limited to, installation of telecommunication equipment, solar equipment or any other uses.

18.17    Reserved.

18.18    Parking and Common Areas.  Unless otherwise directed by Landlord, Tenant shall be entitled to the non-exclusive use of the Common Areas of the Building and the Project as they exist from time to time during

the Term, including the right to park in common with other tenants of the Project (including the trailer storage area) in up to the Maximum Parking Spaces identified in the Basic Lease Information (if none listed, then Tenant's Share of the parking spaces exclusively serving the Building) in those areas designated by Landlord for nonreserved parking. Tenant agrees not to overburden the parking facilities and agrees to cooperate with Landlord and other tenants in the use of parking facilities. Landlord may, but is not obligated to, designate exclusive parking spaces for Tenant and other tenants in the Project if Landlord reasonably determines that such designation is necessary or desirable. In furtherance of the foregoing, Tenant shall be entitled to the exclusive use of (a) all of the vehicular parking spaces in the portion of the Common Area identified as the Exclusive Parking Area shown on Exhibit A-1 attached hereto (the "Exclusive Parking Area") for the purpose of parking of standard vehicles, and (b) the twenty (20) trailer parking spaces in the portion of the Common Area identified as the Trailer Storage Area shown on Exhibit A-1 attached hereto (the "Trailer Storage Area") for the limited purpose of storing tractor trailers in connection with Tenant's operations at the Premises, in each case subject to (i) Landlord's right to adjust the location and size of the Exclusive Parking Area and/or Trailer Storage Area in its reasonable discretion for any reason, and (ii) adjustment or proportional reduction by Landlord in its reasonable discretion in connection with any casualty or condemnation event (including a Taking). In addition, Tenant shall be entitled to use any loading dock positions exclusively serving the Premises for the temporary parking of operable vehicles at such positions for deliveries in the ordinary course of Tenant's business, subject, however, subject to (A) Tenant's obligation to be in full compliance with Applicable Law in all respects, (B) the obligation that such use does not limit or otherwise impair or interfere with the rights of any other tenants at the Project, and (C) the express prohibition on Tenant exercising such right for storage or other non-parking purposes. In all cases, Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. Landlord's rights regarding the Common Areas include, but are not limited to, the right to (1) restrain unauthorized persons from using the Common Areas, (2) temporarily close any portion of the Common Areas, and (3) change the shape and size of the Common Areas, including the addition of, elimination of or change to any improvements located in the Common Areas, provided such change does not have a material adverse impact on Tenant's access to and use of the Premises, the Exclusive Parking Area, and the Trailer Storage Area (except, with respect to the Exclusive Parking Area and Trailer Storage Area, as may be required by any applicable permitting or governmental authority as described herein).

18.19    Common Area. Tenant may, subject to rules prescribed by Landlord, use the following areas on the Land or within the Building ("Building Common Area") that are designated by Landlord to be used in common with Landlord and/or other tenants of the Building: hallways, stairwells, entranceways, restroom facilities, refuse facilities, landscaped areas, driveways necessary for access to the Premises, parking spaces and other common facilities located in the Building and/or on the Land designated by Landlord from time to time for the common use of all tenants of the Building. Tenant may, subject to any CC&Rs and any Rules or Regulations, use the following areas of the Project ("Project Common Area") in common with Landlord, tenants of the Building and/or other owners, tenants or lawful users of the Project: refuse facilities, landscaped areas, roads, driveways necessary for access to the Premises, parking spaces, retention basins and other common facilities designated by Landlord from time to time for the common use of all tenants and owners of the Project. The Building Common Area and the Project Common Area are collectively referred to herein as the "Common Area". Landlord shall not be responsible for non-compliance by any other tenant or occupant of the Project with, or Landlord's failure to enforce, any of the Rules or Regulations or CC&Rs or any other terms or provisions of such tenant's or occupant's lease. Tenant shall promptly comply with the reasonable requirements of any board of fire insurance underwriters or other similar body now or hereafter constituted. Tenant shall not do any act which shall in any way encumber the title of Landlord in and to the Premises, the Building, the Land or the Project.

18.20    Electronic Signatures. Landlord and Tenant each (1) have agreed to permit the use from time to time, where appropriate, of telecopy, electronic mail, or other electronic signatures in order to expedite the transaction contemplated by this Lease, (2) intends to be bound by its respective telecopy electronic mail, or other electronic signature, (3) is aware that the other will rely on the telecopied, electronic mail, or other electronically transmitted signature, and (4) acknowledges such reliance and waives any defenses to the enforcement of this Lease and the documents affecting the transaction contemplated by this Lease based on the fact that a signature was sent by telecopy, electronic mail, or electronic transmission only.

18.21    Roof Equipment. Subject to Landlord's rights set forth in the Lease, Tenant shall, with the express prior written consent of Landlord, have the non-exclusive right to install, maintain, and replace from time to time up to two (2) satellite dishes or similar antennae devices (each a "Satellite Dish" and collectively, the "Satellite Dishes") on the roof of the Premises, subject to the following: (a) compliance with all Applicable Laws, (b) the right of Landlord to supervise any roof penetrations and approve any contractor used in connection with such installations or maintenance, (c) compliance with the conditions of any roof bond or roof warranty maintained by Landlord on the Premises, (d) each Satellite Dish not being visible at street level or being covered by reasonable screening, and (e) Landlord's approval of the location, size, and installation methodology of the Satellite Dish. Tenant shall be responsible for the repair of any damage to any portion of the Building caused by Tenant's installation, use, or removal of the Satellite Dishes. The Satellite Dishes shall remain the exclusive property of Tenant, and Tenant shall remove same at any time during the term of the Lease. Tenant shall protect, defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, liabilities, costs, or expenses of every kind and nature (including without limitation reasonable attorney fees) imposed upon or incurred by or asserted against Landlord arising out of Tenant's installation, maintenance, use, or removal of the Satellite Dishes. Furthermore, Landlord shall have the right, at Tenant's sole cost and expense, to temporarily remove or relocate, or to cause Tenant to temporarily remove or relocate, the Satellite Dishes in connection with Landlord's exercise of its rights hereunder or in connection with the undertaking of any repairs, maintenance, or other obligations set forth herein (including the replacement of the roof).

18.22    Trash Container/Dumpster. Subject to Tenant's compliance with Applicable Law, Tenant shall have the right to install one (1) trash container/dumpster at one of the dock doors/positions which exclusively serves

the Premises, subject, however, to (a) Landlord's prior written approval of the specific location of such trash container/dumpster, such approval not to be unreasonably withheld, and (b) Tenant's compliance with all other obligations set forth in this Lease, including, without limitation, Tenant's general maintenance obligations (including the obligation set forth in Section 9.1 hereof) and the express obligations set forth in the last sentence of Section 1.2 hereof.

IN WITNESS WHEREOF, the parties have executed this Lease as of the date set forth above.

"Landlord"                                              "Tenant"

400 CABOT DRIVE, LLC,                                   DYNAMIC MARKETING, INC.,
a New Jersey limited liability company                  a New York corporation

By: ProLogis Six Rivers Limited Partnership, a
    Delaware series limited partnership, as to its Brazos
    series, its sole member                             By: _____
                                                        Name: _____
By: BRE/LPV Brazos GP LLC, a Delaware limited           Its: _____
    liability company, the general partner of its Brazos
    business

By: Brazos Property Trust, a Maryland real estate
    investment trust, its sole member

By: _____
Name: _____Charles E. Sullivan_____
Its: _____Vice President_____

ADDENDUM 1

## RENEWAL OPTION

Notwithstanding anything to the contrary in the Lease, Tenant shall have one (1) option to renew the Term (the "Renewal Option") on the following terms and conditions:

(a)      Provided that as of the date of the receipt of the Renewal Notice (as hereinafter defined) by Landlord and the Renewal Commencement Date (as hereinafter defined), (i) Tenant is the tenant originally named herein, (ii) Tenant actually occupies all of the Premises initially demised under this Lease and any space added to the Premises, and (iii) no default exists, or would exist but for the passage of time or the giving of notice, or both, then Tenant shall have the right to extend the Term for an additional term of sixty (60) months (the "Renewal Term") commencing on the day following the expiration of the Term (the "Renewal Commencement Date"). Tenant shall give Landlord written notice (the "Renewal Notice") of its election to renew the Term in accordance with the terms hereof at least twelve (12) months, but not more than sixteen (16) months, prior to the scheduled expiration date of the Term.

(b)      The Base Rent payable by Tenant to Landlord during the Renewal Term shall be the greater of (i) the Base Rent applicable to the last year of the Term, and (ii) the then-prevailing market rate for comparable space in comparable buildings in the vicinity of the Property taking into account the size of the Lease, the length of the renewal term, market escalations, and the credit of Tenant. The Base Rent shall not be reduced by reason of any costs or expenses saved by Landlord by reason of Landlord's not having to find a new tenant for such premises (including, without limitation, brokerage commissions, costs of improvements, rent concessions or lost rental income during any vacancy period).

(c)      Landlord shall notify Tenant of its determination of the Base Rent (which shall be made in Landlord's sole discretion) for the Renewal Term, and Tenant shall advise Landlord in writing of any objection within ten (10) days of receipt of Landlord's notice. Failure to respond within the ten (10) day period shall constitute Tenant's rejection of such Base Rent. If Tenant objects, Landlord and Tenant shall commence negotiations to attempt to agree upon the Base Rent for a period of up to thirty (30) days after Landlord's receipt of Tenant's objection notice. If (i) Tenant has rejected (or been deemed to reject) such Base Rent or (ii) the parties cannot agree after Tenant objects, each acting in good faith but without any obligation to agree, on the Base Rent on or before the end of such thirty (30) day period, then Tenant's exercise of the Renewal Option shall be deemed withdrawn and the Lease shall expire or terminate in accordance with its terms.

(d)      The determination of the Base Rent does not reduce the Tenant's obligation to pay or reimburse Landlord for operating expenses, real estate taxes and assessments, and any other reimbursable or chargeable items as set forth in the Lease, and Tenant shall reimburse and pay Landlord as set forth in the Lease with respect to such items with respect to the Premises during the Renewal Term.

(e)      Except for the Base Rent for the Renewal Term as determined above, Tenant's occupancy of the Premises during the Renewal Term shall be on the same terms and conditions as are in effect immediately prior to the expiration of the Term; provided, however, Tenant shall have no further right to any allowances, credits or abatements or any options to expand, contract, renew, terminate or extend the Lease.

(f)      If Tenant does not give the Renewal Notice within the period set forth above, the Renewal Option shall automatically terminate. Time is of the essence as to the giving of the Renewal Notice.

(g)      Landlord shall have no obligation to refurbish or otherwise improve the Premises for the Renewal Term. The Premises shall be tendered on the Renewal Commencement Date in "as-is" condition.

(h)      If the Lease is extended for the Renewal Term, then, promptly after the determination of Base Rent in accordance with the terms of this addendum, Landlord shall prepare and Tenant shall execute an amendment to the Lease confirming the extension of the Term and the other provisions applicable thereto.

(i)      If Tenant exercises its right to extend the term of the Lease for the Renewal Term pursuant to this addendum and the parties execute the amendment, the term "Term" as used in this Lease, shall be construed to include, when practicable, the Renewal Term except as provided in subparagraph (e) above.

## ADDENDUM 2

### EARLY ACCESS

Tenant shall have the right to enter the Premises ("Early Access") during the period from and after September 15, 2013 (the "Early Access Commencement Date") to the day immediately preceding the Commencement Date ("Early Access Period") for the purpose of installing racking systems and low-voltage internet technology equipment/storage of inventory and preparation of the space for the Tenant's operations, subject to the following terms and conditions:

1. Tenant's Early Access shall not constitute occupancy for operation of Tenant's business and shall not trigger the Commencement Date.

2. Tenant's Early Access shall be at Tenant's sole risk and Landlord shall have no liability whatsoever in connection with Tenant's Early Access.

3. Tenant and its agents and contractors shall comply with Section 10 of the Lease and all Applicable Laws during the Early Access Period, including obtaining any approvals, permits, or other authorizations required to perform its work within, and operate at, the Premises during the Early Access Period.

4. Tenant shall comply with and be bound by all provisions of the Lease during the Early Access Period, including the obligation to pay all utilities, but excluding the obligation for payment of Base Rent, Operating Expenses, and Real Property Taxes; provided, however, that Tenant shall (i) have paid to Landlord the amounts required pursuant to Section 3 of the Lease and (ii) deliver to Landlord certificates of insurance for all insurance required to be maintained by Tenant pursuant to Section 8.3.2 of the Lease prior to the commencement of the Early Access Period (and notwithstanding the stated Early Access Commencement Date).

5. Tenant shall not interfere with Landlord or Landlord's contractors completing the Landlord's Work, if any, or any other work within the Premises.

6. Tenant shall indemnify, protect, defend and save Landlord and the Premises harmless from and against any and all liens, liabilities, losses, damages, costs, expenses, demands, actions, causes of action and claims (including, without limitation, attorneys' fees and legal costs) arising out of the Early Access, use, construction, or occupancy of the Premises by Tenant or its agents, employees, contractors, customers, guests, or invitees.

EXHIBIT A

SITE PLAN/PREMISES DEPICTION



EXHIBIT A-1

EXCLUSIVE PARKING AREA AND TRAILER STORAGE AREA



EXHIBIT B-1

WORK LETTER

(a)    **AS-IS Condition.** Tenant shall lease the Premises from Landlord on an "AS-IS" basis, without any representation or warranty of any kind made by Landlord in favor of Tenant and without change or modification thereto of any kind other than the work described in this exhibit.

(b)    **Landlord's Work.** Notwithstanding the foregoing subsection (a), Landlord agrees to perform or cause to be performed that certain construction, repair, maintenance, or those certain improvements to the Premises as specified below (the "Landlord's Work"), without warranty and using Landlord's standard building materials and finishes:

      1.    Upgrade the sprinkler system with the Premises to an ESFR system.

      2.    Extend the existing dolly pads at the dock positions which exclusively serve the Premises.

      3.    Separate the electricity to the Premises so that it is separately metered from the remaining portion of the Building which is not leased by Tenant.

      4.    Complete the replacements to the HVAC System (or limited repairs if agreed to between Landlord and Tenant), as determined by Landlord in its sole and absolute discretion and taking into account energy efficiency as a factor, in order to bring the system to good working order (the "HVAC Project"). Notwithstanding the foregoing, in lieu of replacement, the Landlord and Tenant may agree to limited repairs to the HVAC unit used in connection with the explosion proof charging room at the Premises.

(c)    **Substantial Completion.** Landlord agrees to use commercially reasonable efforts to Substantially Complete (as hereinafter defined) the Landlord's Work by November 1, 2013. The Landlord's Work shall be deemed substantially completed ("Substantially Completed" or "Substantial Completion") when, in the opinion of the construction manager (whether an employee or agent of Landlord or a third party construction manager, the "Construction Manager"), the Landlord's Work are substantially completed except for punch list items which do not prevent in any material way the use of the Premises for the purposes for which they were intended. In the event Tenant, its employees, agents, or contractors cause, directly or indirectly, the construction or completion of the Landlord's Work to be delayed, then the date of Substantial Completion shall be deemed to be the date that, in the opinion of the Construction Manager, Substantial Completion would have occurred if such delays or impairments had not taken place. Without limiting the foregoing, Tenant shall be solely responsible for delays caused by Tenant's request for any changes in the plans, Tenant's request for long lead items, Tenant's failure to provide Landlord with reasonable access to the Premises to undertake the Landlord's Work, and/or Tenant's interference with the construction of the Landlord's Work, and such delays shall not entitle Tenant to any abatement of rent or other rights of any kind. Landlord may, but shall not be obligated to, send Tenant a written notice confirming (i) the date the Landlord's Work are Substantially Completed and (ii) the Commencement Date, and Tenant shall sign and acknowledge any such notice within ten (10) days of receipt thereof. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use.

(d)    **Access.** From and after the Commencement Date, Tenant shall provide Landlord with all necessary access to the Premises, and shall cooperate with Landlord in all respects, to undertake and complete the Landlord's Work, it being understood that Tenant shall not be entitled to any abatement of rent or claims of any kind against Landlord in connection with any inconvenience or accommodations which are required by Landlord, or in connection with any interference with Tenant's business operations or damage to any of Tenant's property, as part of the completion of the Landlord's Work. Tenant, at its sole cost and expense and prior to the commencement of the Landlord's Work, shall promptly remove all personal property, trade fixtures, equipment, office furniture and/or other similar items, if any, as may be required by Landlord for Landlord to undertake and complete the Landlord's Work.

(e)    **HVAC Project Cost Sharing.** Landlord and Tenant shall split the total cost for Landlord to complete the HVAC Project (the "HVAC Project Cost") equally (e.g. Landlord and Tenant shall each be responsible for fifty percent (50%) of the HVAC Project Cost) with both parties to share equally in any credits or incentives which Landlord may obtain in connection with such work. The HVAC Project Cost shall include all of the hard and soft costs of completing such work, including the project management fee incurred by Landlord in connection therewith. Upon Substantial Completion of the HVAC Project, Landlord shall provide Tenant with a statement of the final HVAC Project Cost and Tenant shall reimburse Landlord for Tenant's fifty (50%) share of such final HVAC Project Cost within ten (10) days of demand therefor. For the avoidance of doubt and notwithstanding anything to the contrary in the Lease, Landlord shall not pass through its share of the HVAC Project Cost to Tenant as Operating Expenses.

EXHIBIT B-2

## TENANT'S WORK

(a)      **AS-IS Condition.** Tenant shall lease the Premises from Landlord on an "AS-IS" basis, without any representation or warranty of any kind made by Landlord in favor of Tenant and without change or modification thereto of any kind other than the work described in this exhibit.

(b)      **Tenant's Work.** Notwithstanding the foregoing subsection (a), Landlord shall contribute up to a maximum amount of $495,637.50 (the "Allowance") towards Tenant's alterations and improvements to the Premises for the purpose of installing a drive-in door, air rotation system, battery charging station, warehouse grid lighting, dock lights, office upgrades, and such other work as may be agreed upon between Landlord and Tenant and provided that, in all cases, any such alterations or improvements will become permanently affixed to the Property, directly benefit the Building, and completed in accordance with final plans and specifications approved by Landlord in accordance with the terms of the Lease (collectively, the "Tenant's Work").

(c)      **Landlord's Approval; Tenant's Obligations.** The Tenant's Work shall be deemed Alterations and shall be subject to the terms of Section 10 of the Lease. In addition to obtaining Landlord's consent (not to be unreasonably withheld) as and when required pursuant to Section 10 of the Lease, Tenant shall obtain Landlord's prior written consent for any of the Tenant's Work for which Tenant will seek reimbursement from the Allowance. In all cases, Tenant shall deliver plans and specifications for Tenant's Work, and any other documentation reasonably requested by Landlord, to Landlord for approval prior to commencing any of Tenant's Work. Tenant's Work shall be constructed in a good and workmanlike manner and in compliance with all Applicable Laws, and Tenant shall perform, at its expense, any alteration or modification required by Applicable Laws as a result of Tenant's Work. Landlord may monitor the construction of Tenant's Work, subject to the obligation to provide prior notice to Tenant of any entry onto the Premises (except in the case of emergency, in which case no prior notice is required). In the event the scope of work requested by Tenant is such that Landlord elects to engage a third-party architect, engineer, or other similar consultant or professional to review such proposed work, Tenant shall reimburse Landlord for its actual, reasonable out-of-pocket costs in reviewing plans and specifications and in monitoring the construction for compliance with such approved plans and specifications. Landlord's right to approve Tenant's Work and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that Tenant's Work complies with Applicable Laws.

(d)      **Allowance.** The Allowance may be used only for the hard costs and Eligible Soft Costs (as hereinafter defined) of construction of Tenant's Work pursuant to the approved plans and specifications. "Eligible Soft Costs" shall be deemed to be costs and expenses incurred by Tenant which are directly and primarily related to Tenant's Work and which relate solely to the work of any architect, space planner, engineer, or similar construction professional or which are direct payments made to applicable authorities for permitting and license fees; provided, however, that in no event shall the Eligible Soft Costs exceed fifteen percent (15%) of the total Allowance or be used for services provided in connection with the negotiation of the Lease. For the avoidance of doubt, Eligible Soft Costs shall expressly exclude any financing costs, attorneys' fees, or other costs and expenses not expressly permitted hereunder. In no event will the Allowance be used to pay for moving or storage expenses or furniture, racking, equipment, cabling, telephone systems or any other item of personal property which is not intended to be permanently affixed to the Premises. Payment of the Allowance shall be made by Landlord to Tenant within thirty (30) days following the last to occur of: (i) completion of Tenant's Work, (ii) Landlord's receipt of Tenant's invoice substantiating the costs related thereto, (iii) Landlord's receipt of final lien waivers from all contractors and subcontractors who performed Tenant's Work, and (iv) Landlord's receipt of a copy of the final permit approved by the applicable governing authority for any work which requires the same. Landlord shall be under no obligation to pay for any of Tenant's Work in excess of the Allowance. Further, the Tenant's Work Allowance shall only be available for Tenant's use for work performed and submitted to Landlord for reimbursement in accordance with the terms of this subsection (b) on or before October 31, 2014, at which time Tenant hereby waives any and all rights to any unused portion of the Tenant's Work Allowance.

EXHIBIT C

PROHIBITED USES

The following types of operations and activities are expressly prohibited on the Premises:

1.  automobile/truck/forklift maintenance, repair or fueling; provided, however, that ordinary course forklift maintenance and repair for forklifts used at the Premises by Tenant shall be permitted subject to Tenant's full compliance with Applicable Law, the terms of Section 12 in the Lease, the standards established by the National Fire Protection Agency, and best practices for the detection, minimization, and mitigation of any release of Hazardous Materials which may occur as a result thereof. For the avoidance of doubt, the preceding carveout is not to be deemed as a consent to the use of any specific Hazardous Materials or an acknowledgment that any release of Hazardous Materials is permitted or otherwise acceptable to Landlord.

2.  battery manufacturing or reclamation;
3.  ceramics and jewelry manufacturing or finishing,
4.  chemical (organic or inorganic) storage, use or manufacturing;
5.  drum recycling;
6.  dry cleaning;
7.  electronic components manufacturing;
8.  electroplating and metal finishing;
9.  explosives manufacturing, use or storage;
10. hazardous waste treatment, storage, or disposal;
11. leather production, tanning or finishing;
12. machinery and tool manufacturing;
13. medical equipment manufacturing and hospitals;
14. metal shredding, recycling or reclamation;
15. metal smelting and refining;
16. mining;
17. paint, pigment and coating operations;
18. petroleum refining;
19. plastic and synthetic materials manufacturing;
20. solvent reclamation;
21. tire and rubber manufacturing;
22. above- and/or underground storage tanks;
23. fertilizer storage;
24. residential use or occupancy;
25. auctions of any type;
26. retail sales of any type; and
27. tire storage.

EXHIBIT C
-1-

EXHIBIT D

RULES AND REGULATIONS

1.  No automobile, recreational vehicle or any other type of vehicle or equipment shall remain upon the Common Area longer than seventy-two (72) hours and no vehicle or equipment of any kind shall be dismantled or repaired or serviced on the Common Area. All vehicle parking shall be restricted to areas designated and marked for vehicle parking. The foregoing restrictions shall not be deemed to prevent temporary parking for loading or unloading of vehicles in designated areas.

2.  Signs will conform to sign standards and criteria established from time to time by Landlord. No other signs, placards, pictures, advertisements, names or notices shall be inscribed, displayed or printed or affixed on or to any part of the outside or inside of the building without the written consent of Landlord and Landlord shall have the right to remove any such non-conforming signs, placards, pictures, advertisements, names or notices without notice to and at the expense of Tenant.

3.  No antenna, aerial, discs, dishes or other such device shall be erected on the roof or exterior walls of the Premises, or on the grounds, without the written consent of the Landlord in each instance. Any device so installed without such written consent shall be subject to removal without notice at any time.

4.  No loud speakers, televisions, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the Premises without the prior written consent of the Landlord.

5.  The outside areas immediately adjoining the Premises shall be kept clean and free from dirt and rubbish by the Tenant to the satisfaction of Landlord and Tenant shall not place or permit any obstruction or materials in such areas or permit any work to be performed outside the Premises.

6.  No open storage shall be permitted in the Project.

7.  All garbage and refuse shall be placed in containers placed at the location designated for refuse collection, in the manner specified by Landlord.

8.  No vending machine or machines of any description shall be installed, maintained or operated upon the Common Area.

9.  Tenant shall not disturb, solicit, or canvass any occupant of the building and shall cooperate to prevent same.

10. No noxious or offensive trade or activity shall be carried on upon any units or any part of the Common Area nor shall anything be done thereon which would in any way interfere with the quiet enjoyment of each of the other tenants of the Project or which would increase the rate of insurance or overburden utility facilities from time to time existing in the Project.

11. Landlord reserves the right to make such amendments to these rules and regulations from time to time as are nondiscriminatory and not inconsistent with the Lease.

EXHIBIT D
-1-

EXHIBIT E

## MINIMUM HVAC SYSTEM SERVICE CONTRACT REQUIREMENTS

The Service Contract must become effective within 30 days of occupancy, and service visits shall be performed on a quarterly basis. The Service Contract must cover all hot water, heating, and air conditioning systems and equipment within or exclusively serving the Premises. Landlord requires that the qualified HVAC contractor include the following items as part of such maintenance contract:

1.   Adjust belt tension;
2.   Lubricate all moving parts, as necessary;
3.   Inspect and adjust all temperature and safety controls;
4.   Check refrigeration system for leaks and operation;
5.   Check refrigeration system for moisture;
6.   Inspect compressor oil level and crank case heaters;
7.   Check head pressure, suction pressure and oil pressure;
8.   Inspect air filters and replace when necessary;
9.   Check space conditions;
10.  Check condensate drains and drain pans and clean, if necessary;
11.  Inspect and adjust all valves;
12.  Check and adjust dampers;
13.  Run machine through complete cycle.

EXHIBIT F

REQUIREMENTS FOR IMPROVEMENTS OR ALTERATIONS BY TENANT

If Landlord shall permit Tenant to construct any initial tenant improvements in the Premises or to have any work performed in the Premises at any time prior to or during the Term by a contractor retained by Tenant, including, without limitation, the installation of Tenant's Trade Fixtures or the construction of any Alterations in accordance with Section 10 of the Lease (the "Tenant's Improvements"), then Tenant shall comply with the requirements set forth herein. The Tenant's Improvements shall not be properly authorized unless and until Tenant receives express written approval and consent from Landlord for such work, which consent shall be conditioned upon Tenant's compliance with the provisions set forth herein and any other applicable requirements of Landlord regarding construction of the Tenant's Improvements.

1.    SUBMITTAL OF PLANS.

(a)    Prior to the commencement of the Tenant's Improvements, Tenant shall submit to Landlord for approval its proposed plans for such work. Without limiting the foregoing, Tenant shall, at its sole cost and expense, provide to Landlord the following:

(i)    A schedule of all work to be performed.

(ii)    A separate scale drawing denoting all proposed construction and/or demolition, including specific dimensions for and complete references to such work.

(iii)    A separate drawing for each trade proposing structural, electrical, mechanical, civil or landscaping modifications.

(iv)    If adding extra electrical or mechanical equipment, complete operating and maintenance specifications for each item.

(b)    Landlord's failure to respond to a written request from Tenant shall be deemed to be Landlord's disapproval of the applicable request for approval hereunder.

2.    BUILDING PERMITS. Prior to commencing any of the Tenant's Improvements requiring any permit under Applicable Law, Tenant shall provide Landlord with copies of all permits secured in connection with any of the Tenant's Improvements, along with the plans submitted in connection with such permits. Upon completion of the Tenant's Improvements, Tenant shall provide copies of the final inspection, a certification of occupancy to the extent require under Applicable Law, and a notice of completion.

3.    CONTRACTORS PROVIDING TENANT IMPROVEMENT SERVICES.

(a)    All contractors and subcontractors employed by Tenant shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld.

(b)    Tenant shall provide Landlord with a list of each contractor and sub-contractor, along with such contractor's or sub-contractor's address, contact information, and contact person. Each contractor and subcontractor employed by Tenant shall be duly licensed in the state in which the Premises are located and shall provide proof of licensing as a general or specialty contractor in accordance with such state's laws. Additionally, each contractor or sub-contractor shall furnish proof of licensing in the city or municipality in which the construction related activity is to take place (to the extent licensing is required by Applicable Law).

(c)    Tenant and Tenant's contractors and subcontractors shall comply with all Applicable Laws pertaining to the performance of the Tenant's Improvements and all applicable safety regulations established by Landlord or Landlord's contractor. If state law requires Tenant to employ the services of a general contractor in addition to contractors for specialty work being performed, Tenant shall comply with such state law in all respects.

(d)    Prior to the commencement of the Tenant's Improvements, Tenant and Tenant's contractors and subcontractors shall have a signed contract in place, which contract shall contain an indemnification section indemnifying Landlord and shall list the insurance requirements to be followed. Each of Tenant's contractors and subcontractors shall obtain and keep in force at all times the following insurance in the following coverage amounts and Tenant shall obtain and provide to Landlord a certificate of insurance evidencing the same:

(i)    Commercial General Liability with a $2,000,000 Combined Single Limit covering the liability of Landlord and contractor for bodily injury and property damage arising as a result of the construction of the improvements and the services performed thereunder. The insurance certificate shall be submitted to Landlord for approval and all General Liability insurance policies shall name Landlord, Landlord's lender, if any, and any property management company of Landlord for the Premises as additional insureds.

(ii)    Business Automobile Liability with a $2,000,000 Combined Single Limit covering Landlord and vehicles used by contractor (and any subcontractor) in connection with the construction of the improvements

EXHIBIT F
-1-

      (iii)    Workers' Compensation and Employer's Liability as required by law, for employees of the contractor (and any subcontractors) performing work on the Premises.

(e)    The following requirements shall be incorporated as "Special Conditions" into the contract between Tenant and Tenant's contractors and a copy of the contract shall be furnished to Landlord prior to the commencement of the Tenant's Improvements:

      (i)    Prior to the commencement of the Tenant's Improvements, Tenant's contractor shall provide Landlord with a construction schedule in "bar graph" form indicating the completion dates of all phases of the Tenant's Improvements.

      (ii)    Tenant's contractor shall be responsible for the repair, replacement and clean-up of any damage done to the Premises and other contractors' work, which specifically includes access ways to the Premises which may be concurrently used by others.

      (iii)    Tenant's contractor shall accept the Premises prior to starting any trenching operations. Any rework of sub-base or compaction required after the contractor's initial acceptance of the Premises shall be done by Tenant's contractor, which shall include the removal from the Project of any excess dirt or debris.

      (iv)    Tenant's contractor shall contain its storage of materials and its operations within the Premises and such other space as it may be assigned by Landlord or Landlord's contractor. Should Tenant's contractor be assigned space outside the Premises, it shall move to such other space as Landlord or Landlord's contractor shall direct from time to time to avoid interference or delays with other work.

      (v)    Tenant's contractor shall clean up the construction area and surrounding exterior areas daily. All trash, demolition materials and surplus construction materials shall be stored within the Premises and promptly removed from the Premises and the Project and disposed of at an approved sanitation site.

      (vi)    Tenant's contractor shall provide temporary utilities, portable toilet facilities, and potable drinking water as required for its work within the Premises and shall pay to Landlord or Landlord's contractor the cost of any temporary utilities and facilities provided by Landlord or Landlord's contractor at Tenant's contractor's request.

      (vii)    Tenant's contractor shall notify Landlord or Landlord's project manager of any planned work to be done on weekends or other than normal job hours.

      (viii)    Tenant's contractor or subcontractors shall not post signs on any part of the Project or on the Premises except as expressly required by Applicable Law.

(f)    Upon completion of the project, Tenant shall provide Landlord with a set of "As-Built" drawings for any work performed to the Premises.

4.    COSTS.

(a)    Tenant shall promptly pay any and all costs and expenses in connection with or arising out of the performance of the Tenant's Improvements (including the costs of permits therefore) and shall furnish to Landlord evidence of such payment upon request.

(b)    Tenant shall reimburse Landlord for all reasonable costs which Landlord may incur in connection with granting approval to Tenant for any alteration and/or addition, including any costs or expenses which Landlord may incur in electing to have outside architects and engineers review said matters.

5.    CONTRACTOR'S BONDS. Prior to the commencement of construction, Tenant shall, if required by Landlord, obtain or cause its contractors to obtain payment and performance bonds covering the faithful performance of the contract for the construction of the Tenant's Improvements and the payment of all obligations arising thereunder and shall furnish to Landlord evidence of such bonds upon request. In the alternative, and at Landlord's option, Tenant may appoint Landlord as its contractor, and in so doing, Tenant shall deposit with the Landlord a sum of money equal to the entire amount of the estimated construction costs of the Tenant's Improvements. If Tenant deposits with Landlord monies for such construction costs, it is agreed that Landlord will not be placed in a fiduciary capacity as a trustee, or any other fiduciary title, for the sums of monies in Landlord's possession. Tenant agrees to hold Landlord harmless from any and all claims, for workmanship and installation of the Tenant's Improvements, and for merchantability and quality of goods used for the installation of the Tenant's Improvements, as are requested by Tenant. Any bonds obtained pursuant hereto shall be for the mutual benefit of both Landlord and Tenant as obligees and beneficiaries.

6.    BUILDING STANDARDS. All work shall (a) be performed during Landlord's designated hours for construction work, (b) conform to Landlord's established rules (including clean up rules), regulations, building standards and specifications, (c) not interfere with any other tenant of Landlord, nor block any access points, and (d) comply with any CC&Rs and all laws, rules and regulations. Tenant is required to make these standards part of the construction contract.

7.      ROOF PENETRATIONS.  If improvements penetrate the roof membrane, the penetrations will be sealed per Landlord or Landlord's consultant's roofing specifications and inspected by Landlord or Landlord's consultant to maintain the roof warranty.  The cost of inspection and all corrective work shall be borne by Tenant.  Tenant shall use Landlord's original roofing contractor for any inspection or work to be done on the roof of the Building.

8.      BUILDING MODIFICATIONS.  All approved work shall only be constructed within the confines of the Premises or such other space as Landlord may designate in its sole discretion.  Tenant shall not be allowed to modify the Building exterior or any mechanical or electrical services provided to the Building in common with other tenants.

9.      ELECTRICAL WORK.  All electrical work shall only be approved for the electrical panels located within the Premises.  Additional service requirements shall be secured only by direction of Landlord.

10.     CLEAN UP AND DISPOSAL OF CONSTRUCTION DEBRIS.  Tenant shall comply with Landlord's rules regarding clean up.  Building trash containers are provided for office generated trash only and are not to be used for the disposal of construction-related materials and debris.  Unapproved usage will result in a penalty assessment to the Tenant equal to the cost of an extra pick-up service as determined under the current rate schedule of the regular trash removal service.

11.     LANDLORD'S RIGHTS.  Landlord reserves the following rights: (i) the right of inspection prior to, during and at completion of all construction and/or demolition; (ii) the right to post and record a notice of nonresponsibility in conformity with the laws of the state in which the Premises are located; and (iii) the right to order a total stop to all work underway for non-compliance with any of the requirements hereof.

12.     GENERAL PROVISIONS.

        (a)     All materials, work, installations and decorations of any nature whatsoever brought on or installed in the Premises before the commencement of the Term or throughout the Term shall be at Tenant's risk, and neither Landlord nor any party acting on Landlord's behalf shall be responsible for any damage thereto or loss or destruction thereof due to any reason or cause whatsoever.

        (b)     Nothing contained herein shall make or constitute Tenant as the agent of Landlord.

EXHIBIT G

## TENANT ESTOPPEL CERTIFICATE

To:     [Insert name of party to rely on document] ("Relying Party")

_____

_____

Attn: _____

Re:     Lease Dated:_____

Current Landlord:_____

Current Tenant:_____

Square Feet:  Approximately _____

Floor(s):_____

Located at:_____

("Tenant") hereby certifies that as of _____, 201_:

1.     Tenant is the present owner and holder of the tenant's interest under the lease described above, as it may be amended to date (the "Lease") with _____ as Landlord (who is called "Landlord" for the purposes of this Certificate).  (USE THE NEXT SENTENCE IF THE LANDLORD OR TENANT NAMED IN THE LEASE IS A PREDECESSOR TO THE CURRENT LANDLORD OR TENANT.)  [The original landlord under the Lease was _____, and the original tenant under the Lease was _____.]  The Lease covers the premises commonly known as _____ (the "Premises") in the building (the "Building") at the address set forth above.

2.     (a)     The attached Exhibit A accurately identifies the Lease and all modifications, amendments, supplements, side letters, addenda and riders of and to it.

(b)     The term of the Lease commenced on _____, 201_ and will expire on _____, _____, including any presently exercised option or renewal term.

(c)     Tenant has no option or right to renew, extend or cancel the Lease, or to lease additional space in the Premises or Building, or to use any parking, except as set forth in _____.

(d)     Tenant has no option or preferential right to purchase all or any part of the Premises (or the land of which the Premises are a part) except _____.  Tenant has no right or interest with respect to the Premises or the Building other than as Tenant under the Lease.

(e)     The annual minimum rent currently payable under the Lease is $_____ and such rent has been paid through _____, 201_.

(f)     Additional rent [is/is not] payable under the Lease for (i) operating, maintenance or repair expenses, and (ii) property taxes.  Such additional rent has been paid in accordance with Landlord's rendered bills through _____, 201_.

(g)     Tenant has made no agreement with Landlord or any agent, representative or employee of Landlord concerning free rent, partial rent, rebate of rental payments or any other similar rent concession (IF APPLICABLE) [except as expressly set forth in Sections(s) ____ of the Lease (copy attached)].

(h)     Landlord currently holds a security deposit in the amount of $_____ which is to be applied by Landlord or returned to Tenant in accordance with Section(s) _____ of the Lease.  Tenant acknowledges and agrees that Relying Party shall have no responsibility or liability for any security deposit, except to the extent that any security deposit shall have been actually received by Relying Party.

3.     (a)     The Lease constitutes the entire agreement between Tenant and Landlord with respect to the Premises, has not been modified changed, altered or amended and is in full force and effect in the form (CHOOSE ONE) [attached as/described in] Exhibit A.  There are no other agreements, written or oral, which affect Tenant's occupancy of the Premises.

(b)     All insurance required of Tenant under the Lease has been provided by Tenant and all premiums have been paid.

(c)     To the best knowledge of Tenant, no party is in default under the Lease.  To the best knowledge of Tenant, no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default.

(d)     The interest of Tenant in the Lease has not been assigned or encumbered.  Tenant is not entitled to any credit against any rent or other charge or rent concession under the Lease except as set forth in the Lease.  No rental payments have been made more than one month in advance.

4.      All contributions required to be paid by Landlord to date for improvements to the Premises have been paid in full and all of Landlord's obligations with respect to tenant improvements have been fully performed. Tenant has accepted the Premises, subject to no conditions other than those set forth in the Lease.

5.      Neither Tenant nor any guarantor of Tenant's obligations under the Lease is the subject of any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships.

6.      (a)      As used here, "Hazardous Substance" means any substance, material or waste (including petroleum and petroleum products) which is designated, classified or regulated as being "toxic" or "hazardous" or a "pollutant" or which is similarly designated, classified or regulated, under any federal, state or local law, regulation or ordinance.

        (b)      Tenant represents and warrants that it has not used, generated, released, discharged, stored or disposed of any Hazardous Substances on, under, in or about the Building or the land on which the Building is located (IF APPLICABLE) [, other than Hazardous Substances used in the ordinary and commercially reasonable course of Tenant's business in compliance with all applicable laws]. (IF APPLICABLE) [Except for such commercially reasonable use by Tenant,] Tenant has no actual knowledge that any Hazardous Substance is present, or has been used, generated, released, discharged, stored or disposed of by any party, on, under, in or about such Building or land.

7.      Tenant hereby acknowledges that Landlord intends to [discuss action to be taken vis-a-vis Relying Party]. Tenant acknowledges the right of Landlord, Relying Party and any and all of Landlord's present and future lenders and their successors and assigns to rely upon the statements and representations of Tenant contained in this Certificate and further acknowledges that any action taken by such parties will be made and entered into in material reliance on this Certificate.

8.      Tenant hereby agrees to furnish Relying Party with such other and further estoppel as Relying Party may reasonably request.

a _____

By:      _____

        Name: _Vincent_  _Capuano_

        Title: _____Pres._____

EXHIBIT H

MOVE-OUT CONDITIONS

With respect to Section 18.9.2 of the Lease, Tenant shall surrender the Premises in the same condition as received, ordinary wear and tear and damage by fire or casualty excepted. The following list is designed to assist Tenant in the move-out procedures but is not intended to be all inclusive.

1.    All lighting is to be placed into good working order. This includes replacement of bulbs, ballasts, and lenses as needed.

2.    All truck doors and dock levelers shall be serviced and placed in good operating order. This would include the necessary replacement of any dented truck door panels and adjustment of door tension to insure proper operation. All door panels which are replaced need to be painted to match the building standard.

3.    All structural steel columns in the warehouse and office shall be inspected for damage. Repairs of this nature should be pre-approved by the Landlord prior to implementation.

4.    Heating/air-conditioning systems should be placed in good working order, including the necessary replacement of any parts to return the unit to a well maintained condition. This includes warehouse heaters and exhaust fans. Upon move-out, Landlord will have an exit inspection performed by a certified mechanical contractor to determine the condition.

5.    All holes in the sheetrock walls should be repaired prior to move-out.

6.    The carpets and vinyl tiles should be in a clean condition and should not have any holes or chips in them. Landlord will accept normal wear on these items provided they appear to be in a maintained condition.

7.    Facilities should be returned in a clean condition which would include cleaning of the coffee bar, restroom areas, windows, and other portions of the Premises.

8.    The warehouse should be in a clean condition with all inventory and racking removed and the warehouse floor mechanically cleaned if necessary. There should be no protrusion of anchors from the warehouse floor and all holes should be appropriately patched. If machinery/equipment is removed, the electrical lines should be properly terminated at the nearest junction box.

9.    All exterior windows with cracks or breakage should be replaced.

10.   The Tenant shall provide to Landlord the keys for all locks on the Premises, including front doors, rear doors, and interior doors.

11.   Items that have been added by the Tenant and affixed to the Building will remain the property of Landlord, unless agreed otherwise. This would include but is not limited to mini-blinds, air conditioners, electrical, water heaters, cabinets, flooring, etc. Please note that if modifications have been made to the Premises, such as the addition of office areas, Landlord retains the right to have the Tenant remove any Alterations at Tenant's expense.

12.   All electrical systems should be in good working order, including the water heater. Faucets and toilets should not leak.

13.   All plumbing fixtures should be in a safe condition that conforms to code. Bare wires and dangerous installations should be corrected prior to move-out.

14.   All dock bumpers must be left in place and well secured.

EXHIBIT I

## FORM OF LETTER OF CREDIT

........................................................................................................................

........................................................................................................................

IF THIS LANGUAGE FOR THE STANDBY LETTER OF CREDIT IS TO BE USED THEN THE OBLIGOR/APPLICANT
MUST SIGNIFY THEIR APPROVAL BY SIGNING-OFF ON THIS EXHIBIT.

APPROVED AS ISSUED

COMPANY: _____

By:    X _____
        AUTHORIZED SIGNATURE OF OBLIGOR/APPLICANT        DATE

........................................................................................................................

CITIBANK, N.A. HAS PREPARED THIS DRAFT UPON REQUEST AND BASED ON INFORMATION SUPPLIED
TO IT.   NO REPRESENTATION OR COMMITMENT IS MADE BY CITIBANK, N.A. REGARDING THE
ACCURACY OR SUITABILITY OF THIS DRAFT FOR ITS INTENDED PURPOSE
........................................................................................................................

DATE:

BENEFICIARY:
400 CABOT DRIVE, LLC
C/O INDCOR PROPERTIES, INC.
TWO NORTH RIVERDALE PLAZA, SUITE 2100
CHICAGO, IL 60606
ATTN: TREASURY DEPT.

APPLICANT:
DYNAMIC MARKETING INC.
10250 FOREST AVENUE
BROOKLYN, NY 11236

LETTER OF CREDIT NO.

GENTLEMEN:
BY ORDER OF OUR CLIENT, DYNAMIC MARKETING INC. (THE "APPLICANT"), WE HEREBY OPEN
OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____, IN YOUR FAVOR FOR AN
AMOUNT NOT TO EXCEED IN AGGREGATE USD $604,677.78 (SIX HUNDRED AND FOUR THOUSAND
SIX HUNDRED AND SEVENTY SEVEN DOLLARS AND 78/100 U.S. DOLLARS), EFFECTIVE
IMMEDIATELY AND EXPIRING AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA,
INC. AT 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FLORIDA 33610 ATTN. STANDBY
LETTER OF CREDIT UNIT OR SUCH OTHER OFFICE AS WE MAY ADVISE YOU FROM TIME TO TIME
(THE "OFFICE"), ON _____.

FUNDS HEREUNDER ARE AVAILABLE TO YOU AGAINST PRESENTATION OF YOUR SIGHT
DRAFT(S), DRAWN ON US, MENTIONING THEREON OUR LETTER OF CREDIT NUMBER
_____, ACCOMPANIED BY YOUR WRITTEN AND DATED STATEMENT, SIGNED BY AN
AUTHORIZED OFFICER OF YOUR COMPANY, STATING THE FOLLOWING:

"WE HEREBY CERTIFY THAT THE AMOUNT OF ANY DRAFT(S) DRAWN HEREUNDER REPRESENTS
FUNDS DUE AND PAYABLE UNDER THAT CERTAIN LEASE AGREEMENT BETWEEN DYNAMIC
MARKETING INC.  (THE "TENANT"), AND 400 CABOT DRIVE, LLC (THE "LANDLORD"), DATED
_____ ; AND/OR FOR ANY AMENDMENT TO THE LEASE, OR ANY AGREEMENT BETWEEN
LANDLORD AND TENANT RELATED TO THE LEASE.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY
EXTENDED, WITHOUT AMENDMENT, FOR ADDITIONAL PERIOD(S) OF  ONE YEAR FROM THE
EXPIRY DATE HEREOF, OR ANY FUTURE EXPIRATION DATE, BUT NOT BEYOND JUNE 30, 2024,
UNLESS AT LEAST  NINETY (90) DAYS PRIOR TO ANY EXPIRATION DATE WE NOTIFY YOU BY
REGISTERED MAIL OR COURIER MAIL THAT WE ELECT NOT TO CONSIDER THIS LETTER OF
CREDIT RENEWED FOR ANY SUCH ADDITIONAL PERIOD, WHEREUPON YOU MAY DRAW FOR THE
AVAILABLE AMOUNT UNDER THIS LETTER OF CREDIT BY MEANS OF YOUR SIGHT DRAFT(S),
DRAWN ON US, MENTIONING OUR LETTER OF CREDIT NUMBER.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT IS TRANSFERABLE AND MAY BE
TRANSFERRED IN ITS ENTIRETY, BUT NOT IN PART, AND MAY BE SUCCESSIVELY TRANSFERRED

EXHIBIT I
-1-

BY YOU OR ANY TRANSFEREE HEREUNDER TO A SUCCESSOR TRANSFEREE(S). TRANSFER UNDER THIS LETTER OF CREDIT TO SUCH TRANSFEREE SHALL BE EFFECTED UPON PRESENTATION TO US OF THE ORIGINAL OF THIS LETTER OF CREDIT AND ANY AMENDMENTS HERETO ACCOMPANIED BY A REQUEST DESIGNATING THE TRANSFEREE IN THE FORM OF EXHIBIT "A" ATTACHED HERETO APPROPRIATELY COMPLETED, ALL CHARGES AND FEES, INCLUDING IN CONNECTION WITH A TRANSFER, SHALL BE FOR THE ACCOUNT OF APPLICANT.

PARTIAL DRAWS ARE PERMITTED UNDER THIS LETTER OF CREDIT

WE HEREBY AGREE TO HONOR EACH DRAFT DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT IF PRESENTED, AS SPECIFIED, AT OUR OFFICE ON OR BEFORE EXPIRATION DATE. IF A DRAWING IS RECEIVED BY THE ISSUER AT OR PRIOR TO 10:00AM EASTERN TIME ON A BUSINESS DAY, AND PROVIDED THAT SUCH DRAWING CONFORMS TO THE TERMS AND CONDITIONS HEREOF, PAYMENT OF THE DRAWING AMOUNT SHALL BE MADE TO BENEFICIARY IN IMMEDIATELY AVAILABLE FUNDS NO LATER THAN THE SECOND FOLLOWING BUSINESS DAY. IF A DRAWING IS RECEIVED BY THE ISSUER AFTER 10:00 AM EASTERN TIME ON A BUSINESS DAY, AND PROVIDED THAT SUCH DRAWING CONFORMS TO THE TERMS AND CONDITIONS HEREOF, PAYMENT OF THE DRAWING AMOUNT SHALL BE MADE TO BENEFICIARY IN IMMEDIATELY AVAILABLE FUNDS NO LATER THAN THE THIRD FOLLOWING BUSINESS DAY. "BUSINESS DAY" SHALL MEAN ANY DAY WHICH IS NOT A SATURDAY, SUNDAY, OR ON WHICH ISSUER ARE REQUIRED OR AUTHORIZED BY LAW TO BE CLOSED IN THE STATE OF FLORIDA.

IN ADDITION, PRESENTATION OF SUCH DRAFT AND CERTIFICATE MAY ALSO BE MADE BY FAX TRANSMISSION TO FAX NO. 813-604-7187 OR SUCH OTHER FAX NUMBER IDENTIFIED BY CITIBANK IN A WRITTEN NOTICE TO YOU. TO THE EXTENT A PRESENTATION IS MADE BY FAX TRANSMISSION, YOU MUST (I) PROVIDE TELEPHONE NOTIFICATION THEREOF TO CITIBANK (PHONE NO. 866-498-8670) PRIOR TO OR SIMULTANEOUSLY WITH THE SENDING OF SUCH FAX TRANSMISSION AND (II) SEND THE ORIGINAL OF SUCH DRAFT AND CERTIFICATE TO CITIBANK BY OVERNIGHT COURIER, AT THE ADDRESS PROVIDED ABOVE FOR PRESENTATION OF DOCUMENTS , PROVIDED HOWEVER, THAT CITIBANK'S RECEIPT OF SUCH TELEPHONE NOTICE OR ORIGINAL DOCUMENTS SHALL NOT BE A CONDITION TO PAYMENT HEREUNDER.

SHOULD YOU HAVE OCCASION TO COMMUNICATE WITH US REGARDING THIS LETTER OF CREDIT, PLEASE DIRECT YOUR CORRESPONDENCE TO OUR OFFICE, MAKING SPECIFIC MENTION OF THE LETTER OF CREDIT NUMBER INDICATED ABOVE.

EXCEPT AS FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS STANDBY LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES ("ISP98"), INTERNATIONAL CHAMBER OF COMMERCE, PUBLICATION NO. 590, AND AS TO MATTERS NOT GOVERNED BY THE ISP98, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND APPLICABLE U.S. FEDERAL LAW.

EXHIBIT I
-2-

## Exhibit A
## Request for Full Transfer
## Relinquishing all Rights as Beneficiary

(This form is to be used when the Letter of Credit is to be Transferred in its entirety and, no substitution of invoices is involved and, no rights are to be retained by the undersigned Beneficiary.)

Citicorp North America Inc.,                                    Date:
As Servicer for Citibank, N.A.
3800 Citibank Center, Bldg. B, 3rd Fl.
Tampa, FL 33610

                Re: L/C No. _____

                Issued by:  CITIBANK, N.A.

                *Citibank, N.A.* Ref: _____

Gentlemen:

Receipt is acknowledged of the original instrument which you forwarded to us relative to the issuance of a Letter of Credit ( herein called the "Credit" ) bearing your reference number as above in favor of ourselves and/or Transferees and we hereby request you to transfer the said Letter of Credit, in its entirety, to:

_____

whose address is_____

_____

(Optional)  Please advise Beneficiary through the below indicated Advising Bank:

_____

_____

We are returning the original instrument to you herewith in order that you may deliver it to the Transferees together with your customary letter of transfer.

It is understood that any amendments to the Letter of Credit which you may receive are to be advised by you directly to the Transferees and that the drafts and documents of the Transferees, if issued in accordance with the conditions of the Letter of Credit, are to be forwarded by you directly to the party for whose account the credit was opened (or any intermediary) without our intervention.

(continued on page 2)

EXHIBIT 1
-3-

Page 2        Request for Full Transfer  Relinquishing all Rights as Beneficiary

*Citibank, N.A.* reference _____

SIGNATURE GUARANTEED                    Sincerely yours,

The First Beneficiary's signature(s) with
title(s) conforms with that on file
with us and such is/are authorized
for the execution of this instrument.

_____        _____
(Name of Bank)                         (Name of First Beneficiary)

_____        _____
(Bank Address)                         (Telephone Number)

_____        _____
(City, State, Zip Code)                (Authorized Name and Title)

_____        _____
(Telephone Number)                     (Authorized Signature)

_____        _____
(Authorized Name and Title)            (Authorized Name and Title)
                                       ( If applicable )

_____        _____
(Authorized Signature)                 (Authorized Signature)
                                       ( If applicable )

EXHIBIT I
-4-

EXHIBIT B

Door Opening

Door Opening

DMI

APP DMI

Appliance Palace
29,000 SQ FT

YF Logistics
129,000 SqFt

Fire Lane

Fire Lane

Fire Lane

Fire Lane

Fire Lane

Wall

# Exhibit C

MXI Environmental Services LLC
26319 Old Trail Road
Abingdon, VA  24210

Telephone:  276-628-6636
Fax:  276-623-0599

# Invoice

| Date | Invoice # |
|---|---|
| 5/14/2024 | 121155 |

**Please note  remittance
address below**

PAID
05/14/2024

| Bill To | Ship To |
|---|---|
| DMI APPLIANCE GROUP<br>2297 NJ-33 SUITE 901<br>HAMILTON TOWNSHIP, NJ 08690 | MXI ENVIRONMENTAL SERVICES, LLC<br>26319 OLD TRAIL RD<br>ABINGDON, VA 24210 |

| P.O. No. | Terms | Due Date | Rep | County/Locality | Ship Date |
|---|---|---|---|---|---|
|  | Net 30 | 6/13/2024 | BF |  | 5/9/2024 |

| Quantity | Description | Price Each | Total |
|---|---|---|---|
| 1 | RELOCATION OF DRUMS | 1,000.00 | 1,000.00 |

**Please remit to:
MXI Accounting Department
290 Stone Mill Road
Abingdon, VA 24210**

| | |
|---|---|
| Sales Tax  (0.0%) | $0.00 |
| **Total** | $1,000.00 |

We accept Visa and Mastercard.  A 5% processing fee will be applied

MXI Environmental Services LLC
26319 Old Trail Road
Abingdon, VA  24210

Telephone: 276-628-6636
Fax: 276-623-0599

# Invoice

| Date | Invoice # |
|---|---|
| 5/31/2024 | 121265 |

**Please note  remittance address below**

| Bill To | Ship To |
|---|---|
| DMI APPLIANCE GROUP<br>2297 NJ-33 SUITE 901<br>HAMILTON TOWNSHIP, NJ 08690 | MXI ENVIRONMENTAL SERVICES, LLC<br>26319 OLD TRAIL RD<br>ABINGDON, VA 24210 |

| P.O. No. | Terms | Due Date | Rep | County/Locality | Ship Date |
|---|---|---|---|---|---|
|  | Net 30 | 6/30/2024 | BF |  | 5/17/2024 |

| Quantity | Description | Price Each | Total |
|---|---|---|---|
| 1 | SEE COST BREAKDOWN | 28,700.00 | 28,700.00 |

**Please remit to:**
**MXI Accounting Department**
**290 Stone Mill Road**
**Abingdon, VA 24210**

| | |
|---|---|
| Sales Tax  (0.0%) | $0.00 |
| **Total** | $28,700.00 |

We accept Visa and Mastercard.  A 5% processing fee will be applied

**Project Cost Breakdown**

| Disposal: | Cost | Quantity | Total |
|---|---|---|---|
| Motor Oil | $ 75.00 | 41 | $ 3,075.00 |
| DEF | $ 85.00 | 3 | $ 255.00 |
| Combustible Liquid | $ 550.00 | 2 | $ 1,100.00 |
| Oil Filters | $ 280.00 | 3 | $ 840.00 |
| Grease | $ 75.00 | 3 | $ 225.00 |
| Non-Haz Substances | $ 75.00 | 1 | $ 75.00 |
| Trailer Tires (no rim) | $ 50.00 | 22 | $ 1,100.00 |
| Trailer Tires (w/ rim) | $ 85.00 | 7 | $ 595.00 |
| Trash & Debris | $ 250.00 | 19 | $ 4,750.00 |
| Trailer/Truck Towing & Disposal | $ 1,750.00 | 4 | $ 7,000.00 |
| **Disposal Total:** | | | **$ 19,015.00** |

| Supplies/ Labor: | | | |
|---|---|---|---|
| Speedi Dry | $ 30.00 | 3 | $ 90.00 |
| PPE Kits | $ 20.00 | 3 | $ 60.00 |
| CYB/Pallet/Liner | $ 100.00 | 3 | $ 300.00 |
| Tyvek Suits | $ 35.00 | 3 | $ 105.00 |
| 40 hr Laborer (Shipping Preparation Work, Appliance Prep, Trailer Unload) | $ 250.00 | 9 | $ 2,250.00 |
| Project Manager | $ 625.00 | 2 | $ 1,250.00 |
| QA, QC, Manifesting, Labeling, & Profiling Fee | $ 100.00 | 1 | $ 100.00 |
| Forklift | $ 750.00 | 1 | $ 750.00 |
| **Supplies/Labor Total** | | | **$ 4,905.00** |

| Transportation: | | | |
|---|---|---|---|
| Hazardous Material Pickup | $ 1,150.00 | 1 | $ 1,150.00 |
| Trash, Debris, Pallets (Yellow Trailer Material) Pickup | $ 1,150.00 | 1 | $ 1,150.00 |
| Delivery to MXIVA: $40/drum space x 67= $2,680.00 | $ 40.00 | 62 | $ 2,480.00 |
| **Transportation Total:** | | | **$ 4,780.00** |

| | | | |
|---|---|---|---|
| | | **Project Total:** | **$ 28,700.00** |

# MXI

## MXI Maumee Express, Inc.

**MANIFEST**

297 Zimmerman Lane
Langhorne, PA 19047
Phone: (267) 590-0043
Fax: (267) 590-0050

26319 Old Trail Road
Abingdon, VA 24210
Phone: (276) 628-1156
Fax: (276) 628-4435

14750 Boyle Ave.
Fontana, CA 92337
Phone: (909) 350-9090
Fax: (909) 350-9287

Transporter EPA ID#:
**NJD986607380**

№ MXI 5172 4 A

| GENERATOR NAME/ MAILING ADDRESS | TELEPHONE NUMBER: | GENERATOR EPA ID NO: |
|---|---|---|
| **DMI APPLIANCE GROUP**<br>**2297 NJ-33 SYUTE 901**<br>**HAMILTON TWP, NJ 08690** | | N O T  R E Q U I R E D |
| GENERATOR SITE ADDRESS<br>(IF DIFFERENT) | TRACTOR        TRAILER | APPOINTMENT TIME: |

| DRIVER PRINT NAME | SIGNATURE | BOX SPOTTED | BOX REMOVED | TIME AT GENERATOR (MILITARY TIME ONLY) |
|---|---|---|---|---|
| M. Andersen | | | | ARRIVAL TIME     DEPARTURE TIME |

COMMENTS OR DELAYS AT GENERATOR/ EQUIPMENT & MATERIALS USED

**STATE MANIFEST NO.:**

| (X) HM | UN/NA/No. | PROPER U.S. D.O.T. SHIPPING NAME | U.S. D.O.T. HAZ. CLASS | PACKING GROUP | NO. CONT. | CONT. TYPE | NET (EST) QUANTITY | UNIT MEASURE | APPROVAL NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| | N/A | Non-DOT, Non-RCRA Regulated Material (Motor Oil) | N/A | — | 41 | DM | 14350 | P | |
| | N/A | Non-DOT, Non-RCRA Regulated Material (DEF) | N/A | — | 3 | DF | 600 | P | |
| | N/A | Non-DOT, Non-RCRA Regulated Material (Grease) | N/A | — | 3 | DM | 900 | P | |
| | N/A | Non-DOT, Non-RCRA Regulated Material (Non-Haz Liquid) | N/A | — | 1 | DF | 200 | P | |

SPECIAL HANDLING INSTRUCTIONS INCLUDING CONTAINER EXEMPTION

**24 HOUR EMERGENCY TELEPHONE NUMBER**
1-800-424-9300    CCN701926

GENERATOR'S CERTIFICATION: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled and are in proper condition for transportation according to the applicable regulations of the Department of Transportation, U.S. EPA and the State. The wastes described above were consigned to the Transporter named. The Treatment, Storage or Disposal Facility can and will accept the shipment of waste, and has a valid permit to do so. I certify that the forgoing is true and correct to the best of my knowledge.

Payment to the contractor/broker for waste removal does not constitute payment to the carrier and if the contractor/broker does not pay the carrier, the generator is obligated to pay the agreed rate offered to the contractor/broker.

| GENERATOR'S NAME (PRINT)<br>Brent Friel | GENERATOR'S SIGNATURE<br>X _Brent Friel_<br>I HAVE READ THE ABOVE AND UNDERSTAND AND AGREE TO ALL OF ITS CONTENT | DATE LOADED<br>5 / 17 / 24<br>MO.   DAY   YR. |
|---|---|---|

| TSDF NAME / ADDRESS<br>**MXI ENVIRONMENTAL SERVICES**<br>26319 OLD TRAIL ROAD<br>ABINGDON, VA 24210 | TELEPHONE NUMBER<br>276-628-1156 | TSDF EPA ID NO.:<br>VAR000503920 |
|---|---|---|
| | TRACTOR        TRAILER | APPOINTMENT TIME: |

| DRIVER UNLOADING PRINT NAME | SIGNATURE | BOX SPOTTED | BOX REMOVED | TIME AT TSDF (MILITARY TIME ONLY) |
|---|---|---|---|---|
| | | | | ARRIVAL TIME     DEPARTURE TIME |

| COMMENTS OR DELAYS AT TSDF | EQUIPMENT USED |
|---|---|

| TSDF PRINT NAME/ TITLE | TSDF SIGNATURE<br>X | DATE UNLOADED<br>/ /<br>MO.   DAY   YR. |
|---|---|---|

ADDITIONAL INFORMATION:

**White:** MXI Original    **Canary:** Retained by Transporter    **Pink:** Retained by Generator



# MXI

## MXI Maumee Express, Inc.

**MANIFEST**

297 Zimmerman Lane
Langhorne, PA 19047
Phone: (267) 590-0043
Fax: (267) 590-0050

26319 Old Trail Road
Abingdon, VA 24210
Phone: (276) 628-1156
Fax: (276) 628-4435

14750 Boyle Ave.
Fontana, CA 92337
Phone: (909) 350-9090
Fax: (909) 350-9287

Transporter EPA ID#:
**NJD986607380**

Nº MXI 51724B

| GENERATOR NAME / MAILING ADDRESS | TELEPHONE NUMBER: | GENERATOR EPA ID NO. |
|---|---|---|
| **DMI APPLIANCE GROUP**<br>**2297 NJ-33 SYUTE 901**<br>**HAMILTON TWP, NJ  08690** | | NOT REQUIRED |

GENERATOR SITE ADDRESS
(IF DIFFERENT)

| TRACTOR | TRAILER | APPOINTMENT TIME: |
|---|---|---|

| DRIVER PRINT NAME | SIGNATURE | BOX SPOTTED | BOX REMOVED | TIME AT GENERATOR (MILITARY TIME ONLY) |
|---|---|---|---|---|
| M Anderson | | | | ARRIVAL TIME          DEPARTURE TIME |

COMMENTS OR DELAYS AT GENERATOR/ EQUIPMENT & MATERIALS USED

**STATE MANIFEST NO.:**

| (X)<br>HM | UN/NA/No. | PROPER U.S. D.O.T. SHIPPING NAME | U.S. D.O.T.<br>HAZ. CLASS | PACKING<br>GROUP | NO.<br>CONT. | CONT.<br>TYPE | NET EST<br>QUANTITY | UNIT<br>MEASURE | APPROVAL<br>NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| X | NA1993 | **COMBUSTIBLE LIQUID** | 3 | III | 2 | DF | 400 | P | |
| | NONE | Non- DOT, Non-RCRA Regulated Material (Oil Filters) | N/A | — | 3 | LF | 1800 | P | |
| | NONE | Trash + Debris | N/A | — | 7 | LF | 2100 | P | |

| SPECIAL HANDLING INSTRUCTIONS INCLUDING CONTAINER EXEMPTION | 24 HOUR EMERGENCY TELEPHONE NUMBER<br>1-800-424-9300   CCN701926 |
|---|---|

GENERATOR'S CERTIFICATION: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled and are in proper condition for transportation according to the applicable regulations of the Department of Transportation, U.S. EPA and the State. The wastes described above were consigned to the Transporter named. The Treatment, Storage or Disposal Facility can and will accept the shipment of waste, and has a valid permit to do so. I certify that the forgoing is true and correct to the best of my knowledge.

Payment to the contractor/broker for waste removal does not constitute payment to the carrier and if the contractor/broker does not pay the carrier, the generator is obligated to pay the agreed rate offered to the contractor/broker.

| GENERATOR'S NAME (PRINT) | GENERATOR'S SIGNATURE | DATE LOADED |
|---|---|---|
| Brent Frick | X _____ <br> I HAVE READ THE ABOVE AND UNDERSTAND AND AGREE TO ALL OF ITS CONTENT | 5 / 17 / 24<br>MO.    DAY    YR. |

| TSDF NAME / ADDRESS | TELEPHONE NUMBER | TSDF EPA ID NO. |
|---|---|---|
| MXI ENVIRONMENTAL SERVICES<br>26319 OLD TRAIL ROAD<br>ABINGDON, VA  24210 | 276-628-1156 | VAR000503920 |
| | TRACTOR          TRAILER | APPOINTMENT TIME: |

| DRIVER UNLOADING PRINT NAME | SIGNATURE | BOX SPOTTED | BOX REMOVED | TIME AT TSDF (MILITARY TIME ONLY) |
|---|---|---|---|---|
| | | | | ARRIVAL TIME          DEPARTURE TIME |

| COMMENTS OR DELAYS AT TSDF | EQUIPMENT USED |
|---|---|

| TSDF PRINT NAME/ TITLE | TSDF SIGNATURE | DATE UNLOADED |
|---|---|---|
| | X _____ | /    /<br>MO.   DAY   YR. |

ADDITIONAL INFORMATION:

**White:** MXI Original    **Canary:** Retained by Transporter    **Pink:** Retained by Generator

# MXI

## MXI Maumee Express, Inc.

**MANIFEST**

Transporter EPA ID#:
NJD986607380

№ MXI 51724

297 Zimmerman Lane
Langhorne, PA 19047
Phone:  (267) 590-0043
Fax:     (267) 590-0050

26319 Old Trail Road
Abingdon, VA 24210
Phone:  (276) 628-1156
Fax:     (276) 628-4435

14750 Boyle Ave.
Fontana, CA 92337
Phone:  (909) 350-9090
Fax:     (909) 350-9287

| GENERATOR NAME/ MAILING ADDRESS | TELEPHONE NUMBER: | GENERATOR EPA ID NO. |
|---|---|---|
| DMI APPLIANCE GROUP 2297 NJ-33 SYUTE 901 HAMILTON TWP, NJ 08690 | | NOT REQUIRED |

| | TRACTOR | TRAILER | APPOINTMENT TIME: |
|---|---|---|---|

GENERATOR SITE ADDRESS
(IF DIFFERENT)

| DRIVER PRINT NAME | SIGNATURE | BOX SPOTTED | BOX REMOVED | TIME AT GENERATOR (MILITARY TIME ONLY) |
|---|---|---|---|---|
| M. Anderson | | | | ARRIVAL TIME     DEPARTURE TIME |

COMMENTS OR DELAYS AT GENERATOR/ EQUIPMENT & MATERIALS USED

**STATE MANIFEST NO.:**

| (X) HM | UN/NA/No. | PROPER U.S. D.O.T. SHIPPING NAME | U.S. D.O.T. HAZ. CLASS | PACKING GROUP | NO. CONT. | CONT. TYPE | NET QUANTITY | UNIT MEASURE | APPROVAL NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| | NONE | Tires | N/A | — | 9 | CW | 800 | P | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| SPECIAL HANDLING INSTRUCTIONS INCLUDING CONTAINER EXEMPTION | 24 HOUR EMERGENCY TELEPHONE NUMBER |
|---|---|
| | 1-800-424-9300    CCN701926 |

GENERATOR'S CERTIFICATION: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled and are in proper condition for transportation according to the applicable regulations of the Department of Transportation, U.S. EPA and the State. The wastes described above were consigned to the Transporter named. The Treatment, Storage or Disposal Facility can and will accept the shipment of waste, and has a valid permit to do so. I certify that the forgoing is true and correct to the best of my knowledge.

Payment to the contractor/broker for waste removal does not constitute payment to the carrier and if the contractor/broker does not pay the carrier, the generator is obligated to pay the agreed rate offered to the contractor/broker.

| GENERATOR'S NAME (PRINT) | GENERATOR'S SIGNATURE | DATE LOADED |
|---|---|---|
| Brent Gril | X Brent      I HAVE READ THE ABOVE AND UNDERSTAND AND AGREE TO ALL OF ITS CONTENT | 5 / 17 / 24 MO.   DAY   YR. |

| TSDF NAME / ADDRESS | TELEPHONE NUMBER | TSDF EPA ID NO. |
|---|---|---|
| MXI ENVIRONMENTAL SERVICES 26319 OLD TRAIL ROAD ABINGDON, VA 24210 | 276-628-1156 | VAR000503920 |

| | TRACTOR | TRAILER | APPOINTMENT TIME: |
|---|---|---|---|

| DRIVER UNLOADING PRINT NAME | SIGNATURE | BOX SPOTTED | BOX REMOVED | TIME AT TSDF (MILITARY TIME ONLY) |
|---|---|---|---|---|
| | | | | ARRIVAL TIME     DEPARTURE TIME |

| COMMENTS OR DELAYS AT TSDF | EQUIPMENT USED |
|---|---|

| TSDF PRINT NAME/ TITLE | TSDF SIGNATURE | DATE UNLOADED |
|---|---|---|
| | X | / / MO.   DAY   YR. |

ADDITIONAL INFORMATION:

**White: MXI Original**     **Canary: Retained by** Transporter     **Pink: Retained by** Generator

MXI Environmental Services LLC
26319 Old Trail Road
Abingdon, VA  24210

Telephone: 276-628-6636
Fax: 276-623-0599

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/31/2024 | 121266 |

**Please note  remittance
address below**

| Bill To | Ship To |
|---------|---------|
| DMI APPLIANCE GROUP<br>2297 NJ-33 SUITE 901<br>HAMILTON TOWNSHIP, NJ 08690 | MXI ENVIRONMENTAL SERVICES, LLC<br>26319 OLD TRAIL RD<br>ABINGDON, VA 24210 |

| P.O. No. | Terms | Due Date | Rep | County/Locality | Ship Date |
|----------|-------|----------|-----|-----------------|-----------|
|  | Net 30 | 6/30/2024 | BF |  | 5/17/2024 |

| Quantity | Description | Price Each | Total |
|----------|-------------|------------|-------|
| 2 | TRAILER PREPARATION & REPAIR | 500.00 | 1,000.00 |
| 2 | TRAILER TOWING SERVICES | 1,250.00 | 2,500.00 |

**Please remit to:
MXI Accounting Department
290 Stone Mill Road
Abingdon, VA 24210**

| Sales Tax  (0.0%) | $0.00 |
|-------------------|-------|
| **Total** | $3,500.00 |

We accept Visa and Mastercard.  A 5% processing fee will be applied

**Munnlane Workplace**
225 Haddon Ave
Haddon Township, NJ
08108-2600 US
jenna@munnlaneworkplace.com



# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| Alan Joskowicz | Alan Joskowicz | **INVOICE #** 1065 |
| DMI | DMI | **DATE** 05/16/2024 |
| 400 Cabot Drive | 400 Cabot Drive | **DUE DATE** 05/16/2024 |
| Unit B | Unit B | **TERMS** Due on receipt |
| Hamilton Township, NJ  08690 | Hamilton Township, NJ 08690 | |

| ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| **Services** | Breakdown and remove assets from sub-tenant space, dispose of trash, remove barriers, stage products, move to trailers. | 1 | 17,150.00 | 17,150.00 |

Thank You for choosing Munnlane Workplace.

| | |
|---|---|
| SUBTOTAL | 17,150.00 |
| TAX | 0.00 |
| TOTAL | 17,150.00 |
| BALANCE DUE | **$17,150.00** |

# Exhibit D

| Scope | Expense | |
|---|---|---|
| **General Conditions** | | |
| Drywall Repair | $ | 4,400.00 |
| Replace and patch demising wall | $ | 14,465.00 |
| | | |
| Demo | | |
| Remove and dispose of several garbage bags- piles of tenant debris in parking lot and office area | | |
| Remove and dispose of first row of sheetrock of demising wall, remove screws from studs (studs remain) | | |
| Remove and dispose of hanging chains, signage, cctv domes, paddle fans Mirrors from deck and miscellaneous hardware and signage attached to columns | | |
| Remove and dispose of exterior compactor in front far left rollup | $ | 33,330.00 |
| Electric | | |
| Remove 400 amp service for forklift chargers and compactor | | |
| Remove all wiring and  receptacles for forklift station | | |
| Remove disconnect for trash compactor. | | |
| Remove hanging exit signs. | | |
| Remove data and cameras and access. | | |
| Remove drop cords from center of warehouse. | | |
| Repair damaged conduits and receptacle. | $ | 20,790.00 |
| Mechanical | | |
| Allowance based on inspection report for DMI side | $ | 5,000.00  *Link's actual project spend anticipated to be higher. |
| Dock Door/Leveler Repairs | | |
| Pulled from DMI-provided MHS Lift inspection report (pro rata share) | $ | 31,046.40  *Link's actual project spend anticipated to be higher. |
| | | |
| **Total:** | **$** | **109,031.40** |

# Exhibit E

# Invoice

**Dynamic Marketing Inc.**

400 Cabot Drive, Suite B
Hamilton, NJ 08690

| Date | Invoice # |
|------|-----------|
| 3/28/2024 | 9005642 |

| Bill To | Ship To |
|---------|---------|
| 1 Stop Electronics Center, Inc.<br>1870 Bath Avenue<br>Brooklyn, NY 11214 | |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | | | 3/28/2024 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| 1 | 6720 | 400 Cabot Drive<br>April 2024 Holdover Rent | 56,250.00 | 56,250.00 |

| | **Total** | $56,250.00 |
|---|---|---|

# Exhibit F

## SUBLEASE

SUBLEASE ("Sublease") dated as of November 20, 2023 ("Sublease Date") between Dynamic Marketing Inc. ("Sublandlord") and 1 Stop Electronics Center, Inc. d/b/a 1 Stop Computer and Cameras ("Subtenant").

WHEREAS Sublandlord is the tenant under the Overlease for the premises (the "Overlease Premises"); and

WHEREAS Sublandlord desires to sublease to Subtenant, and Subtenant desires to sublease from Sublandlord, the Sublease Premises on the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Sublandlord and Subtenant agree as follows:

## 1.   **Definitions and Basic Terms**

Set forth below are certain definitions and basic terms of this Sublease.

1.1   Sublease Date: November 20, 2023

1.2   Sublandlord:   Dynamic Marketing Inc., a New Jersey corporation.

1.3   Subtenant:   1 Stop Electronics Center, Inc. d/b/a 1 Stop Computer and Cameras, a New York corporation.

1.4   Overlandlord:   HRP Mercer Urban Renewal, LLC, a New Jersey limited liability company.

1.5   Overlease:   That certain lease dated February 7, 2023 between HRP Mercer Urban Renewal, LLC, as landlord, and Dynamic Marketing, Inc., as tenant, as may be amended from time to time.

1.6   Incorporated Provisions: All of the provisions of the Overlease except for those listed on Exhibit D hereto.

1.7   Building: 1369 Lamberton Road, Hamilton Township, New Jersey

1.8   Sublease Premises:   The portion of the Overlease Premises set forth on Exhibit A, annexed hereto and made part hereof.

1.9   Expiration Date:   September 30, 2030

1.10  Sublease Base Rental Rate:

| Period from | Period to | Rentable Square Footage | Rent Per Square Foot | Annual Rent | Monthly Installment of Rent |
|---|---|---|---|---|---|
| *1/1/2024 | 6/30/2024 | 232,640 | $12.65 | $2,942,896.00 | $245,241.34 |
| 7/1/2024 | 6/30/2025 | 232,640 | $13.12 | $3,052,236.80 | $254,353.07 |
| 7/1/2025 | 6/30/2026 | 232,640 | $13.62 | $3,168,556.80 | $264,046.40 |
| 7/1/2026 | 6/30/2027 | 232,640 | $14.13 | $3,287,203.20 | $273,933.60 |
| 7/1/2027 | 6/30/2028 | 232,640 | $14.66 | $3,410,502.40 | $284,208.54 |
| 7/1/2028 | 6/30/2029 | 232,640 | $15.21 | $3,538,454.40 | $294,871.20 |
| 7/1/2029 | 6/30/2030 | 232,640 | $15.78 | $3,671,059.20 | $305,921.60 |
| 7/1/2030 | 9/30/2030 | 232,640 | $16.37 | $3,808,316.80 | $317,359.74 |

* Subject to the Credit for Annual Rent during the Credit period per Section 3.1.

Regardless of the Method of Charging for Electricity selected in Section 1.17, the Sublease Rental Rate does not include a charge for electricity.

1.11 Subtenant's Proportionate Share:   27.49628% percent

1.12 Sublease Premises Rentable Area:   232,640 square feet. This area is agreed upon by Sublandlord and Subtenant, and shall be used for all purposes of this Sublease regardless of the actual area of the Sublease Premises.

1.13 Overlease Premises Rentable Area:  846,078 square feet. This area is agreed upon by Sublandlord and Subtenant, and shall be used for all purposes of this Sublease regardless of the actual area of the Overlease Premises.

1.14 Taxes:   Subtenant shall pay Additional Rent in an amount equal to Subtenant's Proportionate Share of the Taxes, and any other amounts, set forth in Section 5 of the Overlease.

2

1.15 Expenses: Subtenant shall pay Additional Rent in an amount equal to Subtenant's Proportionate Share of the Expenses, and any other amounts, set forth in Section 5 of the Overlease.

1.16 If Subtenant will pay Additional Rent based on increases in the porter wage rate, check here __ and complete Section 1.16.1, 1.16.2 and 1.16.3.

> 1.16.1 Sublease Porter Wage Base Date:____
>
> 1.16.2 Porter Wage Multiplier:____
>
> 1.16.3 Porter Wage Rate:____

1.17 Method of Charging for Electricity (as described on Exhibit E hereto) [Check one.]
> Option A ___
> Option B _X_
> Option C ___
> Option D ___  Initial Electric Charge:  $_____ per annum.
> Option E ___  Initial Electric Charge:  $_____ per annum.

1.18 Included Personal Property:  Items, if any, listed on Exhibit F hereto.

1.19 Personal Property Rent:  $_0_ per annum.

1.20 Required Security Deposit Amount:  $735,724.02

1.21 Recognized Broker(s):_n/a_

1.22 Sublandlord's Work: Work, if any, listed on Exhibit B hereto

1.23 This Sublease: This Agreement of Sublease, including the Incorporated Provisions as incorporated herein.  The terms "herein," "hereunder", etc. refer to this Agreement of Sublease, including the Incorporated Provisions as incorporated herein.

## 2.    Sublease Premises; Term; Permitted Use

2.1    Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, the Sublease Premises upon, and subject to, the terms and conditions set forth herein.

2.2    The term ("Term") of this Sublease shall commence on the January 1, 2024 (the "Commencement Date") on which date all of the following shall have occurred:

2.2.1    Overlandlord shall have consented to this Sublease in accordance with Section 14 below;

2.2.2    The Sublease Premises shall be vacant and free and clear of all rights of occupancy of third parties; and

2.2.3    Overlandlord shall have tendered possession of the Overlease Premises to Sublandlord, and Sublandlord shall have tendered possession of the Sublease Premises to Subtenant.

2.3    Subject to Section 2.4 of the Overlease, and further subject to Sublandlord's consent, Subtenant may be provided early access to the Sublease Premises for the purpose of installing furniture, fixtures, racking and other equipment.

2.4    This Sublease shall terminate on the Expiration Date, or on such earlier date pursuant to any of the provisions of this Sublease, the Overlease or the law.

2.5    Subtenant shall use the Sublease Premises for the purposes permitted under the Overlease ("Permitted Use"), and for no other purposes.

2.6    Subject to the terms of the Overlease and the approval of the Overlandlord, and provided that Sublandlord has renewed the Overlease in accordance with its current terms, and further provided that Subtenant has not defaulted and/or is not in default of the Overlease or Sublease, then in such event, Subtenant shall have the option to seek the renewal of the Sublease for an additional period of up to five (5) additional years provided it sends notice to Sublandlord at least nine (9) months, but no more than twelve (12) months, prior the Expiration Date, setting forth

4

therein Subtenant's desire  to the renew the Sublease, in which
case the parties shall negotiate the terms and conditions of the
such renewal, it be agreed and understood that the failure of the
parties to agree upon any such renewal shall not be deemed a
default or an act of bad faith by either or both parties.

### 3.    Rent

3.1  Commencing on January 1, 2024, Subtenant shall pay rent
("Base Rent") to Sublandlord at the Sublease Base Rental Rate in
advance, in equal monthly installments, at least five (5) business
days prior to the first day of the month for which the Base Rent is
due.

3.1.1 Notwithstanding anything to the contrary herein,
provided there has been no event of default under the
the Overlease or Sublease, Subtenant shall be credited in
the amount of the entirety of the monthly Base Rent with
respect to the Sublease Premises for the one month period
from January 1, 2024 through January 31, 2024 only, as
and when the same becomes due and payable (the "Credit"),
for a total Credit amount of $245,241.34.  The Credit
shall not reduce any other amounts that are otherwise
payable under this Sublease.  Subtenant understands and
agrees that the Credit has been granted on the
expectation that Subtenant will: (a) use the
aforementioned one month period to prepare the Sublease
Premises for Subtenant's use and occupancy, and (b)
faithfully and fully perform its obligations under this
Sublease, and accordingly, is conditioned upon the
absence of any default under the Overlease or Sublease
through the second (2nd) anniversary of the Commencement
Date.  In the event of Subtenant's default under the
Overlease or Sublease, and the default occurred on or
before the second (2nd) anniversary of the Commencement
Date, then the Credit shall immediately become null and
void and the full $245,241.34 amount of the Credit shall
become immediately due and payable by the Subtenant.
Notwithstanding anything to the contrary, from and after
the second (2nd) anniversary of the Commencement Date,
Subtenant shall have no further obligation to repay the
Credit.

5

3.1.2  Notwithstanding anything to the contrary herein, on or before February 1, 2024 Subtenant shall make an advance payment of one month's Base Rent to the Sublandlord to be applied to the first full month's Base Rent due, which, under this Sublease is February 1, 2024.


3.2  Commencing on February 1, 2024, Subtenant shall be responsible for, and pay, Additional Rent in an amount equal to Subtenant's Proportionate Share of all amounts of Taxes and any other amounts due and payable by Sublandlord to Overlandlord.

3.3  Commencing on February 1, 2024, Subtenant shall be responsible for, and pay, Additional Rent in an amount equal to Subtenant's Proportionate Share of all amounts of Expenses and any other amounts due and payable by Sublandlord to Overlandlord.

3.4  Subtenant's payments under Section 3.2 in respect of Taxes and Section 3.3 in respect of Expenses and any other amounts shall be due five (5) business days before the date(s) on which Sublandlord's payments under the corresponding provisions of the Overlease are due to Overlandlord; provided, however, that (except for subsequent continuing equal monthly payments) no such payment shall be due until three (3) business days after Sublandlord shall have furnished Subtenant with notice thereof, together with a copy of the related bill and supporting documentation, if any, received by Sublandlord.

3.5  If Overlandlord shall issue to Sublandlord any credit or refund with respect to Taxes or Expenses relating to any period for which Subtenant made corresponding payments to Sublandlord under this Sublease, Sublandlord shall (a) provide Subtenant with a copy of the supporting documentation, if any, received by Sublandlord, and (b) give Subtenant a credit or refund equal to Subtenant's Proportionate Share of the portion of such credit or refund remaining after deducting therefrom the costs and expenses, including attorneys' fees, incurred by Sublandlord in connection with obtaining such credit or refund.

3.6  If Section 1.16 is checked then Subtenant shall pay to Sublandlord Additional Rent at a per annum rate from time to time equal to the product of (a) the excess, if any, of the Porter Wage Rate then in effect over the Porter Wage Rate in effect on the Sublease Porter Wage Base Date, (b) the Porter Wage Rate Multiplier, and (c) the Sublease Premises Rentable Area.  The per

6

annum rate of Additional Rent payable under this Section shall change each time the Porter Wage Rate shall change. The Additional Rent payable under this Section shall be payable in equal monthly installments in advance on the same dates as those on which the Base Rent is payable, pro-rated for any partial month; provided, however, that neither the initial payment under this Section nor any increase therein shall be due until Sublandlord shall have provided Subtenant with at least ten days prior notice of the amount thereof. Upon request, Sublandlord shall furnish Subtenant with any documentation received from Overlandlord relating to the Porter Wage Rate.

3.7  Subtenant shall, within five(5) business days of demand, pay or reimburse Sublandlord for all amounts payable under the Overlease arising out of Subtenant's requests for services, including (a) supplemental chilled or condenser water, (b) above building standard or overtime HVAC, (c) extra cleaning, (d) overtime or dedicated freight elevator service, and (e) any maintenance, repair or other service for which a separate charge is made by Overlandlord. In addition, Subtenant shall be responsible for, and pay, a management fee to the Sublandlord in the annual amount of $27,917 (i.e. - $.12 per square foot of the Sublease Premises), payable in equal monthly installments, along with the monthly payment of the Base Rent, Taxes, Expenses, Additional Rent and/or any other amounts, as the case may be. In the event that Subtenant exercises the option to extend the term pursuant to Section 2.6 herein, it is agreed that the aforementioned management fee shall be increased to $33,780 provided that the square footage of the Sublease Premises remains the same. Notwithstanding the foregoing, in the event that Subtenant shall no longer be a Shareholder in Dynamic Marketing Inc., or Subtenant subleases the Premises pursuant to Section 8.2, it is further agreed that Sublandlord may reasonably increase this management fee, but such increased management fee may not exceed 1.5% of the gross rent paid under this sublease, at any time in its sole discretion. This Section 3.7 shall not be applicable to electricity, gas, water or sewer, which are covered by Section 9 hereto.

3.8  As used herein the term "Additional Rent" shall refer to all sums of money which shall become due and payable by Subtenant to Sublandlord hereunder, other than Base Rent, and the term "Rents" shall refer to Base Rent and Additional Rent. All Rents shall be payable in lawful money of the United States at such place and to such person as Sublandlord shall from time to time designate.

7

3.9  Subtenant shall promptly pay all Rents as and when the same shall become due and payable without set-off, offset or deduction of any kind whatsoever, and if Subtenant fails to pay any Rents or Additional Rent when due, Sublandlord shall have all of the rights and remedies provided for herein or at law or in equity as in the case of non-payment of Base Rent.

3.10 Sublandlord's failure to deliver any statements or bills required to be delivered to Subtenant hereunder, or Sublandlord's failure to make a demand under this Sublease, shall not be a waiver of, or cause Sublandlord to forfeit or surrender, its rights to collect any Rents or Additional Rent which is or may have become due pursuant to this Sublease.  Subtenant's liability for Rents and Additional Rent accruing during the Term of this Sublease, shall survive the expiration or sooner termination of this Sublease.

3.11 Unless otherwise directed in writing by Sublandlord, all payments by Subtenant under this Sublease shall be made by Subtenant only (not an affiliate or parent company) by ACH or wire transfer to Sublandlord's account.

## 4.   Condition of the Sublease Premises; Sublandlord's Work

4.1  Subtenant represents that it has examined (or waived examination of) the Sublease Premises.  Sublandlord has not made and does not make any representations or warranties as to the physical condition of the Sublease Premises (including any latent defects in the Sublease Premises), the manner in which the Sublease Premises may be used, or any other matter or thing affecting or relating to the Sublease Premises, except as specifically set forth in this Sublease.

4.2  Except as provided in Section 4.3, (a) Subtenant agrees to accept the Sublease Premises in "as is" condition on the date hereof, as the same may be affected by reasonable wear and tear after the date hereof, and (b) Sublandlord shall have no obligation whatsoever to alter, improve, decorate or otherwise prepare the Sublease Premises, or any portion thereof, for Subtenant's occupancy.

4.3  If any Sublandlord's Work is listed on Exhibit B hereto, then after Overlandlord shall have consented to this Sublease in accordance with Section 15, and shall have consented to such Sublandlord's Work, if and to the extent required by the Overlease,

8

and after all occupants of the Sublease Premises, if any, shall have vacated the same, (and all rights of occupancy by third parties have terminated), Sublandlord shall promptly commence and thereafter diligently prosecute to completion Sublandlord's Work. Sublandlord shall be responsible for installing the demising wall, and all costs associated with the installation thereof. Sublandlord shall notify Subtenant when Sublandlord's Work is substantially completed. Any such notice shall be binding upon Subtenant unless, within ten (10) business days of receipt thereof, Subtenant notifies Sublandlord of the particular respects in which Subtenant claims that Sublandlord's Work was not substantially completed. As used in this Sublease the term "substantially completed" shall mean completed except for details of construction (commonly known as "punch list items") the non-completion of which does not materially adversely affect Subtenant's use of the Sublease Premises. If Subtenant shall take occupancy of the Sublease Premises for the conduct of Subtenant's business, Sublandlord's Work shall be deemed substantially completed, unless a portion of Sublandlord's Work is discovered to be improper or insufficient within ten (10) business days of Subtenant's occupancy and Subtenant provides the requisite notice. Promptly following the substantial completion of Sublandlord's Work, Sublandlord shall complete all punch list items.

4.4 Subtenant agrees and acknowledges that the cost of Sublandlord's Work for which Sublandlord shall be responsible for, and pay, shall not exceed $1,140,000, and Subtenant agrees to be responsible for, and pay, for all amounts of Sublandlord's Work incurred in excess of $1,140,000. The Sublandlord shall be responsible for the entire cost to install the demising wall, and the aforementioned cost to construct the demising wall shall not be included as part of the $1,140,000 allocation for Sublandlord's Work.

## 5.    Subordination to and Incorporation of the Overlease

5.1 This Sublease is subject and subordinate to the Overlease, and to all leases, mortgages and other matters to which the Overlease is subject or subordinate. This provision shall be self-operative but Subtenant shall within five (5) business days of Sublandlord's request, execute any instrument reasonably requested by Sublandlord or Overlandlord to evidence or confirm the same. Sublandlord represents that (a) a true and complete copy of the Overlease (excluding redacted terms and conditions not relevant to

9

Subtenant) is attached hereto as Exhibit C; (b) Sublandlord is the tenant under the Overlease; (c) the term of the Overlease commenced on February 7, 2023, the expiration date of the Overlease is set forth therein, and the Overlease is in full force and effect; (d) to the best of Sublandlord's knowledge, Sublandlord is not in default under the Overlease; and (e) Sublandlord has not received any notice of default under the Overlease.  If the Overlease shall terminate for any reason, then this Sublease shall also automatically terminate immediately without any further action or notice.  Sublandlord shall not be liable to Subtenant for any termination of the Overlease and/or this Sublease.

    5.2  Except as otherwise expressly provided in, or otherwise inconsistent with, this Sublease, and except to the extent not applicable to the Sublease Premises, the Incorporated Provisions from the Overlease are hereby incorporated in this Sublease by reference with the same force and effect as if set forth herein, except that, unless the context requires otherwise:

    5.2.1    References in the Overlease to Owner, Landlord or Lessor shall be deemed to refer to Sublandlord;

    5.2.2    References in the Overlease to Tenant or Lessee shall be deemed to refer to Subtenant;

    5.2.3    References in the Overlease to the Premises or the Demised Premises shall be deemed to refer to the Sublease Premises; and

    5.2.4    References in the Overlease to subleases, sublettings or subtenants shall be deemed to refer to subsubleases, subsublettings or subsubtenants.

    5.3  Sublandlord shall not be deemed to have made any representation made by Overlandlord in any of the Incorporated Provisions.  Moreover, Sublandlord shall not be obligated:

    5.3.1    To provide any of the services or utilities that Overlandlord has agreed in the Overlease to provide;

    5.3.2    To make any of the repairs or restorations that Overlandlord has agreed in the Overlease to make;

    5.3.3    To comply with any laws or requirements of public authorities with which Overlandlord has agreed in the

Overlease to comply with; or

      5.3.4    To take any action with respect to the operation, administration or control of the Building or any of its public or common areas that the Overlandlord has agreed in the Overlease to take.

(all the foregoing being herein called the "Building Services") and Sublandlord shall have no liability to Subtenant on account of any failure of Overlandlord to do so, or on account of any failure by Overlandlord to observe or perform any of the terms, covenants or conditions of the Overlease required to be observed or performed by Overlandlord.

     5.4  Sublandlord agrees:

      5.4.1    Upon Subtenant's request, to use reasonable efforts (excluding litigation), at Subtenant's expense, (a) to cause Overlandlord to provide any Building Service, or (b) to obtain Overlandlord's consent or approval whenever required by the Overlease (unless, in such instance, Sublandlord shall be entitled to withhold its consent or approval); and

      5.4.2    That, if under the Overlease, any right or remedy of Sublandlord or any duty or obligation of Overlandlord is subject to or conditioned upon Sublandlord's making any demand upon Overlandlord or giving any notice or request to Overlandlord then, if Subtenant shall so request, Sublandlord, at Subtenant's expense, shall make such demand or give such notice or request, except that Sublandlord shall not be required to request Overlandlord's consent or approval with respect to any act or thing as to which Sublandlord shall have determined in accordance with this Sublease to withhold its consent or approval.

    5.5  Whenever Subtenant desires to do any act or thing which requires the consent or approval of Overlandlord:

      5.5.1    Subtenant shall not do such act or thing without first having obtained the consent or approval of both Overlandlord and Sublandlord (and Sublandlord's right to withhold consent or approval shall be independent of Overlandlord's right);

      5.5.2    Subtenant shall not request Overlandlord's consent or approval directly (and no efforts by Sublandlord to obtain Overlandlord's consent or approval shall constitute

Sublandlord's consent or approval or prejudice Sublandlord's right to withhold consent or approval); and

       5.5.3    In no event shall Sublandlord be required to give its consent or approval prior to Overlandlord doing so.

    5.6  Notwithstanding any other provision of this Sublease, Subtenant shall perform all of its obligations hereunder at such times, by such dates or within such periods as Sublandlord shall be required to perform its corresponding obligations under the Overlease.  If Overlandlord shall give any notice of failure or default under the Overlease arising out of any failure by Subtenant to perform any of its obligations hereunder (other than the payment of money) then Sublandlord shall promptly furnish Subtenant with a copy thereof.  If the Overlease shall provide any grace or cure period for such failure or default then the grace or cure period hereunder shall expire two (2) business days prior to the date on which the grace or cure period under the Overlease shall expire. In no event shall this Section 5.6 extend the time, date or period by or within which Subtenant is required to perform.

    5.7  If (a) Subtenant shall fail to perform any of its obligations hereunder and such failure shall continue beyond any cure period provided for herein, or (b) Overlandlord shall give any notice of failure or default under the Overlease arising out of any failure by Subtenant to perform any of its obligations hereunder then, in either case, Sublandlord shall have the right (but not the obligation) to perform or endeavor to perform such obligation at Subtenant's expense, and for which Subtenant shall be liable, and Subtenant shall, within five (5) business days of Sublandlord's demand, reimburse Sublandlord for all costs and expenses incurred by Sublandlord in connection therewith.

## 6.   Insurance and Indemnification

    6.1  Whenever, pursuant to any of the Incorporated Provisions as incorporated herein, Subtenant is required to furnish insurance to or for Sublandlord, Subtenant shall also be required to furnish such insurance to or for Overlandlord and such other persons as shall be entitled thereto pursuant to the Overlease or otherwise.

6.2    Whenever, pursuant to any of the Incorporated Provisions as incorporated herein, Subtenant is required to indemnify or defend Sublandlord in the event of a breach or default by, or conduct of, Subtenant, Subtenant shall be required also to indemnify or defend Overlandlord and such other persons as shall be entitled thereto under the Overlease or otherwise.

6.3    In addition to Subtenant's obligations under Section 6.2, Subtenant shall indemnify, defend and hold harmless Sublandlord from and against any loss, cost, damage or expense (including attorneys' fees), or any claim therefor, arising out of (a) actions taken by Sublandlord at Subtenant's request pursuant to Section 5.4, or (b) any failure by Subtenant to observe or perform any of the terms, covenants or conditions of this Sublease required to be observed or performed by Subtenant, including any loss, cost, damage or expense which may result from (i) any default under or termination of the Overlease arising by reason of any such failure, or (ii) any holding over by Subtenant in the Sublease Premises beyond the expiration or sooner termination of this Sublease, including any such liability with respect to the entire Overlease Premises arising out of such holding over by Subtenant.

## 7.    <u>Covenant of Quiet Enjoyment</u>

Sublandlord covenants that Subtenant may peaceably and quietly enjoy the Sublease Premises without disturbance by Sublandlord or any person claiming by, through or under Sublandlord, subject nevertheless to the terms and conditions of this Sublease, the Overlease, and any other agreement, lease and/or mortgages to which this Sublease is subordinate.

## 8.    <u>Assignment and Subsubletting</u>

8.1    This Sublease shall not be assigned, encumbered or otherwise transferred, including by operation of law. Any change in the ownership or control of Subtenant (i) having as its principal purpose, or resulting in, the transfer of this Sublease, or (ii) which under the terms of the Overlease is deemed to be an assignment, shall be deemed an assignment of this Sublease.

13

8.2   The Sublease Premises shall not be subsublet by Subtenant in whole or in part except upon: (a) the prior written consent of the Sublandlord, which approval shall not be unreasonably withheld provided that: (i) the sub-subtenant provides copies of its financial report and other relevant financial information requested by Sublandlord, and sub-subtenant's financial information reasonably demonstrates to Sublandlord in its sole discretion that the sub-subtenant can comply with all terms and conditions of the sub-sublease, (ii) the sub-subtenant complies with all terms and conditions set forth in Section 11 of the Overlease, (iii) the sub-subtenant shall only use the Sublease Premises for warehousing and storage of general merchandise excluding any perishable merchandise or goods, or Hazardous Materials as defined in section 7.1 of the Overlease, (iv) the sub-subtenant shall not cause or permit the Sublease Premises to be used as an Industrial Establishment as defined in Section 7.2 of the Overlease,  and/or (v) is not a competitor of the Sublandlord in any manner whatsoever, and (b) the prior written consent of the Overlandlord obtained pursuant to Section 11 of the Overlease.   The  Subtenant shall be responsible for, and pay, all costs and expenses incurred by the Sublandlord and Landlord in connection with any subsublet, including attorneys fees.

8.3   The Sublease Premises shall not be used or occupied by any person other than Subtenant, in whole or in part.

8.4   Notwithstanding  the  foregoing,  no  assignment  or subsublease shall release the Subtenant named herein or any of its successors from any liability hereunder.   If this Sublease is assigned or the Sublease Premises or any part thereof are subsublet in violation of this Sublease then Sublandlord may collect Rents from or accept performance from the assignee or subsubtenant and no such collection or acceptance shall effect any such release or be deemed to constitute Sublandlord's consent to any assignment or subsubleasing.

## 9.   **Electricity, Gas, Water and Sewer**

9.1   Subtenant shall pay for electricity in accordance with the provisions of Exhibit E selected in Section 1.17 of this Sublease.

9.2  Subtenant shall pay all sales, use and/or utility taxes attributable to the electricity or gas furnished to the Sublease Premises.  All amounts payable under this Section 9.2 shall be due within five (5) business days of Sublandlord's bills therefor, if any.

9.3  Sublandlord shall pay to Overlandlord or the utility company all charges for electricity furnished to the Overlease Premises, except as otherwise provided in Exhibit E, Option A, if applicable.

9.4  The Sublease Premises has a separate gas meter, and Subtenant shall be responsible for, and directly pay, the utility company for all costs and expenses incurred in connection with its gas supply and usage.

9.5  Subtenant shall be responsible for, and directly pay, the water and sewer charges for the Sublease Premises.

9.5  In no event shall Sublandlord have any liability for any defect in, or any interruption or failure of, the electricity or gas furnished to the Sublease Premises. In no event shall Subtenant draw or use more electricity or gas than that which the pipelines, feeders, risers, panels and/or any other gas or electricity supply equipment serving the Sublease Premises are capable of safely providing or supplying.

## 10. **Alterations**

10.1 Subtenant shall not make any alterations, additions, installations, or improvements in or to the Sublease Premises without first having obtained the written consent and approval of Overlandlord (if and to the extent required by the Overlease), and of Sublandlord.  Sublandlord may withhold such consent or approval in its sole discretion.  Subtenant shall not directly seek any such written consent and approval from the Overlandlord.

10.2 If Overlandlord and Sublandlord shall consent to any alterations, installations, additions or improvements, then Subtenant shall diligently and promptly observe and perform all of the terms, covenants and conditions of the Overlease applicable thereto.

15

## 11.  Personal Property

11.1 Sublandlord hereby leases to Subtenant, and Subtenant hereby hires from Sublandlord, the Included Personal Property listed on Exhibit F hereto, if any.  In consideration of the foregoing, Subtenant shall pay to Sublandlord, as Additional Rent payable in equal monthly installments together with each monthly payment of Base Rent, an amount per annum equal to the Personal Property Rent and any sales, other taxes that may be imposed in connection with the Subtenant's rental, use or right to use the Included Personal Property pursuant to this Sublease.

11.2.    Subtenant shall:

11.2.1    Accept the Included Personal Property in its "as is" condition as of the date hereof, as the same may be affected by reasonable wear and tear after the date hereof;

11.2.2    Insure the Included Personal Property against loss or damage by fire or other casualty (and all of the provisions of this Sublease applicable to insurance required to be carried by Subtenant shall be applicable thereto); and

11.2.3    Surrender the Included Personal Property to Sublandlord in the Sublease Premises upon the expiration or sooner termination of this Sublease in the same condition as at the commencement of this Sublease, as the same may be affected by reasonable wear and tear or damage by fire or other casualty; provided, however, that if the Included Personal Property shall have been damaged by fire or other casualty and not repaired or replaced then upon such expiration or sooner termination Subtenant shall pay to Sublandlord the full replacement cost thereof.

## 12.  Security Deposit

12.1  Cash Security

(a)    Subtenant shall deliver to Sublandlord a security deposit in the Required Security Deposit Amount, in the amount of $735,724.02 (the "Required Security Deposit Amount"), in order to secure the faithful observance and performance by Subtenant of the

16

terms and conditions of this Sublease.  The Required Security Deposit Amount shall be paid to Sublandlord in three equal installments as follows: (i) First installment, in the amount of $245,241.34, due on or before December 1, 2023; (ii) Second installment, in the amount of $245,241.34, due on or before January 1, 2024; and (iii) Third installment, in the amount of $245,241.34, due on or before January 15, 2024.  If Subtenant defaults in the observance or performance of any of such terms and conditions, Sublandlord may use or apply all or any part of such security deposit for the payment of any amounts not paid when due or for the payment of any other amounts due Sublandlord by reason of such default, including any costs of Sublandlord's observing or performing such terms or conditions on Subtenant's behalf and any deficiencies in reletting or damages incurred by Sublandlord.  If Sublandlord shall use or apply all or any part of such security deposit, Subtenant shall be liable for such deficiency, and immediately upon notice from Sublandlord, deliver to Sublandlord additional funds so as to restore the security deposit to the Required Security Deposit Amount.  If Subtenant shall faithfully observe and perform all of the terms and conditions of this Sublease, the security deposit, or so much thereof as shall not have been used or applied in accordance with this Sublease (or is not eligible to be applied), shall be returned to Subtenant after the expiration or sooner termination of this Sublease and the surrender of the Sublease Premises to Sublandlord,  vacant, and when the Sublandlord shall have determined that all of the Subtenant's obligations under this Sublease have been fulfilled, and in accordance with this Sublease.   If Sublandlord shall transfer the security deposit to an assignee of Sublandlord's interest under the Overlease, the Sublandlord making such transfer and assignment shall be deemed released from all liability to Subtenant with respect to the security deposit or the return thereof, and Subtenant agrees to look solely to the transferee and assignee with respect thereto.  Subtenant shall not assign (other than to an assignee of this Sublease) or encumber its interest in the security deposit and no such assignment or encumbrance shall be valid or binding upon Sublandlord.

12.2 Letter of Credit

(a) Within eighteen months from December 1, 2023, the required Security Deposit shall in the form of an Irrevocable Standby Letter of Credit in favor of the Sublandlord.  Subtenant shall deliver to Sublandlord, as security for this Sublease, an irrevocable letter of credit (the "Original Letter of Credit") in

17

the amount of $735,724.02 (the "Required Security Deposit Amount")
issued by a bank which is a member of the Federal Reserve System
satisfactory to Sublandlord, which shall (i) be transferable, (ii)
be payable to Sublandlord in partial or full draws upon
presentation solely of a notice signed by an officer of Sublandlord
(which presentation may be made at the issuer's counter or by
courier or by overnight mail at the address specified in such
letter of credit), (iii) have an initial expiry date not less than
one year from the date of issue and contain an "evergreen"
provision to the effect that such letter of credit will be
automatically extended for successive one-year periods unless at
least sixty (60) days prior to the expiration thereof, the issuer
gives written notice to Sublandlord that such letter of credit will
not be extended for the next annual period, (iv) have a final
expiry date which shall be not earlier than the day which is sixty
(60) days after the Sublease Expiration Date, and (v) be in form
and substance otherwise satisfactory to Sublandlord.  The Original
Letter of Credit and any Replacement Letter of Credit (as
hereinafter defined) delivered to Sublandlord as hereinafter
provided is herein referred to as the "Letter of Credit". Any and
all fees or costs charged by the issuer in connection with the
issuance, maintenance or transfer of the Letter of Credit shall be
paid by Subtenant. Upon receipt of the foregoing Letter of Credit
from the Subtenant, provided it was timely delivered and satisfies
all of the foregoing provisions of this Section 12.2, Sublandlord
shall promptly return the cash Security Deposit as set forth in
Section 12.1 above, to Subtenant less any amounts deducted
therefrom in accordance with the terms of this Sublease, if any.

   12.3  Additional Conditions and Provisions Applicable to Cash
         Security and/or Letter of Credit

         (a)  If Subtenant defaults in the observance or
performance of any of the terms and conditions of this Sublease,
Sublandlord may draw upon the Letter of Credit, and may use or
apply all or any part of the proceeds of such drawing and any cash
security deposit then held by Sublandlord for the payment of any
amounts not paid when due or for the payment of any other amounts
due Sublandlord by reason of such default, including any costs of
Sublandlord's observing or performing such terms or conditions on
Subtenant's behalf, any deficiencies in reletting, and any damages
to which Sublandlord may be entitled. Any proceeds of the Letter of
Credit which are not used or applied as hereinabove provided shall
be held by Sublandlord as a cash security deposit until so used or
applied. If any portion of the Letter of Credit is drawn upon,

18

Subtenant shall, within five (5) business days after written demand from Sublandlord, deliver to Sublandlord either an amendment of the Letter of Credit signed by the issuer, reinstating the undrawn amount of such Letter of Credit by an amount equal to such drawing up to the Required Security Deposit Amount (an "Amendment"), or shall deliver to Sublandlord, in replacement of such Letter of Credit a Replacement Letter of Credit (as hereinafter defined), in which latter event, the Letter of Credit so replaced shall be returned to Subtenant and, provided there is then no outstanding default by Subtenant, any cash security held by Sublandlord shall be paid over to Subtenant. A "Replacement Letter of Credit" shall mean a letter of credit in the Required Security Deposit Amount in the same form as the Original Letter of Credit issued by a bank which is a member of the Federal Reserve System satisfactory to Sublandlord. Subtenant's failure to increase the Letter of Credit or to deliver a Replacement Letter of Credit to Sublandlord within such five (5) business day period shall be deemed to be a default under this Sublease entitling Sublandlord to exercise all of its rights under this Sublease without requiring Sublandlord to provide any further notice or grace period to Subtenant.

(b)    If the issuer of the Letter of Credit gives notice to Sublandlord that the Letter of Credit will not be extended for the next annual period, Sublandlord may immediately draw the full amount of the Letter of Credit, and the amount so drawn shall be held as a cash security deposit by Subtenant which may be used and applied as provided in Subsection (a) hereof. Subtenant within five (5) business days after demand by Sublandlord, shall deliver a Replacement Letter of Credit to Sublandlord, in which case, provided there is then no outstanding default by Subtenant, any cash security then held by Sublandlord shall be paid over to Subtenant.

(c)    Subtenant's failure to deliver an Amendment or Replacement Letter of Credit to Sublandlord as provided in Subsection (a) hereof or to deliver a Replacement Letter of Credit to Sublandlord as provided in Subsection (b) hereof within the periods specified in such subsections shall be deemed to be a default under this Sublease entitling Sublandlord to terminate this Sublease by notice to Subtenant in the same manner and with the same effect as provided in this Sublease, and to exercise all other rights and remedies hereunder, without requiring Sublandlord to provide any further notice or grace period to Subtenant.

(d)    If Subtenant shall faithfully observe and perform all of the terms and conditions of this Sublease, the Letter of Credit and any cash security or so much thereof as shall not have been used or applied in accordance with the terms hereof (or is not eligible to be applied), shall be returned to Subtenant within sixty (60 days) after the expiration or sooner termination of this Sublease and the surrender of the Premises to Sublandlord, vacant, and at such time after termination of this Sublease when Sublandlord shall have determined that all of Subtenant's obligations under this Sublease have been fulfilled, and in accordance with the terms of this Sublease.

(e)    If Sublandlord shall transfer or assign the Letter of Credit or any cash security deposit held by Sublandlord to a transferee or assignee of Sublandlord's interest under the Lease, Sublandlord shall be deemed released from all liability to Subtenant with respect to the Letter of Credit or such cash security deposit, or the return thereof, and Subtenant agrees to look solely to such transferee or assignee with respect thereto.

(g)    Subtenant shall not assign or encumber its interest in the Letter of Credit or any cash security deposit hereunder, and no such assignment or encumbrance shall be valid or binding upon Sublandlord.

## 13.  **Notices**

Any notice or other communication under this Sublease shall be in writing and shall be sent by e-mail, USPS express mail or by a nationally recognized overnight delivery service addressed to the party for whom intended at its address set forth on the signature page hereof, or to such other address as such party shall have designated by notice to the other in the manner herein prescribed. Any such notice, etc. shall be deemed given when sent (if by e-mail), delivered or refused or when delivery is attempted on a business day.

## 14.  **Broker**

Subtenant represents and warrants to Sublandlord that Subtenant has dealt with no broker, agent or finder in connection with this Sublease other than the Recognized Broker, and Subtenant agrees to indemnify Sublandlord against any claim for commission or other compensation in connection with this Sublease made against Sublandlord by any other broker, agent or finder with whom Subtenant has dealt, or is claimed to have dealt, in connection with this Sublease, and all costs, expenses and liabilities in connection therewith, including attorneys' fees and disbursements incurred by Sublandlord in the defense of any such claim. Sublandlord shall pay any commission due the Recognized Broker in accordance with a separate agreement. The provisions hereof shall survive the termination of this Sublease.

## 15.  **Overlandlord Consent**

This Sublease is subject to Overlandlord's written consent. Sublandlord shall request the same, and Subtenant shall pay any fees or charges expressly provided for in the Overlease. Subtenant shall pay Overlandlord directly, or reimburse Sublandlord, for any costs, expenses or fees charged to Sublandlord pursuant to 11.6 of the Overlease – the foregoing obligation of Subtenant shall survive even if the Overlandlord's consent is not obtained and/or the Sublease canceled.  Subtenant agrees promptly to provide any financial or other information requested by Overlandlord.  Each party agrees promptly to execute and deliver a consent agreement or any other form or agreement requested by Overlandlord provided that the any such form or agreement is no less favorable to such party in any material respect than any form or agreement already submitted to Overlandlord.  If Overlandlord's consent is not received within 30 days of the full execution and delivery hereof, either party by notice to the other given prior the receipt of Overlandlord's consent, may cancel this Sublease, in which case Sublandlord shall promptly return to Subtenant all sums theretofore paid by Subtenant hereunder.  Subtenant waives any claim against Overlandlord arising out of any failure or refusal by Overlandlord to grant consent.

21

## 16. **Miscellaneous**

16.1 In any instance in which Sublandlord is required by any provision of this Sublease or applicable law not unreasonably to withhold consent or approval, Subtenant's sole remedy shall be an action for specific performance or injunction requiring Sublandlord to grant such consent or approval, all other remedies which would otherwise be available being hereby waived by Subtenant.

16.2 This Sublease contains the entire agreement between the parties hereto, and all prior negotiations and agreements are merged in this Sublease.  Any agreement hereafter made shall be ineffective to change, amend, alter, modify or discharge this Sublease in whole or in part unless such agreement is in writing and signed by the party to be charged.

16.3 The submission of this document by Sublandlord to Subtenant shall not constitute an offer by Sublandlord, and Sublandlord shall not be bound in any way unless and until this Sublease is executed and delivered by both parties.

16.4 The failure or delay of either party in exercising any right hereunder shall not operate as a waiver of such right, nor shall a single or partial exercise of such right preclude any further exercise of such right.

16.5 No party shall be considered the draftsman of this Sublease for the purpose of construing alleged ambiguities herein. The Sublease is the product of informed, voluntary negotiations and compromises, and was entered into after a reasonable period of time.  Each party has reviewed the Sublease and have mutually participated in its drafting.

16.6 The parties warrant and represent for themselves that: (a) they have full power, legal capacity and authority to enter into and perform this Sublease; (b) all actions required to be taken and all consents required to be obtained to authorize the execution and performance of this Sublease have been taken or obtained, and/or are in the process of being obtained pursuant to the terms and conditions of the Overlease and/or where the consent of the Overlandlord is required; (c) subject to the terms and conditions of the Overlease, the parties are not prohibited from entering into this Sublease or consummating the Sublease contemplated herein by law, regulation, agreement, instrument,

22

restriction, order or judgment; and (d) this Sublease constitutes the legal, valid and binding obligation of each party, enforceable in accordance with its terms.

16.7 Subject to the terms and conditions as set forth in this Sublease and the Overlease, including but not limited to the requirement to obtain the Sublandlord's and/or Landlord's consent, the Sublease shall be binding upon, and shall inure to the benefit of each of the parties and their successors and successors-in-interest.

16.8 Each of the parties to the Sublease acknowledges that it has relied on the advice of its own attorneys in entering into this Sublease, and each further acknowledges that it has been afforded a full and complete opportunity to review and evaluate the terms and conditions of the Sublease with counsel.

16.9 The Sublease may be executed by the parties in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This Sublease may be executed by facsimile or other electronic copy and each signature thereto shall be and constitute and original signature, as if all parties had executed a single original document.

16.10    The parties agree and acknowledge that if one or more of the provisions of this Sublease shall be invalid, illegal or unenforceable in any respect, the validity, the legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. If any provision contained in this Sublease is held, for any reason, to be unenforceable, such provision shall be construed by limiting and reducing it so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

16.11    This Agreement shall be governed by, and construed in accordance with, the laws of the state of New Jersey.

/

/

/

/

23

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement of Sublease as of the day and year first above written.

Dynamic Marketing Inc.
Sublandlord

By:_____
Name: Andrew J. Guattery
Title: President.


1 Stop Electronics Center, Inc.
d/b/a 1 Stop Computer and Cameras
Subtenant

By:_____
Name: ROBERT D. BAYRY
Title: CFO


24

Sublandlord Address for Notices:

Dynamic Marketing Inc.
1369 Lamberton Road
Hamilton Township, New Jersey 08611
Attention: Alan Joskowicz, Executive Director
Tel.: 347-729-7055
E-Mail: Alan@DMIORG.com

with a copy to:

Dynamic Marketing Inc.
400 Cabot Drive Unit B
Hamilton Township, New Jersey 08690
Attention: Alan Joskowicz, Executive Director

>    Mailing Address:
>    Dynamic Marketing Inc.
>    P.O. Box 9990
>    Trenton, New Jersey 08650


Subtenant Address for Notices:

1 Stop Electronics Center, Inc.
1870 Bath Avenue
Brooklyn, New York 11214
Attention: Rick Bunka, President
Tel.: 440-915-5398
E-mail: rick.bunka@polished.com

with a copy to:

1 Stop Electronics Center, Inc.
1870 Bath Avenue
Brooklyn, New York 11214
Attention: Kishan Bhavsar, Esq., Corporate Counsel
Tel.: 347-350-2078 x4959
E-Mail: kishan.bhavsar@polished.com

**Exhibit A**

**Sublease Premises**

# 1 STOP

## LAMBERTON BLDG 1 | HAMILTON NJ

**OPTION-1**

SCALE: N.T.S.

15 MAY 2023 | 9651

EXHIBIT A





PARETTE
SOMJEN

ARCHITECTS



**Exhibit B**

**Sublandlord's Work**

**EXHIBIT B - Sublandlord's Work**

*One Stop:*

·Fit-Out - Two Offices - see attached Exhibit B-1 7/25/2023
full set of drawings for One-Stop Warehouse Office Fit-Out
drawing showing the location of two offices.

(1) 1 Stop Office - Offices, Open Office, Conference Room,
Mens/Women's Restrooms, Unisex Restrooms, Breakroom
- see attached Exhibit B-1 7/25/2023 full set of
drawings for One-Stop Warehouse Office Fit-Out;

(2) 1 Stop Warehouse Office - (1x) Receiving Office, (1x)
Storage Room, (1x) Unisex Receiving Restroom
- see attached Exhibit B-1 7/25/2023 full set of
drawings for One-Stop Warehouse Office Fit-Out;

·Finishes - Plam Millwork, painted birch doors and KD frames.
Aladdin carpet tile "Pattern Perspective", Armstrong VCT,
Armstrong 769 Ceiling tile and Armstrong 15/16" ceiling
grid. All lighting to be industry standard LED troffer style
fixtures, receptacles to be industry standard, standard
light switching, standard Grade 2 ADA hardware. All restroom
partitions to be baked enamel or equal. Standard grab bars
and stainless steel toilet fixtures. All toilets to be wall
mounted. All sinks to be wall mounted.

- Pursuant to Section 4.4 of the Sublease, Subtenant
explicitly agrees and acknowledges the cost of
Sublandlord's Work for which Sublandlord shall be
responsible for, and pay, shall not exceed $1,140,000,
and Subtenant agrees to be responsible for, and pay,
for all amounts Sublandlord's Work incurred in excess
of $1,140,000, regardless of the estimates set forth in
any Rough Order.

· Demising Wall - Pursuant to Section 4.3 of the Sublease,
Sublandlord shall be responsible for installing the demising
wall, and pay all costs associated with the installation
thereof.  It is agreed that it shall be within Sublandlord's
sole and unreviewable discretion as to the type and the
composition of demising wall to be installed, including but
not limited to fencing, drywall, and the like.

## PROJECT GENERAL NOTES:

DRAWINGS ARE NOT TO BE SCALED. DIMENSIONS ARE PROVIDED TO INDICATE DESIGN INTENT ONLY. LARGE-SCALE DETAILS SHALL SUPERSEDE SMALLER-SCALE DRAWINGS

THE GENERAL CONTRACTOR SHALL:

1) Coordinate the work of all trades and the owner's requirements for all work indicated in these Contract documents and assume final responsibility for all construction coordination

2) Verify all existing conditions, dimensions, etc. at the site.  Report any discrepancies to the architect in writing prior to construction. Any surfaces requiring repair for proper installation of new finishes must be included in the base bid.  Contractor shall also coordinate work with the work of other trades.

3) Submission of bid acknowledges that the bidder has visited the site and is sufficiently familiar with all pertinent conditions for a competent and meaningful bid.

4) Be responsible for all demolition as required for completion of the project.  Remove all demolished materials, not designed for reuse, from the premises.  Existing conditions disturbed by alteration work shall be patched, repaired, or repaired to match existing conditions & finishes to a like new condition.  Remove all debris from the site & leave the premises clean, neat and orderly at the completion of the project.

5) Cap & identify all existing utilities prior to demolition in areas including floors coverings & partitions, etc.  Coordinate with Owner's vendors

6) Provide proper protection for all building work, furniture, materials, equipment and fixtures which are likely to be damaged during construction.  The existing structures/systems shall keep be protected and structural integrity maintained.  Temporary partitions to separate work areas from occupied areas shall be provided to prevent the spread of dust, moisture, and other construction debris

7) Be responsible for maintaining the security of the building throughout the project to free competition and owner's acceptance.  Cooperate with building management on security procedures

8) Verify requirements for fire extinguisher locations and installation, per requirements of the local Fire Marshal

9) Perform all work shown on these drawings unless specifically noted otherwise

10) Be responsible for scheduling and coordination of all trades including those not directly in new projects.  These will include but not be limited to Furniture, Security, and Data/Telco Cabling

11) (if applicable)  Coordinate the work of this construction phase with tenant moving company, telephone vendor, internet I.  (esp), and owners security system vendor, and building manager.

12) Obtain all permits, inspections and certificates necessary for occupancy by Tenant U.H.O., Temporary Certificate of Occupancy (T.C.O.) or C.O./C.O. as a pre-requisite to final payment for the Work indicated in these contract documents, at the completion of this phase (or project)

13) Include (as) all permits in bid (unless mandated per requirement)  bid work shall conform to the requirements of all appropriate codes, laws, rules, and regulations of all constituted authorities having jurisdiction

14) Contractor to prepare coordination drawings of all items, material samples and equipment cut-sheets.  Shop drawings shall include detailed fabrication and erection drawing, setting drawings, diagrammatic drawings and materials, all dated shall be clearly indicated.  Reproduced shall begin only after receiving approved shop drawings.

15) All new materials and installations shall be in accordance with Manufacturer's listed specification requirements and in accordance with current code requirements

16) Drawings may not represent all existing site conditions.  Contractor is responsible for field verification of existing conditions prior to ordering any materials or proceeding with the work.  Contractor to notify Architect of any discrepancies or questions and obtain required clarification prior to proceeding with work

17) No change orders will be permitted unless submitted in writing by the contractor & approved by the owner in advance submittals

18) Contractor shall submit shop drawings of all items, material samples and equipment cut-sheets.  Shop drawings shall include detailed fabrication and erection drawing, setting drawings, diagrammatic drawings and materials, all dated shall be clearly indicated.  Reproduced shall begin only after receiving approved shop drawings

19) Provide maximum of (1) one-year warranty of all workmanship.

20) Punchlist to be provided, if requested, only after receipt of Certificate of Occupancy (C.O.)

## SYMBOLS

SINGLE-ELEVATION MARKER
Elevation Number
Sheet Number

MULTI-ELEVATION MARKER
Elevation Number, Top

DETAIL MARKER
Detail Number
Sheet Number

SECTION MARKER
Section Number
Sheet Number

COLUMN GRID MARKER

ROOM MARKER
Department Name
Room Name
Room Number

FINISH MARKER
Wall
Base
Floor

REVISION MARKER

DRAWING NOTE

NEW DOOR & NUMBER

EXIST DOOR

PARTITION TYPE

## ABBREVIATIONS

A.F.F.    Above Finished Floor
BLDG.     Building
CLG       Ceiling
L         Centerline
COL.      Column

CONC.     Concrete
EQ.       Equal
EXIST.    Existing
F.E.C.    Fire Extinguisher Cabinet
G.C.      General Contractor
HT.       Height
H.V.A.C.  Heating Ventilating Air Conditioning
MAX.      Maximum
MTL.      Metal
N.T.S.    Not To Scale
O.C.      On CENTER
O.C.      Overall Count
PTD.      Painted
R.O.      Rough Opening
S.F.      Square Foot (Feet)
S.S.      Stainless Steel
TYP       Typical

U.O.N.    Unless Otherwise Noted
V.I.N.O.  Unless Noted Otherwise
VCT       Vinyl Composition Tile
V.I.F.    Verify in Field

## MAIN TITLE

PROPOSED IMPROVEMENTS FOR
HASSETT:

# ONE-STOP WAREHOUSE OFFICE FIT-OUT

### 1369 LAMBERTON ROAD
### HAMILTON TOWNSHIP, NEW JERSEY 08611
### BLOCK: 2506 LOT: 8

**KEY PLAN**                    **SCALE: N.T.S.**

▨▨▨ AREA OF CONSTRUCTION

**LIST OF DRAWINGS**

**ARCHITECTURAL**

| | |
|---|---|
| T1.01 | COVER SHEET |
| A0.01 | SPECIFICATIONS |
| A1.01 | CONSTRUCTION PLAN |
| A1.02 | CONSTRUCTION PLAN |
| A2.01 | REFLECTED CEILING PLAN |
| A2.02 | REFLECTED CEILING PLAN |
| A3.01 | DETAILS |
| A4.01 | DETAILS & SCHEDULES |

## PROJECT DESCRIPTION

PROPOSED IMPROVEMENTS FOR
HASSETT

LOCATION    1369 LAMBERTON ROAD
            HAMILTON TOWNSHIP, NEW JERSEY 08611

PROPOSED CONSTRUCTION OF (2) KEY OFFICE SPACES IN AN EXISTING WAREHOUSE.

## CODE DATA

N.J.I.C.C. NEW JERSEY UNIFORM CONSTRUCTION CODE
           INTERNATIONAL BUILDING CODE 2021 NJ ED.

REHABILITATION SUBCODE SUBCHAPTER 6
5.23-6.8 ALTERATION

USE GROUP 2021 IBC - M

SECTION 304 BUSINESS GROUP B/S-1
TYPE OF CONSTRUCTION
NB FULLY SPRINKLERED

OFFICE AREA              5,810 S.F.

WAREHOUSE:               222,190 S.F.

AREA OF CONSTRUCTION     5,810 S.F.

VOLUME OF CONSTRUCTION   79,000 C.F.

IBC-NJ 2021 TABLE 1004.5
MINIMUM FLOOR AREA ALLOWANCES PER OCCUPANT

OFFICE      1 PER 150 SFA          39 OCCUPANTS
WAREHOUSE   1 PER 500 SFA          444 OCCUPANTS

## CODE & REGULATION NOTES:

ALL WORK SHALL CONFORM TO ALL RULES AND REGULATIONS OF THE STATE OF NEW JERSEY, MERCER COUNTY, HAMILTON TOWNSHIP AND ALL GOVERNING AUTHORITIES HAVING JURISDICTION. THIS INCLUDES, BUT IS NOT LIMITED TO FIRE CODES, BUILDING AND CONSTRUCTION CODES, CONTROLLED INSPECTIONS, MATERIAL TESTING, LABOR LAW, AND ZONING AND HEALTH REGULATIONS.

ANY WORK WHICH DEVIATES FROM SUCH STANDARDS SHALL BE RECTIFIED TO THE SATISFACTION OF THE GOVERNING AUTHORITY. THE REQUIREMENTS OF GOVERNING AUTHORITIES SHALL SUPERSEDE THE DRAWINGS AND SPECIFICATIONS IN ALL CASES. THE ARCHITECT SHALL BE NOTIFIED BY WRITTEN CHANGE ORDER REQUEST AND CHANGE ORDER MUST BE APPROVED BEFORE SUCH WORK IS STARTED. NON-FAMILIARITY WITH GOVERNING RULES AND REGULATIONS SHALL NOT BE CAUSE FOR AN EXTRA CHARGE AT THE EVENT THAT WORK MUST BE REPLACED FOR NONCOMPLIANCE.

BELOW ARE THE CURRENT ADOPTED SUBCODES UNDER NEW JERSEY UNIFORM CONSTRUCTION CODE(N.J.A.C.5.23-3.14)

INTERNATIONAL BUILDING CODE (IBC)
2021 NEW JERSEY EDITION (NJ3C)

INTERNATIONAL MECHANICAL CODE (IMC)
2021 EDITION

ASHRAE STANDARD-90.1
2019 EDITION

INTERNATIONAL ELECTRICAL CODE (NEC)
2020 EDITION

THE NATIONAL STANDARD PLUMBING CODE (N.S.P.C.)
2021 EDITION

PARETTE
SOMJEN

ARCHITECTS

639 Route 10 East
Randolph, NJ 07869
Tel 973.584.2400
Fax 973.584.5441
www.sibanetPSA.com

PROPOSED IMPROVEMENTS FOR
HASSETT

ONE-STOP
OFFICE FIT-OUT

1369 LAMBERTON ROAD
HAMILTON TOWNSHIP, NJ 08611
BLOCK: 2506 LOT: 8

NOT FINAL

EXHIBIT B-1

| REV | DATE | REMARK |
|---|---|---|

**COVER SHEET**

**T1.01**

GENERAL CONSTRUCTION NOTES

UNLESS NOTED OTHERWISE BY SEPARATE AND SPECIFIC REFERENCE ON THE DRAWINGS, THIS PROJECT SHALL CONFORM TO THE FOLLOWING CONSTRUCTION STANDARDS.

DIVISION 1: GENERAL REQUIREMENTS

01010 - CONSTRUCTION PROCEDURES

01040 - REGULATORY REQUIREMENTS

01100 - SPECIAL PROJECT PROCEDURES

01400 - QUALITY CONTROL

01500 - EXPANSION OF PREMISES

01600 - PROTECTION OF PREMISES

DIVISION 3: CONCRETE

03010 - CONCRETE MATERIALS

DIVISION 5: METALS

DIVISION 8: DOORS AND WINDOWS

08200 - WOOD AND PLASTIC DOORS

08800 - GLAZING

DIVISION 9: FINISHES

09100 - CEILING SUSPENSION SYSTEMS

09250 - GYPSUM BOARD

09500 - ACOUSTICAL SYSTEMS

09650 - RESILIENT FLOORING

09900 - PAINTING



PARETTE
SOMJEN
ARCHITECTS

PROPOSED IMPROVEMENTS FOR:
HASSETT

ONE-STOP
OFFICE FIT-OUT

1344 LAMBERTON ROAD
HAMILTON TOWNSHIP, NJ 08611
BLOCK: 2295 LOT: 8

NOT FINAL





SPECIFICATIONS

A0.01



**CONSTRUCTION PLAN (A)**

SCALE: 1/4" = 1'-0"

## GENERAL NOTES:

EXISTING ELECTRICAL WIRING IN PARTITION CONSTRUCTION TO BE DEMOLISHED IS TO BE REMOVED BACK TO NEAREST JUNCTION BOX, TYP.

WHERE REQUIRED BY NEW CONSTRUCTION, CONTRACTOR SHALL SATISFACTORILY PATCH, REPAIR AND/OR REPLACE EXISTING CONSTRUCTION (TO PROVIDE "AS NEW SURFACES" TO MATCH NEW CONSTRUCTION).

ALL SUBSTRATE SURFACES TO BE PROPERLY PREPARED TO RECEIVE NEW FINISH MATERIALS. SUBCONTRACTOR IS NOT TO APPLY FINISHES UNTIL SUBSTRATE SURFACE IS SMOOTH, DRY, AND READY TO RECEIVE MATERIALS AS SPECIFIED IN MANUFACTURER'S WRITTEN INSTRUCTIONS FOR INSTALLATION OR APPLICATION.

G.C. TO PROTECT, REPAIR & CLEAN ALL "EXISTING TO REMAIN" ITEMS AS NEEDED TO PROVIDE "AS NEW" APPEARANCE.

G.C. TO VERIFY ALL INDICATED ELECTRICAL DEMOLITION IN FIELD AND NOTIFY ARCHITECT OF DISCREPANCIES.

DIMENSIONS ARE FROM FACE OF GYP. BOARD (TYP.) AND WALL THICKNESSES ARE AS INDICATED BY DETAILS UNLESS NOTED OTHERWISE.

CONSTRUCTION SHALL BE NON COMBUSTIBLE. ANY LUMBER MUST BE FIRE RETARDANT AS PER IBC 2021 NJ EDITION SECTION 2303.2, AS PER NEW JERSEY UNIFORM CONSTRUCTION CODE N.J.A.C.5:23-6.1².

PROVIDE BLOCKING IN WALLS FOR SUPPORT OF ALL WALL HUNG ITEMS.

CONTRACTOR TO PROVIDE ACCESS PANELS WHERE REQUIRED IN OFFICE CONSTRUCTION WHERE "SHUT-OFF" VALVES ARE AFFECTED IN CONSTRUCTION.

## DRAWING NOTES:

1. PATCH AND REPAIR FLOOR TO ACCEPT NEW FLOOR FINISHES. REFER TO FINISH SCHEDULE ON SHEET A4.01 FOR MORE INFORMATION TYPICAL FOR ALL AREAS IN NEW OFFICE FIT OUT.

2. ALL NEW AND EXISTING WALL SURFACES, SHALL BE PAINTED WITH ONE COAT OF PRIMER AND TWO COATS OF SPECIFIED PAINT TO MATCH BUILDING STANDARD.

3. CONTRACTOR TO VERIFY WIDTH OF NEW CHASE WALL WITH SIZE OF NEW WALL HUNG TOILET CARRIERS.

4. BUILD NEW COLUMN ENCLOSURE, CONTRACTOR TO MINIMIZE SIZE OF COLUMN ENCLOSURE.

5. PROVIDE FIRE-RATED BLOCKING IN PARTITION FOR TV'S. CONTRACTOR TO COORDINATE ALL LOCATION REQUIREMENTS WITH ONE-STOP REP. AND A/V VENDOR.

6. NEW PARTITION TO BE CENTERED & TIGHT TO WINDOW MULLION. END OF PARTITION IS TO BE FINISHED OFF & MATCH EXISTING BUILDING STANDARD

7. NEW KITCHEN CABINETRY. SEE DETAILS ON SHEET A4.01. NEW ADA SINK AND FAUCET TO BE BUILDING STANDARD. CONNECT TO EXISTING BUILDING PLUMBING. WASTE AND VENT. NO PVC PIPE TO BE USED IN PLENUM. UTILIZE COPPER PIPE ONLY. CONTRACTOR TO PROVIDE SEPARATE LINE ITEM IN PRICING PACKAGE FOR MILLWORK.

8. NEW ADA RESTROOM. CONNECT TO EXISTING SANITARY LINE. INSTALL NEW ADA TOILETS, SINKS, MIRRORS, AND ACCESSORIES. COORDINATE EXACT SPECIFICATIONS WITH LANDLORD. INSTALL 4'-0" HIGH A.F.F. WITH FRP WAINSCOTE WITH PAINT FINISH ABOVE.

9. NEW ADA RESTROOM. CONNECT TO EXISTING SANITARY LINE. INSTALL NEW ADA TOILETS, URINALS, SINKS, MIRRORS, ACCESSORIES AND PARTITIONS. COORDINATE EXACT SPECIFICATIONS WITH LANDLORD. INSTALL 4'-0" HIGH A.F.F. WITH FRP WAINSCOTE WITH PAINT FINISH ABOVE.

## SYMBOL LEGEND:

EXISTING CONSTRUCTION TO REMAIN

EXISTING DOOR TO REMAIN

NEW DOOR AND TAG - SEE DOOR SCHEDULE

NEW 12'-0" HIGH CEILING PENETRATING PARTITION. SEE SHEET A4.01

NEW 12'-0" HIGH FURRED OUT PARTITION. SEE A4.01

**KEY PLAN: N.T.S.**

---

PARETTE SOMJEN

ARCHITECTS

PROPOSED IMPROVEMENTS FOR:
HASSETT

ONE-STOP
OFFICE FIT-OUT

1349 LAMBERTON ROAD
HAMILTON TOWNSHIP, NJ 08611
BLOCK: 2306 LOT: 8

NOT FINAL

| KEY | DATE | REMARK |
|---|---|---|
| A | | ISSUED FOR PERMIT |

CONSTRUCTION
PLAN
MAIN OFFICE

A1.01



**GENERAL NOTES:**

**DRAWING NOTES:**

**SYMBOL LEGEND:**

CONSTRUCTION PLAN (B)

SCALE: 1/4" = 1'-0"

KEY PLAN: N.T.S.

PARETTE
SOMJEN

ARCHITECTS

PROPOSED IMPROVEMENTS FOR:
HASSETT

ONE-STOP
OFFICE FIT-OUT

1769 LAMBERTON ROAD
HAMILTON TOWNSHIP, NJ 08611
BLOCK: 2508 LOT: 8

NOT FINAL

CONSTRUCTION
PLAN
WAREHOUSE
OFFICE

A1.02



PARETTE
SOMJEN
ARCHITECTS

PROPOSED IMPROVEMENTS FOR:

ONE-STOP
OFFICE FIT-OUT

1369 LAMBERTON ROAD
HAMILTON TOWNSHIP, NJ 08611
BLOCK 3504, LOT 8

NOT FINAL

## REFLECTED CEILING NOTES:

PROVIDE ADDITIONAL WIRE HANGER SUPPORT AT ALL CORNERS OF LED LUMINAIRES WHERE NOT SUPPORTED BY A MAIN RUNNER OF THE CEILING GRID TRACK.

ALARM INDICATING DEVICES MUST BE VISIBLE AND AUDIBLE WITHIN TENANT SPACE OR ADDITIONAL DEVICES ARE REQUIRED TO BE INSTALLED IN TENANT SPACE AS PER NEW JERSEY UNIFORM CONSTRUCTION CODE NJAC5:23-6.7(H)1, AND IBC NJ 2021 SECTION 907.2.

CEILING HEIGHT IS +/-10'-8" A.F.F., V.I.F.

EXIT LIGHTS WITH BATTERY BACKUP AND EMERGENCY LIGHTING SHALL BE INSTALLED AS INDICATED ON DRAWINGS. A FUNCTIONAL TEST OF THE BUILDING'S EMERGENCY SYSTEM IS REQUIRED TO BE CONDUCTED AND WITNESSED BY LOCAL FIRE CODE OFFICIAL. ADDITIONAL EXIT DIRECTIONAL LIGHTS AND EMERGENCY LIGHTING MAY BE REQUIRED AS DETERMINED BY FIRE CODE OFFICIAL AND PER IBC NJ 2021 SECTIONS 1011 AND 1008 AND NEW JERSEY UNIFORM CONSTRUCTION CODE NJAC 5:23-6.17(E) & (F)

ALL SPACES SHOWN ON THE REFLECTED CEILING PLAN WITHOUT CEILING START POINTS WILL BEGIN AT A POINT LOCATED AT THE MIDPOINT OF ALL WALLS (I.E. THE EXACT CENTER OF THE ROOM)

ALL RECESSED FIXTURES SHALL BE SET FLUSH INTO ACOUSTIC TILE CEILINGS.

## HVAC NOTES:

REFER TO ENGINEERING DRAWINGS FOR FURTHER INFORMATION.

## SPRINKLER NOTE:

SPRINKLER LAYOUT SHOWN FOR LAYOUT PURPOSES ONLY. SEE ENGINEERING DRAWINGS FOR FURTHER INFORMATION.

ALL MODIFICATIONS TO EXISTING SPRINKLER SYSTEM TO BE DESIGNED BY OTHERS.

GENERAL CONTRACTOR IS RESPONSIBLE FOR ALL DESIGN AND COSTS ASSOCIATED WITH SPRINKLER MODIFICATIONS IN THIS SPACE.

## DRAWING NOTES:

1  NEW BUILDING STANDARD 2X4 CEILING WITH 15/16" GRID. COORDINATE EXACT SPECIFICATIONS WITH HILCO REPRESENTATIVE TBD

## SYMBOL LEGEND:

2'x4' LED LIGHT FIXTURE, NEW

SPRINKLER HEAD (N) NEW

AUDIBLE & VISIBLE FIRE ALARM & STROBE LIGHT; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW.

VISIBLE FIRE ALARM STROBE LIGHT; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW.

COMBINATION EXIT SIGN & EMERGENCY LIGHT W/BATTERY BACKUP; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW.

EMERGENCY LIGHT W/BATTERY BACKUP; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW.



REFLECTED CEILING PLAN (A)    SCALE: 1/4" = 1'-0"

KEY PLAN: N.T.S.

REFLECTED
CEILING PLAN

A2.01



## REFLECTED CEILING NOTES:

PROVIDE ADDITIONAL WIRE HANGER SUPPORT AT ALL CORNERS OF LED LUMINAIRES WHERE NOT SUPPORTED BY A MAIN RUNNER OF THE CEILING GRID TRACK

ALARM INDICATING DEVICES MUST BE VISIBLE AND AUDIBLE WITHIN TENANT SPACE OR ADDITIONAL DEVICES ARE REQUIRED TO BE INSTALLED IN TENANT SPACE AS PER NEW JERSEY UNIFORM CONSTRUCTION CODE NJAC5.23-6.7(H)1, AND IBC NJ 2021 SECTION 907.2.

CEILING HEIGHT IS +/-16'-6" A.F.F., V.I.F.

EXIT LIGHTS WITH BATTERY BACKUP AND EMERGENCY LIGHTING SHALL BE INSTALLED AS INDICATED ON DRAWINGS. A FUNCTIONAL TEST OF THE BUILDING'S EMERGENCY SYSTEM IS REQUIRED TO BE CONDUCTED AND WITNESSED BY LOCAL FIRE CODE OFFICIAL. ADDITIONAL EXIT DIRECTIONAL LIGHTS AND EMERGENCY LIGHTING MAY BE REQUIRED AS DETERMINED BY FIRE CODE OFFICIAL AND PER IBC NJ 2021 SECTIONS 1011 AND 1006 AND NEW JERSEY UNIFORM CONSTRUCTION CODE NJAC 5.23-6.17(E) & (F).

ALL SPACES SHOWN ON THE REFLECTED CEILING PLAN WITHOUT CEILINGS START POINTS WILL BEGIN AT A POINT LOCATED AT THE MIDPOINT OF ALL WALLS (I.E. THE EXACT CENTER OF THE ROOM)

ALL RECESSED FIXTURES SHALL BE SET FLUSH INTO ACOUSTIC TILE CEILINGS.

## HVAC NOTES:

REFER TO ENGINEERING DRAWINGS FOR FURTHER INFORMATION.

## SPRINKLER NOTE:

SPRINKLER LAYOUT SHOWN FOR LAYOUT PURPOSES ONLY. SEE ENGINEERING DRAWINGS FOR FURTHER INFORMATION.

ALL MODIFICATIONS TO EXISTING SPRINKLER SYSTEM TO BE DESIGNED BY OTHERS.

GENERAL CONTRACTOR IS RESPONSIBLE FOR ALL DESIGN AND COSTS ASSOCIATED WITH SPRINKLER MODIFICATIONS IN THIS SPACE.

## DRAWING NOTES:

1  NEW BUILDING STANDARD 2X4 CEILING WITH 15/16" GRID. COORDINATE EXACT SPECIFICATIONS WITH HILCO REPRESENTATIVE. TYP

## SYMBOL LEGEND:

2'x4' LIGHT LIGHT FIXTURE, NEW.

SPRINKLER HEAD (N) NEW

AUDIBLE & VISIBLE FIRE ALARM & STROBE LIGHT; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW

VISIBLE FIRE ALARM STROBE LIGHT; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW

COMBINATION EXIT SIGN & EMERGENCY LIGHT W/BATTERY BACKUP; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW

EMERGENCY LIGHT W/BATTERY BACKUP; DASHED IS TO BE REMOVED, (R) TO BE RELOCATED, & (N) NEW.



REFLECTED CEILING PLAN (B)    SCALE: 1/4" = 1'-0"

A

KEY PLAN: N.T.S.

PARETTE
SOMJEN

ARCHITECTS

PROPOSED IMPROVEMENTS FOR
HASSETT

ONE-STOP
OFFICE FIT-OUT

1569 LAMBERTON ROAD
HAMILTON TOWNSHIP, NJ 08611
BLOCK 2566 LOT: 8



NOT FINAL

REFLECTED
CEILING PLAN

A2.02





1 ADA WATER CLOSET BLOCKING    1/2" = 1'-0"

5 LOCATION OF TACTILE SIGNAGE AT DOORS    N.T.S.

2 REQUIRED ADA KNEE / TOE CLEARANCES    1/2" = 1'-0"

6 REQUIRED REACH RANGES    N.T.S.

3 LOCATION OF TACTILE SIGNAGE AT DOORS    1/2" = 1'-0"

8 TYP. ADA MOUNTING HTS    1/2" = 1'-0"

4 LOCATION OF TACTILE SIGNAGE AT DOORS    1/2" = 1'-0"

7 TYPICAL ADA DETAILS AND CLEARANCES    N.T.S.

TYPE F:
8" W x 9" H

WOMEN'S
RESTROOM

MEN'S
RESTROOM

PARETTE
SOMJEN
ARCHITECTS

PROPOSED IMPROVEMENTS FOR
HASSETT

ONE-STOP
OFFICE FIT-OUT

1369 LAMBERTON ROAD
HAMILTON TOWNSHIP, NJ 08611
BLOCK: 2506 LOT: 8

NOT FINAL

DETAILS

A3.01



PARETTE
SOMJEN

ARCHITECTS

PROPOSED IMPROVEMENTS FOR:
HASSETT

ONE-STOP
OFFICE FIT-OUT

DETAILS
& SCHEDULES

A4.01

**Exhibit C**

**Overlease**

OMITTED

# Exhibit G

# APPLICATION FOR PAYMENT

TO OWNER: **Dynamic Marketing Inc**
**1369 Lamberton Rd**
**Hamilton TWP, NJ 08611**

FROM CONTRACTOR: **Hassett Enterprises, Inc**
**3300 Trewigtown Rd**
**Colmar, PA 18915**

PROJECT: **One Stop Office Fit-Out**

PROJECT #:
PO#

APPLICATION #: **11 - FINAL RETAINAGE**

PERIOD TO: **10/31/24**

DATE: **10/16/24**

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation sheet is attached.

| | | |
|---|---|---|
| 1. Original Contract Sum | $ | 1,511,588.61 |
| 2. Net Change by Change Orders | $ | 9,646.12 |
| 3. Contract Sum to Date (Line 1+/- 2) | $ | 1,521,234.73 |
| 4. Total Completed & Stored to Date | $ | 1,521,234.73 |
| (Column G on Continuation Sheet) | | |
| 5. Retainage | $ | - |
| 6. Total Earned Less Retainage | $ | 1,488,116.91 |
| (Line 4 less Line 5 Total) | | |
| 7. Less Previous Applications for Payment | $ | 1,488,116.90 |
| 8. Current Payment Due | | $33,117.82 |
| 9. Balance to Finish, including Retaininage | | |
| (Line 3 less Line 6) | $ | - |

The undersigned Contractor certifies to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued, and payments received from the Owner, and that current payment shown here is now due

CONTRACTOR:_____ Hassett Enterprises Inc.

Commonwealth of Pennsylvania - Notary Seal
MICHAEL P SULOCK III - Notary Public
Montgomery County
My Commission Expires August 17, 2025
Commission Number 1404099

By: _____ Date: 10/16/2024

State of: Pennsylvania    County of: Montgomery
Subscribed and sworn to before me this 16 day of October, 2024
Notary Public: _____
My Commission expires: 08/17/2025

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

Amount Certified . . . . . .    33,117.82

(attach explanation if amount certified differs from amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.

ARCHITECT:

By: _____ Date: 10·30·24

This Certificate is non negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

| Change Order Summary | Additions | Deductions |
|---|---|---|
| Total changes approved in previous months by Owner | $ (41,032.13) | $ - |
| Total approved this Month | $ 50,678.25 | $ - |
| TOTALS | $ 9,646.12 | $ - |
| NET CHANGES by Change Order | $ | 9,646.12 |

Project ID: _____

Project Name: _____

Application # 11 - FINAL RETAINAGE
Period To: 10/31/24
Dated: 10/16/24

| Description | Contract Summary | | | Current Invoice | | | | Total | | | % Comp | % Retainage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Scheduled Value | Changes | Total Amount | Previous Application | Work This Invoice | Retainage This Invoice | Total less retainage | Total Retainage | Total Invoiced | Balance to Finish | | |
| General Requirements | 140,785.00 | 0.00 | 140,785.00 | 140,785.00 | 225.00 | 0.00 | 225.00 | 0.00 | 140,785.00 | 0.00 | 100.00% | 10% |
| Miscellaneous | 19,005.00 | 0.00 | 19,005.00 | 19,005.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,005.00 | 0.00 | 100.00% | 10% |
| Demolition & Concrete | 13,860.00 | 0.00 | 13,860.00 | 13,860.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13,860.00 | 0.00 | 100.00% | 10% |
| Carpentry | 420,836.00 | 0.00 | 420,836.00 | 420,836.00 | 3,433.70 | 0.00 | 3,433.70 | 0.00 | 420,836.00 | 0.00 | 100.00% | 10% |
| Electrical & Fire Alarm | 392,335.00 | 0.00 | 392,335.00 | 392,335.00 | 5,233.50 | 0.00 | 5,233.50 | 0.00 | 392,335.00 | 0.00 | 100.00% | 10% |
| Plumbing | 114,100.00 | 0.00 | 114,100.00 | 114,100.00 | 2,210.00 | 0.00 | 2,210.00 | 0.00 | 114,100.00 | 0.00 | 100.00% | 10% |
| HVAC | 141,350.00 | 0.00 | 141,350.00 | 141,350.00 | 565.40 | 0.00 | 565.40 | 0.00 | 141,350.00 | 0.00 | 100.00% | 10% |
| Fire Suppression | 39,000.00 | 0.00 | 39,000.00 | 39,000.00 | 492.00 | 0.00 | 492.00 | 0.00 | 39,000.00 | 0.00 | 100.00% | 10% |
| Painting and Wall Covering | 13,150.00 | 0.00 | 13,150.00 | 13,150.00 | 1,315.00 | 0.00 | 1,315.00 | 0.00 | 13,150.00 | 0.00 | 100.00% | 10% |
| Flooring & Carpet | 28,100.00 | 0.00 | 28,100.00 | 28,100.00 | 1,306.00 | 0.00 | 1,306.00 | 0.00 | 28,100.00 | 0.00 | 100.00% | 10% |
| Roofing | 23,060.00 | 0.00 | 23,060.00 | 23,060.00 | 0.00 | 0.00 | 0.00 | 0.00 | 23,060.00 | 0.00 | 100.00% | 10% |
| Overhead Doors | 23,474.00 | 0.00 | 23,474.00 | 23,474.00 | 0.00 | 0.00 | 0.00 | 0.00 | 23,474.00 | 0.00 | 100.00% | 10% |
| Structural Steel | 27,185.00 | 0.00 | 27,185.00 | 27,185.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27,185.00 | 0.00 | 100.00% | 10% |
| | | | | | 0.00 | | | | | | | |
| Insurance | 14,528.00 | 0.00 | 14,528.00 | 14,528.00 | 255.03 | 0.00 | 255.03 | 0.00 | 14,528.00 | 0.00 | 100.00% | 10% |
| Builders Risk Insurance | 1,149.72 | 0.00 | 1,149.72 | 1,149.72 | 0.00 | 0.00 | 0.00 | 0.00 | 1,149.72 | 0.00 | 100.00% | 10% |
| Permit - Allowance | 25,000.00 | 0.00 | 25,000.00 | 25,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 | 0.00 | 100.00% | 10% |
| Builders Fee - 5% | 74,670.89 | 0.00 | 74,670.89 | 74,670.89 | 1,034.27 | 0.00 | 1,034.27 | 0.00 | 74,670.89 | 0.00 | 100.00% | 10% |
| | | | | | | | | | | | | |
| CO#1 - Touchless Devices | 5,702.22 | 0.00 | 5,702.22 | 5,702.22 | 570.22 | 0.00 | 570.22 | 0.00 | 5,702.22 | 0.00 | 100.00% | 10% |
| CO#2 - Trash Compactor | 39,688.00 | 0.00 | 39,688.00 | 39,688.00 | 3,418.80 | 0.00 | 3,418.80 | 0.00 | 39,688.00 | 0.00 | 100.00% | 10% |
| CO#3 - Fencing Credit | (166,333.00) | 0.00 | (166,333.00) | (166,333.00) | 0.00 | 0.00 | 0.00 | 0.00 | (166,333.00) | 0.00 | 100.00% | 0% |
| CO#4 - Remobilization Cost | 79,910.65 | 0.00 | 79,910.65 | 79,910.65 | 7,991.07 | 0.00 | 7,991.07 | 0.00 | 79,910.65 | 0.00 | 100.00% | 10% |
| CO#5 - Temporary Restroom Demolition | 50,678.25 | 0.00 | 50,678.25 | 50,678.25 | 5,067.83 | 0.00 | 5,067.83 | 0.00 | 50,678.25 | 0.00 | 100.00% | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 10% |
| | | | | | | | | | | | | |
| SUBTOTAL | 1,521,234.73 | 0.00 | 1,521,234.73 | 1,521,234.73 | 33,117.82 | 0.00 | 33,117.82 | 0.00 | 1,521,234.73 | 0.00 | 100.00% | |

**CONTRACTOR'S AFFIDAVIT**

TO WHOM IT MAY CONCERN:

The undersigned, being duly sworn deposes and states that he is the Owner of Hassett Enterprises, Inc., a Pennsylvania corporation ("**Contractor**"), the general contractor retained by or on behalf of Dynamic Marketing, Inc., a New Jersey corporation, in connection with the work, labor, services, materials, supplies and/or equipment performed and/or furnished by or on behalf of Contractor for tenant improvements at 1369 Lamberton Road, Hamilton, New Jersey, owned or leased by HRP Mercer Urban Renewal, LLC, a New Jersey limited liability company.

The following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specification:

| Name | What For | Contract Price | Amount Paid | This Payment | Balance Due |
|------|----------|----------------|-------------|--------------|-------------|
| Fran Taylor Plumbing | Plumbing | 7,530.00 | 6,777.00 | 735.00 | 0.00 |
| Ocean Coast Electric | Electrical | 397,942.00 | 397,471.30 | 570.70 | 0.00 |
| Streamline Industries | Fire Suppression | 47,000.00 | 46,200.00 | 800.00 | 0.00 |
| DDP Roofing | Roofing | 26,865.00 | 26,484.50 | 380.50 | 0.00 |
| Total Labor And Material Including Extras to Complete | | | | | |
| | | | | | |

All materials are taken from fully paid stock and delivered to the jobsite in our own trucks and all labor is fully paid for.

There are no other contracts for said work outstanding, and there is nothing due or to become due to any person for materials, labor or other work of any kind done upon or in connection with said work other than above stated.

[SIGNATURE ON FOLLOWING PAGE]

Signed this 16 day of October, 2024

Signature:    X_____

Title: Owner of Hassett Enterprises, Inc.
Name: Steven Hassett

State of: Pennsylvania_____)    SS
County of: Montgomery _____)    SS

Subscribed and sworn to before me this <u>16 </u>day of October 2024

Signature:    X_____  _____

Commonwealth of Pennsylvania - Notary Seal
MICHAEL P SULOCK III - Notary Public
Montgomery County
My Commission Expires August 17, 2025
Commission Number 1404099

[SIGNATURE PAGE TO CONTRACTOR'S AFFIDAVIT]

## CONTRACTOR FINAL LIEN WAIVER

This Contractor Final Waiver is made on October 16, 2024, Hassett Enterprises, Inc., a Pennsylvania corporation ("**Contractor**"), a contractor retained by or on behalf of Dynamic Marketing, Inc., a New Jersey corporation ("**Tenant**"), in connection with the work, labor, services, materials, supplies and/or equipment performed and/or furnished by or on behalf of Contractor ("**Work**"), for tenant improvements at 1369 Lamberton Road, Hamilton, New Jersey (the "**Project**"), owned or leased by HRP Mercer Urban Renewal, LLC, a New Jersey limited liability company ("**Owner**").

      1.    **Unconditional Waiver**: Contractor represents that it has received full payment for all Work performed or furnished on or before October 31, 2024 (the "**Paid-Through Date**"), except for unpaid retainage in the amount of $33,117.82("**Accrued Retainage**"). Contractor hereby unconditionally waives, releases and forever discharges the Project, Tenant, Owner, and their respective owners, parent companies, affiliates, successors, assigns, agents, employees, landlords and lenders (collectively, the "**Releasees**") of and from all causes of action, suits, debts, accounts, bonds, contracts, promises, damages, liens, encumbrances, judgments, claims and demands whatsoever, in law or equity, known or unknown, accrued or unaccrued ("**Claims**"), which Contractor ever had, now has or might hereafter have, that are in any way connected with or related to Work performed or furnished on or before the Paid-Through Date, without waiving Contractor's claim for payment of Accrued Retainage.

      2.    **Conditional Waiver**: Contractor requests payment of $33,117.82 ("**Final Payment**") as full and final payment of all amounts owed in connection with the Project, including all Accrued Retainage. Conditioned only on the receipt of Final Payment, Contractor hereby waives, releases and forever discharges the Releasees of and from all Claims which Contractor ever had, now has or might hereafter have, that are in any way connect with or related to Work performed or furnished for the Project.

      3.    **Payments to Subcontractors**: Contractor represents that it has fully paid all amounts due to all employees, subcontractors, suppliers and others entitled to payment for Work performed or furnished on or before the Paid-Through Date and that Contractor will use the Final Payment to pay any additional amounts now or hereafter owed to such persons and entities. To the greatest extent permitted by law, Contractor agrees to defend, indemnify and hold harmless the Releasees from and against all Claims that are in any way connected with or related to Work performed or furnished by or on behalf of Contractor.

[SIGNATURE ON FOLLOWING PAGE]

**CONTRACTOR**

Hassett Enterprises, Inc., a Pennsylvania corporation

By:_____

Name: Steven Hassett

Title: Owner

State of: <u>Pennsylvania</u>)          SS
County of: <u>Montgomery</u>)          SS

SUBSCRIBED and SWORN before me the 16 day of October, 2024, by Steven Hassett, who is personally known to me.

Name: _____ _____

                    Notary Public

My commission expires:

08/17/2025

Commonwealth of Pennsylvania - Notary Seal
MICHAEL P SULOCK III - Notary Public
Montgomery County
My Commission Expires August 17, 2025
Commission Number 1404099

[SIGNATURE PAGE TO CONTRACTOR FINAL LIEN WAIVER]

# Exhibit H

**Dynamic Marketing Inc.**

400 Cabot Drive, Suite B
Hamilton, NJ 08690

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/28/2024 | 9005641 |

| Bill To |
|---------|
| 1 Stop Electronics Center, Inc.<br>1870 Bath Avenue<br>Brooklyn, NY 11214 |

| Description | Amount |
|-------------|--------|
| 1369 Lamberton | |
| CAM Estimate (04/2024) | 18,805.69 |
| Management Fee (04/2024) | 2,326.41 |
| Rent (04/2024) | 245,241.34 |
| Tax Estimate (04/2024) | 31,555.49 |

| | **Total** | $297,928.93 |

# Invoice

**Dynamic Marketing Inc.**

2297 NJ-33
Suite 901
Hamilton Township, NJ 08690

| Date | Invoice # |
| --- | --- |
| 4/26/2024 | 9005679 |

| Bill To |
| --- |
| George Miller, Chapter 7 Trustee<br>of 1 Stop Electronics Center Inc.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 |

| Description | Amount |
| --- | --- |
| 1369 Lamberton | |
| Rent (05/2024) | 245,241.34 |
| CAM Estimate (05/2024) | 18,805.69 |
| Tax Estimate (05/2024) | 31,555.49 |
| Management Fee (05/2024) | 2,326.41 |
| Electrical Usage (March 13, 2024 to April 12, 2024) | 1,989.36 |

| **Total** | $299,918.29 |
| --- | --- |

# Invoice

**Dynamic Marketing Inc.**

2297 NJ-33
Suite 901
Hamilton Township, NJ 08690

| Date | Invoice # |
|------|-----------|
| 5/26/2024 | 9005743 |

| Bill To |
|---------|
| George Miller, Chapter 7 Trustee<br>of YF Logistics LLC<br>& 1 Stop Electronics Center Inc.<br>c/o Colin Robinson, Esq. |

| Description | Amount |
|-------------|--------|
| Rent (06/2024) | 245,241.34 |
| CAM Estimate (06/2024) | 18,805.69 |
| Tax Estimate (06/2024) | 31,555.49 |
| Management Fee (06/2024) | 2,326.41 |
| Electrical Usage (April 13, 2024 to May 13, 2024) | 4,182.98 |
| Gas Usage (March 14, 2024 to April 12, 2024) | 2,968.56 |
| Gas Usage (April 13, 2024 to May 13, 2024) | 914.78 |

| **Total** | $305,995.25 |
|-----------|-------------|