**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| POLISHED.COM INC. *et al.*,[1] | ) | Case No. 24-10353 (TMH) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket No. 417** |

**Objection Deadline: Oct 27, 2026, at 4:00 p.m. (ET) (extended by agreement)**
**Hearing Date: Nov. 19, 2026 at 11:00 a.m. (ET)**

**CHAPTER 7 TRUSTEE'S OBJECTION TO MOTION OF BANK OF AMERICA, N.A. TO ENFORCE COURT-APPROVED SHARING AGREEMENT [DKT. NO. 65]**

George L. Miller, chapter 7 trustee (the "Trustee") to the estates (the "Estates") of the above-captioned debtors (the "Debtors"), hereby submits this objection (the "Objection") to the *Motion of Bank of America, N.A. to Enforce Court-Approved Sharing Agreement [Dkt. No. 65]* [Docket No. 417] (the "Motion") filed by Bank of America, N.A., in its capacity as administrative agent ("BOA"). In support of this Objection, the Trustee submits the *Declaration of Matthew Tomlin* (the "Tomlin Declaration" or "Tomlin Decl."), attached hereto as **Exhibit A**. In further support of this Objection, the Trustee respectfully represents as follows:

## Preliminary Statement

1. BOA asks the Court to compel compliance with a Sharing Agreement that the Motion describes only in part. The Motion quotes paragraph 12 (the Carve-Out), paragraph 14 (turnover of proceeds), and paragraph 21 (the section 506(c) waiver), but it never mentions paragraph 15, the provision the Parties negotiated to govern the costs now in dispute. Under

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number are: Polished.com Inc. (3938); 1 Stop Electronics Center, Inc. (9485); AC Gallery Inc. (3629); Appliances Connection Inc. (8366); Gold Coast Appliances, Inc. (1575); Joe's Appliances LLC (8354); SuperiorDeals Inc. (0096); and YF Logistics LLC (8373).

paragraph 15, the Trustee reports to BOA planned "Costs to Administer," defined as "reasonable costs and expenses exceeding $1,000 necessary to administer, recover, preserve, market, sell or otherwise dispose of property of the Estates," and "in the absence of a written objection by email by counsel to BofA," those costs "shall be deemed approved by the Lenders and the Trustee is authorized to incur such disbursement and pay them from the proceeds of the Asset Sales." Sharing Agreement ¶ 15. Paragraph 15 is not a surcharge provision. Instead, it is BOA's express, bargained-for contractual consent mechanism, and that provision — not the section 506(c) waiver — governs this dispute.

2. The paragraph 15 procedure was followed. As paragraph 15 expressly permits, the Parties replaced the weekly report with periodic reports that the Trustee's accountants at Miller Coffey Tate LLP ("MCT") delivered to BOA's financial advisor, Berkeley Research Group, LLC ("BRG"). Each of these periodic reports set out collections, expenses incurred and paid, and reserves. Tomlin Decl. ¶7 & Ex. 1. The reports were delivered between December 2024 and October 2026, each covering all activity since the last. Every expense BOA now challenges appeared in those reports — some in the very first one, and was carried forward in each report that followed. *Id.* ¶9. BOA's own declarant confirms that he "regularly reviewed" the reports. Emerson Decl. ¶ 5. BRG discussed the reports with the Trustee's accountants, asked that their format be revised, and as recently as August 20, 2026 requested an updated report to include a payment BOA had just received. Tomlin Decl. ¶¶8, 11.[2] Yet BOA never sent the one thing paragraph 15 requires to stop a reported cost: a written objection. The Motion asserts that BOA "repeatedly objected," Motion ¶14, but does not identify how or when. The Trustee, for

[2] On October 15, 2026, after the Motion was filed, BRG requested the Trustee's August and September 2026 Reports, which were delivered on October 21, 2026. Tomlin Decl. ¶8 & Ex. 1

his part, never hid the ball; every one of these costs was disclosed to BOA, report after report. Under paragraph 15, each reported cost was deemed approved.

3. Because BOA approved these costs under the Sharing Agreement, the section 506(c) waiver in paragraph 21 is beside the point. Section 506(c) is the trustee's remedy to charge collateral *without* the secured creditor's consent. Costs the secured creditor agreed to bear — in Recital D(i), paragraph 12, paragraph 14, and paragraph 15 — are not a surcharge; they are performance of the contract. And the result would be no different had BOA sent a timely objection. Paragraph 15 requires the Court to resolve any dispute regarding Costs to Administer under the Sharing Agreement's own definition: costs that are "reasonable" and "necessary to administer, recover, preserve, market, sell or otherwise dispose of" the Collateral. Sharing Agreement ¶15; id. Recital D(i). Each of the disputed items fits that definition: insurance while Collateral was being sold, the depository accounts in which the Trustee is required by law to maintain and hold BOA cash, the bond that secures the Trustee's custody of that cash, preserving and storing the records needed to collect BOA's receivables, and restoring access to the systems in which those receivables are documented.

4. The dispute is also narrower than BOA's $1.18 million headline suggests, and it has narrowed further since the Motion was filed. Before the Motion was filed, the Trustee responded to BOA in writing, item by item, and agreed to remit the $115,631.40 of Cabot Costs exceeding the $100,000 cap in paragraph 12(iv), proposed to reduce the operating reserve that generates the so-called "Collateral Shortfall," and proposed that the Parties reserve rights on the NetSuite costs reserve pending receipt of an actual invoice. Tomlin Decl. ¶¶20-22. After the Motion was filed, the Parties agreed to adjourn the hearing if the Trustee paid the amounts not in dispute, and on September 24, 2026, the Trustee wired $310,423.88 to BOA — the $115,631.40

of Cabot Costs and the portion of the "Collateral Shortfall" exceeding a $50,000 operating reserve, as adjusted for intervening activity. Tomlin Decl. ¶¶24–25. The Motion is moot as to those amounts, and what remains in dispute is approximately $869,819.23. The Trustee has now remitted more than $12.7 million to BOA — $9,781,923.88 under paragraph 14 and $2,979,101.89 in tax refunds under paragraph 6. *Id.* ¶¶14, 25; Emerson Decl. Ex. A. What remains are ordinary costs of holding, insuring, accessing, and accounting for BOA's Collateral, each reported to and accepted by BOA, and each a Cost to Administer under any reading of the Sharing Agreement. The remainder of the Motion should be denied.

## Background

### A. The Chapter 7 Cases and the Sharing Agreement

5. On March 7, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). The chapter 7 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. On March 12, 2024, George L. Miller was appointed chapter 7 trustee.

6. On May 9, 2024, the Court entered the *Order Approving the Sharing Agreement Among Chapter 7 Trustee and Bank of America, N.A. Providing for, Among Other Things, (I) Determination and Allowance of Certain Pre-Petition Secured Claims and Liens; (II) Trustee's Sale of the Debtors' Assets and Secured Lenders' Collateral; (III) Specified Carve-Out From the Secured Lenders' Liens; and (IV) Related Agreements* [Docket No. 65] (the "Sharing Agreement Order"), approving the sharing agreement attached thereto as Exhibit 1 (the "Sharing Agreement"). Capitalized terms used but not defined herein have the meanings given in the Sharing Agreement.

7. The Sharing Agreement was negotiated at a time when, as its recitals record, "the Chapter 7 Trustee expect[ed] that the Estates have and will incur substantial administrative expenses preserving the value of the Prepetition Collateral," and "time [was] of the essence as Prepetition Collateral must be removed from at least one of and if not both of the Debtors' pre-petition warehouse facilities and safeguarded." Sharing Agreement, Background Recitals E–F. The recitals are "incorporated in full and made a part of" the Sharing Agreement. *Id.* ¶1.

8. Three provisions of the Sharing Agreement address who bears the costs of administering BOA's Collateral. *First*, in Recital D under the heading "The Trustee's Use of Cash and Sale Collateral" ("Recital D"), BOA "agrees to carve out from the Prepetition Collateral and proceeds of the Asset Sales: (i) amounts for the payment of reasonable and documented costs and expenses necessary to administer, recover, preserve, market, sell or otherwise dispose of the Collateral; and (ii) amounts to be retained by the Estates for distribution by the Trustee in accordance with section 726 of the Bankruptcy Code . . . as and to the extent set forth below." Sharing Agreement at 3-4.

9. *Second*, in paragraph 12, BOA agreed to subordinate its liens and claims to specified, and in several cases capped, items collectively defined as the "Carve-Out":

> i. To pay Bankruptcy Court approved professional fees and expenses of professionals retained by the Trustee, not to exceed $2,800,000, including fees and expenses incurred to provide any reporting or accounting to BofA required under this Agreement (the "Professional Fees");
>
> ii. To pay Bankruptcy Court approved compensation and expenses for the Trustee under section 326 of the Bankruptcy Code with respect to the Asset Sales;
>
> iii. 10% of the net proceeds generated by the Trustee from Asset Sales to be retained by the Estates for distribution in accordance with section 726 of the Bankruptcy Code (the "Estate Recovery");

> iv. The actual and reasonable costs and expenses for the removal and storage of any Prepetition Collateral located in the warehouse facility located at 400 Cabot Drive, Hamilton, New Jersey 08690 in an amount not to exceed $100,000 (the "Removal Costs"), which Removal Costs will be paid from the proceeds of the sale of the Collateral; and
>
> v. To the extent deemed necessary and agreed upon by the Trustee and the Prepetition Lenders, the actual and reasonable costs and expenses for the removal and storage of any Prepetition Collateral located in the warehouse facility located at 1369 Lamberton Road, Hamilton, New Jersey.

Sharing Agreement ¶12. Paragraph 12 further provides that "BofA agrees to refund any fees, expenses or penalties charged to the Debtors' bank accounts postpetition," and that costs of administering *Excluded* Collateral "shall not be payable from the Carve-Out and shall be payable from proceeds of such Excluded Collateral." *Id.*

10. *Third*, in paragraph 15, the Parties established the procedure by which the Trustee obtains BOA's approval of the costs of administering property of the Estates:

> The Trustee by 11:59 p.m. EST on Friday of each week, *or such other time as agreed to by the Parties*, will submit to counsel for BofA for approval a report of planned disbursements for reasonable costs and expenses exceeding $1,000 necessary to administer, recover, preserve, market, sell or otherwise dispose of property of the Estates (the "Costs to Administer") for the following week and *in the absence of a written objection by email by counsel to BofA* to the reported planned disbursements on or before the close of business on the following Tuesday, *the planned disbursements shall be deemed approved by the Lenders and the Trustee is authorized to incur such disbursement and pay them from the proceeds of the Asset Sales,* subject to the Carve-Out. If a written objection to the Costs to Administer is received, the administration of the estates shall be limited in scope to attendance at scheduled hearings and preparing and filing responses to filed pleadings until the objection is resolved. In the event the written objection to the Costs to Administer remain unresolved, the Parties reserve the right to seek relief with the Bankruptcy Court . . . .

*Id.* ¶ 15 (emphasis added).

11. Paragraph 14 governs the Trustee's accounting and turnover. Each month the Trustee furnishes BOA "an accounting . . . of all Estate assets collected, all expenses incurred and/or paid . . . and the current cash balance on hand in the Estates," and "[c]ontemporaneously with each such accounting, and subject to the Estates having a reserve equal to 100% of the then current Carve-Out, the Trustee shall pay to BofA . . . as appropriate, all cash proceeds of the Collateral that were collected in the prior monthly period or in connection with the most recent Asset Sale." *Id.* ¶14.

12. Finally, paragraph 21 provides that "[g]iven the Prepetition Secured Parties' agreement to permit the Trustee to use Cash Collateral and to subordinate the Prepetition Liens to the Carve-Out, the Prepetition Secured Parties are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code" and of the "equities of the case" exception under section 552(b). *Id.* ¶21. The Sharing Agreement is governed by Delaware law. *Id.* ¶27.

**B. Performance Under the Sharing Agreement**

13. Following entry of the Sharing Agreement Order, BOA turned over $1,242,743.84 from the Debtors' prepetition deposit accounts, which under paragraph 5 reduced dollar-for-dollar the Professional Fees payable under paragraph 12(i). Tomlin Decl. ¶12; Emerson Decl. Ex. A ("Bank Turnover Proceeds"). The Trustee conducted a public auction of the Debtors' inventory and other Collateral, thereafter conducted additional sales, and has continued to collect accounts receivable and pursue collection of other assets.

14. Through September 30, 2026, the Trustee had collected $14,476,472.37 of Collateral proceeds subject to sharing, including $2,795,000.40 of accounts receivable collections, and a further $2,979,101.89 in tax refunds. Tomlin Decl. ¶13. Through July 31, 2026, the date of the Report on which the Motion is based, the Trustee had remitted to BOA

$9,471,500.00 of Collateral proceeds under paragraph 14 and 100% of the $2,979,101.89 tax refund under paragraph 6 — a total of $12,450,601.89. *Id.* ¶14; Emerson Decl. Ex. A. BOA does not contend otherwise. On September 24, 2026, after the Motion was filed, the Trustee remitted an additional $310,423.88 of Collateral proceeds to BOA, bringing total remittances through September 30, 2026 to $12,761,025.77. *Id.* ¶¶14, 24.

15. As paragraph 15 permits, the Parties agreed that the Trustee's reports, which included Costs to Administer periodically, would be made on a monthly, rather than weekly basis, contemporaneously with the monthly accounting under paragraph 14. Tomlin Decl. ¶7. Since then, the Trustee's accountants at MCT have delivered to BRG periodic reports setting forth, for each Debtor and on a consolidated basis, all cash receipts by category, all costs paid or accrued by category, all estimated reserves by category, and the resulting cash balance available for distribution to BOA (the "Reports"). *Id.* ¶7 & Ex. 1. The Reports were delivered between December 2024 and August 2026. In months of minimal activity no separate Report was prepared; the activity for those months was included in the next Report, so that every period since December 2024 has been reported to BOA. The document BOA attaches to the Emerson Declaration as Exhibit A is the Trustee's Report as of July 31, 2026, prepared by MCT, with BRG's highlighting added. *Id.* ¶8. MCT has also prepared Reports as of August 31, 2026 (the "August Report") and September 30, 2026 (the "September Report"). On October 15, 2026, BRG requested those Reports, and the Trustee's counsel delivered both to BOA's counsel on October 21, 2026. *Id.* ¶8 & Ex. 1. Each carries forward the costs and reserves at issue, updated for activity through its date. *Id.*

16. Each of the costs BOA challenges was reported in the Reports, identified by name and amount, beginning with the Report indicated below, and was carried forward in each subsequent Report:

| Item | Amount | First Report to BOA | Status |
|---|---|---|---|
| Bank Fees | $108,451.79 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Paid (accumulating monthly) |
| Bond Fees | $7,519.64 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Paid |
| Hill Archive Costs & Expenses | $258,226.80 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Paid |
| Collateral IT Costs – Server Access | $19,170.00 | May 31, 2026 | Paid |
| Insurance Extension Expense | $261,451.04 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Reserve (allowed by stipulation; unpaid); original amount reported was $523,105.26 |
| Cabot Costs in Excess of $100,000 Cap | $115,631.40 | March 15, 2025 | Remitted to BOA on September 24, 2026 |
| NetSuite Costs | $150,000.00 | April 30, 2025 | Reserve (quoted; not invoiced) |
| Collateral IT Costs – Server Access | $15,000.00 | July 15, 2026 | Reserve (final invoice of $15,300.00 received after July 31, 2026) |
| "Collateral Shortfall" | $245,906.55 | N/A | Residual after reserves; excess over $50,000 operating reserve remitted to BOA September 24, 2026 (as adjusted); $50,000 retained |

Tomlin Decl. ¶9. The Reports themselves explain the nature of the reserved items. *See, e.g.*, Emerson Decl. Ex. A, footnote 5 ("Revised estimated amount for Insurance Extension per the stipulation of the Allowed Administrative Claim"), footnote 10 ("Estimated costs for access to Debtor's Accounting platform Netsuite which contains supporting invoices required for pursuit

of accounts receivable"), footnote 11 ("Costs for access to the Debtor's electronic records stored on local servers previously residing in Debtors' NY Offices").[3]

17. At no time before BOA's pre-Motion demand on August 27, 2026, did counsel to BOA deliver to the Trustee or his professionals a written objection by email (or any written objection) to any Cost to Administer reported in the Reports. Tomlin Decl. ¶10. BOA never invoked the administration limitation in paragraph 15 and never sought relief under paragraph 15's dispute mechanism. Instead, BRG received the Reports, raised questions about and discussed the reported figures with MCT from time to time, and accepted the Trustee's remittances calculated on the basis of those reports. *Id.* ¶11.

**C. The Trustee's Pre-Motion Response, the Motion, and the Trustee's Payment of the Undisputed Amounts**

18. On August 27, 2026, BOA's counsel provided the Trustee's counsel with a list of the items now identified in the Motion. The Trustee's counsel responded on September 11, 2026, in writing, item by item, explaining the basis for each cost under the Sharing Agreement, agreeing to remit the $115,631.40 of Cabot Costs in excess of the paragraph 12(iv) cap, offering to reduce the operating reserve reflected in the "Collateral Shortfall" line to $50,000, and proposing that the Parties reserve rights with respect to the NetSuite reserve pending receipt of an actual invoice. Tomlin Decl. ¶20-22. The Trustee's response invited a call to discuss the remaining items and resolve them consensually. Rather than accept that invitation, BOA filed the Motion on the next business day on September 14, 2026.

[3] The amounts in the table above are those reported as of July 31, 2026, the date of the Report on which the Motion is based. The costs that accrue monthly have continued to accrue in the ordinary course: as of September 30, 2026, the Collateral share of Bank Fees was $114,645.79 and of Hill Archive costs was $260,809.26, and the server-access vendor had issued its final invoice of $15,300.00, which is reserved pending payment. Tomlin Decl. ¶¶16, 18-19. The Bond Fees and the Insurance Extension and NetSuite reserves are unchanged. Id.

19. The Motion asks the Court, under section 105(a), to direct the Trustee to wire $1,181,357.18 to BOA within seven days. Motion, Ex. A ¶2. Its argument occupies four paragraphs. Motion ¶¶17–20. It does not cite or discuss paragraph 15 or Recital D of the Sharing Agreement.

20. BOA and the Trustee agreed to adjourn the hearing on the Motion provided that (1) the Trustee promptly pay the undisputed amounts to BOA, and (2) the Trustee not use any of the disputed cash until the Motion is determined or settled. The hearing on the Motion was adjourned to November 19, 2026, with the deadline to object extended to October 27, 2026. *Id.*

21. On September 23, 2026, the Trustee provided BOA with his good-faith calculation of the undisputed amount: $310,423.88. The $1,114.07 difference from BOA's figure reflects activity after the July 31, 2026 Report on which BOA's figure was based — accounts receivable collections of $3,750.00, net of the Trustee's fees and the Carve-Out attributable to those collections, less $4,388.23 of storage costs and bank fees. *Id.* ¶25. On September 24, 2026, the Trustee wired $310,423.88 to BOA. Id. BOA accepted the payment subject to a reservation of its rights, and the Trustee likewise reserves all of his rights. Consistent with the Parties' agreement, the Trustee continues to hold the remaining disputed funds and will not use them until the Motion is determined or settled. *Id.*

## Legal Argument

### A. The Sharing Agreement Must Be Read as a Whole, Giving Effect to Every Provision

22. The Trustee agrees with BOA that the Court has authority to interpret and enforce the Sharing Agreement Order. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); Sharing Agreement ¶26. The Sharing Agreement is a stipulation, and it is interpreted as a contract. *See In re Trico Marine Servs., Inc*. 450 B.R. 474, 482 (Bankr. D. Del. 2011) ("When

construing an agreed or negotiated form of order, . . . the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order."); *Burtch v. Ganz (In re Mushroom Transp. Co.)*, 366 B.R. 414, 442 (Bankr. E.D. Pa. 2007) ("stipulations made in court are interpreted and enforced as contracts"). The question is what the Sharing Agreement means, and that question is governed by Delaware law. Sharing Agreement ¶27.

23. Under Delaware law, a contract's construction "should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Delaware courts "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage," and "will not read a contract to render a provision or term 'meaningless or illusory.'" *Id.* at 1159–60. Where provisions appear to conflict, the court harmonizes them so as to give effect to each. Where a contract contains both a general and a specific provision addressing the same subject, "the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). Clear and unambiguous terms are enforced according to their plain meaning. *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).

24. BOA's Motion does not apply these principles. It reads paragraph 12 and paragraph 21 in isolation and treats the rest of the Sharing Agreement (Recital D, paragraph 14's "as appropriate" qualifier, and the whole of paragraph 15) as though it did not exist. Delaware law does not permit that approach. The Sharing Agreement must be read as a whole, with every provision given effect.

**B. Paragraph 15 Independently Authorizes Payment of Costs to Administer From Asset Sale Proceeds**

25. Paragraph 15 is an operative, self-executing provision. It defines a category of expense — "reasonable costs and expenses exceeding $1,000 necessary to administer, recover, preserve, market, sell or otherwise dispose of property of the Estates" — and prescribes what happens when such costs are reported and BOA's counsel does not object in writing by email: the costs "shall be deemed approved by the Lenders and the Trustee is authorized to incur such disbursement and pay them from the proceeds of the Asset Sales." Sharing Agreement ¶15. The provision does not say the Trustee may pay such costs only if they also fall within one of the enumerated Carve-Out categories in paragraph 12. It says the Trustee is "authorized" to pay them "from the proceeds of the Asset Sales."

26. Paragraph 15 tracks Recital D(i), in which BOA "agrees to carve out from the Prepetition Collateral and proceeds of the Asset Sales . . . amounts for the payment of reasonable and documented costs and expenses necessary to administer, recover, preserve, market, sell or otherwise dispose of the Collateral." Recital D's qualifier ("as and to the extent set forth below") modifies clause (ii), the amounts retained for distribution under section 726 (which paragraph 12(iii) then fixes at 10% of net proceeds). Clause (i), the agreement to bear the costs of administering the Collateral, is not so limited. Recital D(i) is BOA's substantive agreement to bear those costs; paragraph 15 is the approval procedure for them; and paragraph 12 is a separate list of specific, and in several cases capped, items to which BOA subordinated its liens outright.

27. BOA's contrary reading, under which any cost not enumerated in paragraph 12 is unrecoverable regardless of paragraph 15, cannot be squared with Delaware's anti-surplusage rule. The paragraph 12 categories are professional fees, Trustee compensation, the 10% Estate Recovery, and removal and storage costs at two named warehouses. None of those categories

describes insurance premiums, bank charges, bond premiums, records storage, or IT and accounting-system access. If paragraph 15 could authorize only costs already authorized by paragraph 12, then paragraph 15's own definition of "Costs to Administer," its reporting mechanism, its deemed-approval provision, and its dispute-resolution procedure would all be meaningless: an elaborate apparatus for approving costs that could never be paid. Delaware law forbids that result. *See Osborn*, 991 A.2d at 1159–60; *Kuhn Constr., Inc. v. Diamond State Port Corp.,* 990 A.2d 393, 396–97 (Del. 2010).

28. Nor does the phrase "subject to the Carve-Out" at the end of paragraph 15's deemed-approval sentence help BOA. Read in context — and in harmony with paragraph 14, which conditions turnover on "the Estates having a reserve equal to 100% of the then current Carve-Out" — the phrase establishes priority: Costs to Administer are paid from Asset Sale proceeds without impairing the Carve-Out reserve. It does not convert paragraph 15 into a mere sub-procedure for paragraph 12. Had the Parties intended that Costs to Administer be payable only within the paragraph 12 categories and caps, they would have said so, as they did elsewhere when they meant to limit a right to the Carve-Out. *See* Sharing Agreement ¶12 (Excluded Collateral costs "shall not be payable from the Carve-Out"); *id.* ¶20 (limiting investigation costs to "$50,000 of the Professional Fees in the Carve-Out"). The Parties knew how to tie a cost to the Carve-Out when that was their intent. They did not do so in paragraph 15.

29. The remainder of the Sharing Agreement confirms that the Parties expected BOA to bear the costs of administering its Collateral. Recital E records the Parties' expectation of "substantial administrative expenses preserving the value of the Prepetition Collateral." Recital F records that the Collateral had to be "safeguarded." Paragraph 12(i) treats the cost of "reporting or accounting to BofA" as compensable. Paragraph 16 obligates BOA to pay "100%

of the actual costs and expenses of the Estates" incurred in responding to its information requests. Paragraph 12 obligates BOA to "refund any fees, expenses or penalties charged to the Debtors' bank accounts postpetition." And paragraph 3 gives BOA the benefit of any "insurance proceeds" arising from loss or theft of Collateral. It would make little sense to read an agreement that gives BOA the benefit of insured, safeguarded, and well-documented Collateral as placing every cost of achieving that result on other creditors of the Estates.

### C. Each Disputed Cost Was Reported to BOA and Deemed Approved Under Paragraph 15

30. The undisputed record establishes each element of deemed approval. *First*, paragraph 15 permits the Parties to agree on a reporting schedule other than weekly ("or such other time as agreed to by the Parties"), and they did: the Trustee reported periodically, together with paragraph 14 accounting. Tomlin Decl. ¶7. *Second*, the Reports identified each challenged cost by name and amount, beginning on the dates set forth above, and carried each cost forward in each Report thereafter. *Id.* ¶9. *Third*, BOA received and reviewed the Reports. Its own declarant states that he "regularly reviewed the reports of the Chapter 7 Trustee submitted to the Administrative Agent pursuant to the Sharing Agreement," which "included . . . expenses incurred by the estates." Emerson Decl. ¶5. *Fourth*, no written objection by email by counsel to BOA was ever delivered. Tomlin Decl. ¶10.

31. The Motion's assertion that BOA has "repeatedly objected," Motion ¶14, does not change the analysis. The Sharing Agreement specifies the form an objection must take — written, by email, from BOA's counsel — and the consequence of one: the administration of the Estates is curtailed and, under paragraph 18(d), a Termination Event occurs. BOA does not identify a single such objection, and the Motion attaches none. Nor has BOA ever contended that a Termination Event occurred or that the Trustee's use of Cash Collateral terminated, as it

necessarily would have had a paragraph 15 objection been made. Informal expressions of disagreement, if any occurred, are not what the Parties bargained for, and BOA, which negotiated the specific form of objection that would suspend the Trustee's authority, cannot now claim the benefit of a procedure it never invoked. Most important, BOA never behaved as though a paragraph 15 objection had been made.

32. In addition, paragraph 29, the non-waiver clause, does not help BOA either. That clause provides that a Party's "failure . . . to enforce any right" is not a waiver of the right. Deemed approval under paragraph 15 is not a waiver arising from BOA's inaction; it is the affirmative contractual consequence the Parties themselves attached to BOA's failure to invoke paragraph 15's procedure. Reading paragraph 29 to nullify paragraph 15's deemed-approval mechanism would render that mechanism meaningless, in violation of the rule that every provision must be given effect. *Osborn*, 991 A.2d at 1159–60. And where, as here, a specific provision (paragraph 15) and a general one (paragraph 29) address the same subject, the specific provision controls. *DCV Holdings*, 889 A.2d at 961.

33. Finally, BOA has bypassed the very procedure it negotiated. Paragraph 15 provides that, upon a written objection, the Parties attempt to resolve it and, if it "remain[s] unresolved," may "seek relief with the Bankruptcy Court." BOA never took the first step. It proceeded directly to a motion to compel demanding the full disputed amount. Section 105(a) does not authorize the Court to enforce a bargain other than the one the Parties made.

**D. Paragraph 14 Does Not Override Paragraph 15**

34. BOA's principal textual argument is that paragraph 14 requires turnover of "all cash proceeds of the Collateral, subject only to" the Carve-Out reserve. Motion ¶¶10, 18. But the word "only" does not appear in paragraph 14. The provision states that, "subject to the Estates having a reserve equal to 100% of the then current Carve-Out, the Trustee shall pay to

BofA . . . as appropriate, all cash proceeds of the Collateral that were collected in the prior monthly period." Sharing Agreement ¶14. BOA's use of "only" is an amendment to the agreement.

35. Read as written and together with paragraph 15, paragraph 14 operates straightforwardly. Paragraph 15 authorizes the Trustee to pay deemed-approved Costs to Administer "from the proceeds of the Asset Sales." Paragraph 14 then requires the Trustee to remit the Collateral proceeds "as appropriate" — that is, net of the disbursements paragraph 15 authorizes and of the Carve-Out reserve. That is exactly what the Reports show and exactly what the Trustee has done. BOA's reading, by contrast, would require the Trustee to remit proceeds that paragraph 15 expressly authorizes him to spend. Delaware law resolves a conflict of that kind by harmonizing the provisions, not by deleting one of them. *Kuhn*, 990 A.2d at 396–97.

36. Nor does the fact that the Trustee "reserved for all expenses permitted under the Carve-Out from the initial proceeds," Emerson Decl. ¶2 (at page 3), establish that "there should be no reason" for any other reserve. Motion ¶18. Paragraph 14 keys the reserve to the "*then current* Carve-Out," a figure that changes as professional fees and Trustee compensation accrue, and it sets a floor that must be maintained before turnover, not a ceiling on the disbursements paragraph 15 authorizes. The Reports separately identify the Carve-Out reserve and the Costs to Administer, and BOA has not suggested the two were conflated.

**E. The Section 506(c) Waiver Does Not Reach Costs BOA Agreed to Bear**

37. BOA's remaining argument is that, because "the Chapter 7 Trustee waived any right to surcharge" under section 506(c), the Court should order turnover. Motion ¶20. The argument confuses two different things. Section 506(c) permits a trustee to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of

preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c); *see Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). It is a statutory remedy against a secured creditor that has *not* agreed to bear the expense. Where the secured creditor has consented to an expense, the expense is chargeable to the collateral by virtue of that consent, and section 506(c)'s benefit test is not the operative inquiry. *See In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) (payment of administrative expenses from collateral "when the secured creditor caused or consented to the expense").

38. Here, BOA's consent is neither implied nor inferred from a course of dealing. It is written into the Sharing Agreement in four places: Recital D(i) (BOA "agrees to carve out" the costs of administering the Collateral); paragraph 12 (subordination to the Carve-Out and refund of postpetition bank charges); paragraph 14 (turnover "as appropriate" after reserves); and paragraph 15 (deemed approval of reported Costs to Administer). Costs approved through the mechanism BOA negotiated are not a "surcharge" of BOA's Collateral over its objection; they are the performance of BOA's own agreement. The section 506(c) waiver protects BOA against costs it did *not* agree to, such as an attempt by the Trustee to charge BOA's Collateral with the costs of pursuing Excluded Collateral, or costs to which BOA had timely objected in writing. It has no application to costs BOA approved.

**F. Even If BOA Had Timely Objected, the Sharing Agreement Supplies the Standard, and the Disputed Costs Satisfy It**

39. Even if BOA had objected under paragraph 15 of the Sharing Agreement, the question presented would be the one paragraph 15 assigns to the Court: to "resolve any dispute between the Parties regarding the Costs to Administer." Sharing Agreement ¶15. That is a question of whether a particular disbursement is a "Cost to Administer" as the Parties defined

that term. It is a question of contract application, answered under the Sharing Agreement and Delaware law. *See Trico Marine*, 450 B.R. at 482.

40. Section 506(c), however, is not the standard for measuring the costs in dispute for two reasons. First, section 506(c) was waived. Sharing Agreement ¶21. Second, section 506(c) is a non-consensual statutory remedy with its own elements. In this Circuit, a claimant invoking it "must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors." *In re C.S. Assocs.*, 29 F.3d 903, 906 (3d Cir. 1994) (emphasis omitted). The Parties did not adopt that test; instead, they wrote their own.

41. The standard the Parties wrote appears twice in the Sharing Agreement, in nearly identical words. Recital D(i) records BOA's agreement to carve out "reasonable and documented costs and expenses necessary to administer, recover, preserve, market, sell or otherwise dispose of the Collateral." Paragraph 15 defines Costs to Administer as "reasonable costs and expenses exceeding $1,000 necessary to administer, recover, preserve, market, sell or otherwise dispose of property of the Estates." Read together, a disputed cost qualifies if it is (a) reasonable in amount and documented, and (b) necessary to one of six enumerated activities with respect to the Collateral — administering it, recovering it, preserving it, marketing it, selling it, or otherwise disposing of it. The Sharing Agreement supplies one express exclusion: the costs of administering Excluded Collateral, which "shall not be payable from the Carve-Out and shall be payable from proceeds of such Excluded Collateral." Sharing Agreement ¶12. The definition contains no "direct benefit" prong, and no requirement that a cost benefit BOA "primarily," or that the benefit be quantified.

42. Two features of the Parties' chosen language confirm that the departure from section 506(c) was deliberate. The statute speaks of the costs of "preserving, or disposing of" collateral. 11 U.S.C. § 506(c). The Sharing Agreement adds four verbs — "administer, recover, . . . market, sell" — that have no statutory counterpart, and each describes work the Trustee has actually performed here: administering Collateral proceeds across eight Estates, recovering receivables and refunds, and marketing and selling inventory. And the statute's limitation "to the extent of any benefit to the holder of such claim" is omitted altogether. Under Delaware law the Court gives effect to the words the Parties chose, *Osborn*, 991 A.2d at 1159–60, and gives undefined terms such as "reasonable" and "necessary" their ordinary meaning. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) (Delaware courts "look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract"). In ordinary usage, "necessary" means required or essential to accomplish an end — here, one of the six enumerated activities. It does not mean the cheapest alternative available, and it does not mean a cost incurred solely for BOA.

43. The remainder of the Sharing Agreement tells the Court what the Parties themselves regarded as necessary. The recitals record the Parties' shared expectation of "substantial administrative expenses preserving the value of the Prepetition Collateral" and the need for the Collateral to be "removed" and "safeguarded." Sharing Agreement, Recitals E–F. Paragraph 9 obligates both Parties to "use reasonable commercial efforts to cooperate in an attempt to maximize the proceeds from liquidation of the Collateral." Paragraph 3 gives BOA the insurance proceeds of any loss or theft of Collateral. Paragraph 14 requires a monthly accounting of every dollar collected and every expense incurred. Paragraph 16 requires the Trustee to keep "all of the Debtors' books and records" available to BOA on request. A cost

incurred doing what these provisions require, whether insuring the Collateral, accounting for it, preserving the records that document it, or maximizing its proceeds, is "necessary" in the sense the Parties gave that word.

44. To the extent section 506(c) authority is relevant at all, it is relevant only by analogy, and the analogy favors the Trustee. Even under the statute's stricter test, the "[c]lassic examples of compensable expenditures" are "storage costs when the secured creditor's collateral was warehoused, or auction costs incurred on the sale of the creditor's collateral," and the recognized categories include "appraisal fees, auctioneer fees, advertising costs, moving expenses, storage charges, . . . maintenance and repair costs, and marketing costs," all of which are "expenses directly related to disposing of or preserving the creditor's collateral." *In re Visual Indus., Inc.*, 57 F.3d 321, 324 (3d Cir. 1995). If costs of that kind satisfy the narrower statutory standard, they satisfy the broader contractual one as well. The Office of the U.S. Trustee's own guidance likewise treats a written agreement with the secured creditor as the ordinary means by which a chapter 7 trustee recovers the costs of liquidating encumbered property. *See* U.S. Dep't of Justice, Exec. Office for U.S. Trs., Handbook for Chapter 7 Trustees (effective Oct. 1, 2012) ch. 4.C.9.d, at 4-17 (the "Handbook") (trustee "should obtain an agreement in writing from the secured creditor to recover the costs of sale from the collateral"). The Sharing Agreement is that agreement.

**G. Applying That Standard, Each of the Disputed Costs Is a Cost to Administer BOA's Collateral**

45. Even apart from deemed approval, and measured against the standard described above, each challenged item that remains in dispute falls within the paragraph 15 definition and Recital D(i).

46. **Insurance Extension ($261,451.04).** This item represents postpetition premiums for the extension of certain of the Debtors' general liability and commercial business liability insurance policies covering the Collateral through June 30, 2024, the period in which the Trustee marketed and sold the Debtors' assets and inventory. Tomlin Decl. ¶15. Insurance on collateral is the paradigm cost to "preserve" it, and the Sharing Agreement presupposes insured Collateral: Recital F requires that the Collateral be "safeguarded," and paragraph 3 attaches BOA's liens to "all proceeds recovered in connection with, or relating to, the loss or theft of Prepetition Collateral, including . . . any insurance proceeds related thereto." BOA bargained for the benefit of the coverage; it cannot disclaim the premium. The Trustee is also *required* to insure estate property under section 704 of the Bankruptcy Code and the United States Trustee's guidance. *See* Handbook at ch. 4.C.3.f., at 4-6 to 4-7 (chapter 7 trustee "must either determine that the property is insured by the debtor or obtain insurance for the estate. 11 U.S.C. § 704," and may consider "an agreement with the secured creditor to fund the expense of insurance and provide proper safeguarding"). Insurance is an ordinary requirement of any chapter 7 liquidating businesses with assets. The amount in dispute was originally estimated in excess of $523,105.26 (based on the December 13, 2024 Report), but it was eventually negotiated down to $261,451.04 and allowed as an administrative claim by stipulation approved by this Court [Docket No. 191] (the "<u>CNA Claim Stipulation</u>"); Tomlin Decl. ¶15. It remains a reserve pending payment (i.e., distribution) consistent with the terms of the CNA Claim Stipulation.

47. **Bank Fees ($108,451.79).** This cost is the accumulation of monthly service charges on the estate depository accounts in which the Trustee is required to hold Collateral proceeds pending remittance. Tomlin Decl. ¶16. The Trustee must maintain estate funds in approved depositories pursuant to 28 U.S.C. § 586 and 11 U.S.C. § 345, and paragraph 14

requires him to collect Collateral proceeds, hold a 100% Carve-Out reserve, and remit to BOA. Accounts holding BOA's cash cannot be maintained without incurring charges, and those charges are properly borne by the funds they safeguard. In addition, the Trustee is required to hold separate accounts for each debtor Estate, so each of the eight Estates' accounts generates fees. *See* Handbook at ch. 5.E, at 5-7 ("The trustee must immediately open a separate account for each estate as soon as funds are received. . . . 28 U.S.C. § 586"); ch. 5.D, at 5-3 ("Under no circumstances may funds or accounts of separate estates be aggregated or commingled."). Bank fees continue to accrue monthly; as of September 30, 2026, the Collateral share was $114,645.79 of total bank charges of $151,408.70. Tomlin Decl. ¶16.

48. **Bond Fees ($7,519.64).** The Trustee's bond is required by 11 U.S.C. § 322 and secures the Estates' custody of all funds on hand, the overwhelming majority of which has been BOA's Cash Collateral. Tomlin Decl. ¶17. Bond premiums are recoverable both as a Cost to Administer under paragraph 15 and as "expenses for the Trustee" within paragraph 12(ii). A bond is not optional; it is a statutory precondition for serving as a chapter 7 trustee. *See* 11 U.S.C. § 322(a) (to qualify to serve as a trustee, and before beginning official duties, "such person has filed with the court a bond in favor of the United States conditioned on the faithful performance of such official duties"). The bond protects estate beneficiaries, not the trustee, and the estate beneficiary here is overwhelmingly BOA, on behalf of the secured Lenders. *See* Handbook at ch.2.L, at 2-9 ("the bond protects the estate beneficiaries and not the trustee"). And the Trustee has no discretion over the amount of the bond because the U.S. Trustee determines the amount. *See* 11 U.S.C. § 322(b)(2) ("The United States trustee shall determine—(A) the amount of a bond required to be filed under subsection (a) of this section; and (B) the sufficiency of the surety on such bond."); *see also* Handbook at ch.2.L, at 2-9 ("The United States Trustee

determines the amount and terms of the bond . . . . [T]he trustee has an obligation to continually review the adequacy of bond coverage and to inform the United States Trustee of any situation, such as an upcoming asset sale, which may necessitate an increase in bond coverage. The trustee may not cancel or decrease the amount of the bond without United States Trustee authorization.”).

49. **Hill Archive Costs ($258,226.80).** Hill Archive stores the Debtors’ books and records and, during the sale process, performed inventory relocation services necessary to market and sell the Collateral at the best available price. Tomlin Decl. ¶18. The records are necessary to collect accounts receivable (Collateral, of which $2,795,000.40 had been collected through September 30, 2026, including $249,650.75 collected after the July 31, 2026 Report on which the Motion is based, Tomlin Decl. ¶13; *see* Emerson Decl. Ex. A n.2); to reconcile inventory and support the theft-of-collateral insurance claim whose proceeds belong to BOA under paragraph 3 of the Sharing Agreement; and to satisfy the Trustee’s obligation under paragraph 16 of the Sharing Agreement to make “all of the Debtors’ books and records” available to BOA. Likewise, the inventory relocation expenses fall within paragraph 15’s contemplated costs to “market, sell or otherwise dispose of” Collateral. Through September 30, 2026, the Collateral share of Hill Archive charges was $260,809.26. Tomlin Decl. ¶18.

50. **Collateral IT Costs — Server Access ($19,170.00 paid; $15,300.00 reserved) and NetSuite Costs ($150,000.00 reserved).** The server-access costs were incurred to restore access to the Debtors’ electronic records formerly housed on servers located in the Debtors’ New York offices; NetSuite was the Debtors’ accounting platform and “contains supporting invoices required for pursuit of accounts receivable.” Emerson Decl. Ex. A nn. 10–11; Tomlin Decl. ¶19-20. These systems are how the Trustee accesses the supporting information and data for

collection or liquidation of receivables and inventory, and various order, customer, and processor data that supports the Trustee's efforts to liquidate BOA's Collateral under paragraphs 3, 5 and 6 of the Sharing Agreement, and how MCT prepares the Reports on which BOA relies. The server-access vendor has since issued its final invoice of $15,300.00, which is reserved pending payment. *Id.* ¶19. The NetSuite figure is a reserve based on NetSuite's quoted cost to MCT but NetSuite has not issued an invoice. As for the NetSuite costs, the Trustee has proposed that the parties reserve their respective rights on that item. Tomlin Decl. ¶20.

51. **Cabot Costs in Excess of the $100,000 Cap ($115,631.40).** The Trustee remitted this amount to BOA on September 24, 2026, and the Motion is moot as to this item. Tomlin Decl. ¶¶21, 24. The Trustee notes that his willingness to honor the specific negotiated cap of the Collateral Carve-Out in paragraph 12(iv) underscores that no such cap automatically exists for the remaining items.

52. **"Collateral Shortfall" ($245,906.55).** BOA characterizes this figure as an amount the Trustee "acknowledges" is owed but has not paid. Motion ¶14. That characterization is not accurate. As Exhibit A to the Emerson Declaration itself shows, $245,906.55 is simply the arithmetic residual in the Collateral proceeds column after deducting estimated reserves of $642,082.40 from the $887,988.95 cash balance. It is the balance the Trustee is holding after reserves, on a consolidated basis across eight separately administered Estates. Tomlin Decl. ¶22. *Id.* The Trustee reduced the operating reserve to $50,000 and, on September 24, 2026, remitted the balance, adjusted for activity after July 31, 2026, to BOA. *Id.* ¶¶24-25. The Motion is moot as to this item except for the $50,000 operating reserve, which funds the ongoing costs of holding and collecting BOA's Collateral. As of September 30, 2026, the Collateral proceeds column of the September Report reflects a consolidated balance after

reserves of $148,053.85, which includes the $50,000 operating reserve and September 2026 collections. Tomlin Decl. ¶26.

## H. The Trustee Is Not Required to Administer BOA's Collateral at the Estates' Expense.

53. The implication from the Motion is that BOA wants all the benefit of having the Trustee liquidate its Collateral but it does not want to share the burden of costs. The books and records that BOA now asks the Trustee to stop paying for are not an incidental overhead item; they are the documentary foundation of BOA's Collateral. The hard-copy records stored at Hill Archive, and the electronic records and accounting data that the Trustee recovered through IT vendors at considerable expense, are how the Trustee substantiates and collects BOA's accounts receivable and how MCT prepares and updates the Reports on which BOA relies. Tomlin Decl. ¶¶ 18–19. Those receivables are not a marginal asset: the Trustee has collected $2,795,000.40 through September 30, 2026, and BOA receives 90% of the net proceeds under the Sharing Agreement. *Id.* ¶ 13; Sharing Agreement ¶ 12(iii). BOA cannot demand continued collection and reporting on its Collateral while refusing to bear the cost of the records and systems that make both possible. The Trustee has no obligation to do that.

54. "It is generally recognized that a bankruptcy trustee should not liquidate fully encumbered assets, for such action yields no benefit to unsecured creditors." *In re Scimeca Found., Inc.*, 497 B.R. 753, 781 (Bankr. E.D. Pa. 2013) (citing *In re K.C. Mach. & Tool Co.*, 816 F.2d 238, 245–46 (6th Cir. 1987)); *see also In re Feinstein Family P'ship*, 247 B.R. 502, 507 (Bankr. M.D. Fla. 2000) ("Clearly, the Code never contemplated that a Chapter 7 trustee should act as a liquidating agent for secured creditors who should liquidate their own collateral."); Handbook ch. 4.C.9.d ("A secured creditor can protect its own interests in the collateral subject to the security interest."). Where administering encumbered property will not produce a net

benefit to the estate, "it is appropriate for a chapter 7 bankruptcy trustee to abandon any interest in fully encumbered estate property and allow the secured creditors to exercise their right to recover possession of their collateral." *Scimeca*, 497 B.R. at 782; see 11 U.S.C. § 554(a). The Sharing Agreement is the alternative to that outcome. It is the negotiated arrangement under which the Trustee continues to administer BOA's Collateral because BOA agreed to bear the reasonable and necessary costs of doing so. If BOA now insists that it will not pay those costs, the Trustee will have no responsible choice but to seek authority to abandon BOA's Collateral, including the receivables and the records and systems needed to collect them, and to cease further collection efforts. The Trustee would do so only with an appropriate order that ensures the Debtors' books and records are preserved and that the Trustee and the Trustee's professionals retain access to them. That outcome serves no one, least of all BOA, which would be left to collect its own receivables.

**I. The Proposed Order Is Overbroad**

55. Even if the Court were to accept some portion of BOA's position, the proposed order should not be entered as drafted. It would direct the Trustee to wire the full $1,181,357.18 within seven days — including $310,423.88 the Trustee has already paid — without any finding as to which costs are or are not payable under the Sharing Agreement, and while the Trustee continues to incur costs of collecting BOA's receivables. At a minimum, any order should (i) deny the Motion as moot to the extent of the $310,423.88 the Trustee remitted on September 24, 2026, (ii) preserve the reserves for the insurance extension costs, the invoiced server-access costs, the NetSuite costs pending invoicing, and the $50,000 operating reserve, (iii) confirm that costs reported under paragraph 15 without timely written objection are deemed approved, or (iv) in the alternative, determine that each of the disputed costs is a Cost to Administer within the meaning of paragraph 15 and Recital D(i).

**Reservation of Rights**

56. The Trustee reserves all rights in connection with the Motion on any and all available substantive and non-substantive grounds that bankruptcy and nonbankruptcy law may permit, to conduct discovery into the matters raised by the Motion, to supplement this Objection, and to present evidence at any hearing on the Motion. Nothing herein is an admission that any cost reported in the Reports is not payable under the Sharing Agreement, or a waiver of the Trustee's right to seek allowance and payment of any such cost on any other basis.

**Conclusion**

For the reasons set forth above, the Trustee respectfully requests that the Court deny the Motion, as moot to the extent of the amounts the Trustee has remitted to BOA, deny the Motion in all other respects, and grant such other and further relief as is just and proper.

Dated: October 27, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Peter J. Keane*

Bradford J. Sandler (DE Bar No. 4142)
James W. Walker (*admitted pro hac vice*)
Peter J. Keane (DE Bar No. 5503)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: bsandler@pszjlaw.com
jwalker@pszjlaw.com
pkeane@pszjlaw.com
ecorma@pszjlaw.com

*Counsel to George L. Miller, Chapter 7 Trustee*

# Exhibit A

## Tomlin Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| POLISHED.COM INC., *et al.*, | ) | Case No. 24-10353 (TMH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 417** |

**DECLARATION OF MATTHEW TOMLIN IN SUPPORT OF CHAPTER 7 TRUSTEE'S OBJECTION TO MOTION OF BANK OF AMERICA, N.A. TO ENFORCE COURT-APPROVED SHARING AGREEMENT [DKT. NO. 65]**

I, Matthew Tomlin, declare as follows:

1. I am a Partner at Miller Coffey Tate LLP ("MCT"), which has served as accountants and bankruptcy consultants to George L. Miller, the chapter 7 trustee (the "Trustee") for the estates (the "Estates") of the above-captioned debtors (collectively, the "Debtors"), since March 8, 2024.

2. In my capacity as a Partner at MCT and accountant and bankruptcy consultant to the Trustee, I have reviewed the books and records of the Debtors made available to the Estates, and I am familiar with the Estates' cash receipts, cash disbursements, and the reconciliation of recoveries from assets liquidated by the Trustee in these chapter 7 cases.

3. I make this declaration in support of the *Chapter 7 Trustee's Objection to Motion of Bank of America, N.A. to Enforce Court-Approved Sharing Agreement [Dkt. No. 65]* (the "Objection"), filed concurrently herewith, in response to the *Motion of Bank of America, N.A. to Enforce Court-Approved Sharing Agreement [Dkt. No. 65]* [Docket No. 417] (the "Motion") filed by Bank of America, N.A. ("BOA"). Unless otherwise noted, capitalized terms used in this Declaration have the meanings ascribed to them in the Motion, the Objection, or the Sharing Agreement.

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information supplied to me by the Trustee or other MCT personnel working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the Debtors' financial affairs and books and records. I am over the age of eighteen and am authorized to submit this Declaration on behalf of the Trustee. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5. I am familiar with the reconciliation of cash received by the Trustee through the liquidation of assets in these chapter 7 cases and the pursuit and recovery of litigation assets, including accounts receivable and chapter 5 causes of action against third parties. I have reviewed the cash receipts and cash disbursements of each of the Debtors' Estates since the Petition Date.

6. I am also familiar with the Sharing Agreement and its terms. I assisted the Trustee and his bankruptcy counsel with the negotiation of the Sharing Agreement, and MCT has been responsible, since the initial account report as of December 13, 2024, for preparing the accountings and reports delivered to BOA under paragraphs 14 and 15 of the Sharing Agreement.

## A. The Reporting Process Under the Sharing Agreement

7. Paragraph 15 of the Sharing Agreement contemplates a weekly report of planned Costs to Administer "or such other time as agreed to by the Parties." Since the initial account report as of December 13, 2024, Miller Coffey Tate LLP ("MCT") has delivered to Berkeley Research Group, LLC ("BRG"), BOA's financial advisor, each accounting report (each, a "Report") setting forth, for each Debtor and on a consolidated basis: (a) all cash receipts by category, including Collateral proceeds subject to sharing, tax refunds, and non-BOA receipts;

(b) all costs paid or accrued by category; (c) reserve for all estimated costs by category; (d) the Carve-Out reserve; and (e) the resulting cash balance available for distribution to BOA. The Reports through July 31, 2026 were transmitted by email to BRG; the August Report and September Report (each defined below) were transmitted to BOA's counsel, as described below. A schedule identifying each Report by period and transmittal date is attached hereto as **Exhibit 1**.

8. The document attached as Exhibit A to the Declaration of Jonathan Emerson [Docket No. 418], filed in support of the Motion, is the Trustee's Report as of July 31, 2026, prepared by MCT and transmitted to BRG on or about August 20, 2026, with highlighting added by BRG. MCT has also prepared Reports as of August 31, 2026 (the "August Report") and September 30, 2026 (the "September Report"). BRG requested those Reports on October 15, 2026, and they were delivered to BOA's counsel by the Trustee's counsel on October 21, 2026. Each carries forward the costs and reserves listed below, updated for activity through its date. **Exhibit 1** has been updated accordingly.

9. Each of the costs identified in the Motion was reported in the Reports, identified by name and amount, beginning with the Report for the period indicated below, and was carried forward in each subsequent Report, including the August Report and the September Report.

| Item | Amount | First Report to BOA | Status |
|---|---|---|---|
| Bank Fees | $108,451.79 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Paid (accumulating monthly) |
| Bond Fees | $7,519.64 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Paid |
| Hill Archive Costs & Expenses | $258,226.80 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Paid |

| | | | |
|---|---|---|---|
| Collateral IT Costs – Server Access | $19,170.00 | May 31, 2026 | Paid |
| Insurance Extension Expense | $261,451.04 | Included in Initial reporting as of December 13, 2024 and each accounting thereafter | Reserve (allowed by stipulation; unpaid); original amount reported was $523,105.26 |
| Cabot Costs in Excess of $100,000 Cap | $115,631.40 | March 15, 2025 | Remitted to BOA on September 24, 2026 |
| NetSuite Costs | $150,000.00 | April 30, 2025 | Reserve (final invoice of $15,300.00 received after July 31, 2026) |
| Collateral IT Costs – Server Access | $15,000.00 | July 15, 2026 | Reserve |
| "Collateral Shortfall" | $245,906.55 | N/A | Residual after reserves; amount above $50,000 operating reserve remitted to BOA on September 24, 2026 (as adjusted) |

10. Neither I nor, to my knowledge, anyone at MCT received, at any time before BOA's pre-Motion demand on August 27, 2026, a written objection by email from counsel to BOA — or any other written objection from BOA or its professionals — to any of the costs listed above as reported in the Reports.

11. During the period the Reports were delivered, BRG from time to time raised questions regarding, and discussed with MCT, the figures reported in the Reports, including Collateral Receipts – Sharing, Trustee Fee Calculation, BOA Collateral Payment, Bond Fees Paid, Bank Fees Paid, Hill Archive Fees Paid, Insurance Extension, Cabot Costs, Collateral IT Costs, and Netsuite Costs. At no time did BRG or BOA's counsel comply with the Sharing Agreement and dispute that the costs above should not be paid from Collateral proceeds. BOA accepted the remittances calculated on the basis of the Reports.

**B. Collections and Remittances to BOA**

12. Following entry of the Sharing Agreement Order, BOA turned over to the Trustee $1,242,743.84 from the Debtors' prepetition deposit accounts at BOA. Consistent with

paragraph 5 of the Sharing Agreement, that amount was applied dollar-for-dollar against the Professional Fees component of the Carve-Out.

13. Through July 31, 2026, the Trustee had collected $14,220,776.17 in Collateral proceeds subject to sharing under the Sharing Agreement (consisting of Asset Sale proceeds, accounts receivable collections of $2,545,349.65, and other refunds), and $2,979,101.89 in tax refunds. Through September 30, 2026, those amounts were $14,476,472.37 in Collateral proceeds subject to sharing (including accounts receivable collections of $2,795,000.40) and $2,979,101.89 in tax refunds.

14. Through July 31, 2026, the Trustee had remitted to BOA $9,471,500.00 of Collateral proceeds pursuant to paragraph 14 of the Sharing Agreement and $2,979,101.89, representing 100% of the tax refund received, pursuant to paragraph 6 — a total of $12,450,601.89. On September 24, 2026, the Trustee remitted an additional $310,423.88 to BOA, as described below, bringing total remittances through September 30, 2026 to $12,761,025.77 ($9,781,923.88 under paragraph 14 and $2,979,101.89 under paragraph 6).

**C. The Disputed Costs**

15. **Insurance Extension.** This item represents postpetition premiums for the extension of certain of the Debtors' general liability and commercial business liability insurance policies covering the Collateral through June 30, 2024, during the period in which the Trustee marketed and sold the Debtors' assets and inventory. The amount in dispute was originally estimated in excess of $523,105.26 (based on the December 13, 2024 Report), but it was eventually negotiated down to $261,451.04 and allowed as an administrative claim by stipulation approved by this Court [Docket No. 191] (the "CNA Claim Stipulation"). It remains a reserve pending payment (i.e., distribution) consistent with terms of the CNA Claim Stipulation.

16. **Bank Fees.** The Bank Fees are the monthly service and analysis charges assessed on the Estates' depository accounts at Western Alliance Bank and Tri State Bank, an authorized depository under 28 U.S.C. § 586 and 11 U.S.C. § 345, in which the Trustee holds Collateral proceeds pending remittance to BOA and maintains the Carve-Out reserve required by paragraph 14. The $108,451.79 figure represents the portion of total bank charges of $140,056.46 allocated to the Collateral proceeds account(s); the balance was charged to non-BOA proceeds. Bank charges continue to accrue monthly. Through September 30, 2026, total bank charges were $151,408.70, of which $114,645.79 was allocated to the Collateral proceeds account(s).

17. **Bond Fees.** The Bond Fees are premiums for the Trustee's bond required by 11 U.S.C. § 322, allocated to these Estates based on funds on hand. Throughout the case, the substantial majority of funds on hand in the Estates has consisted of Collateral proceeds held pending remittance to BOA. The $7,519.64 figure represents the portion of total bond premiums of $9,089.16 allocated to Collateral proceeds.

18. **Hill Archive.** Hill Archive provides storage of the Debtors' physical books and records, including approximately 1,300 boxes of hard copy records and, during the sale process in 2024, provided inventory relocation and handling services necessary to prepare the Collateral for sale. Total Hill Archive charges through July 31, 2026 were $616,266.18. The charges related to Collateral proceeds totaled $258,226.80. The charges incurred for non-BOA proceeds was $358,039.38 based on the nature of services. The Debtors' records have been used to collect accounts receivable, reconcile inventory, support the theft-of-collateral insurance claim relating to the Cabot facility, and respond to BOA's information requests. Through September 30, 2026, total Hill Archive charges were $618,848.64, of which $260,809.26 related to Collateral proceeds.

19. **Collateral IT Costs — Server Access.** The Debtors' electronic records, including receivables, inventory, order, customer, and payment-processor data, were stored on physical servers located in the Debtors' former New York offices. The Trustee engaged Media Proper to recover and restore access to those servers. $19,170.00 has been paid for that work, and an additional $15,000.00 was reserved for the vendor's continuing restoration services. The vendor has since issued its final invoice of $15,300.00, which is reserved in the August Report and the September Report pending payment. Access to these records is expected to assist in the pursuit of accounts receivable and the insurance claim for theft of collateral. These costs were first reported in the May 31, 2026 Report.

20. **NetSuite.** NetSuite was the Debtors' enterprise accounting platform and contains the invoices and other supporting documentation required to pursue and collect the Debtors' accounts receivable and to reconcile inventory and processor reserves. NetSuite quoted the Trustee $150,000.00 for continued access to the platform and its data. The Trustee has not received an invoice from NetSuite, and the $150,000.00 has been carried as a reserve since April 30, 2025.

21. **Cabot Costs.** Total Cabot costs and related charges reflected in the Reports are $215,631.40, of which $100,000.00 falls within the cap in paragraph 12(iv) of the Sharing Agreement. The Trustee remitted the $115,631.40 balance to BOA on September 24, 2026, as described below. The $100,000.00 within the cap remains reserved.

22. **"Collateral Shortfall."** The $245,906.55 figure that BOA labels the "Collateral Shortfall" is not a separate cost. It is the consolidated cash balance remaining in the Collateral proceeds column of the July 31, 2026 Report ($887,988.95) after deducting the estimated reserves in that column ($642,082.40). Those reserves consist of: (a) $150,000.00 for NetSuite;

(b) $15,000.00 for server access; (c) $261,451.04 for the Insurance Extension; and (d) $215,631,40 for Cabot Costs. Because the eight Estates are administered separately and the figure is consolidated, the amount actually distributable to BOA on an Estate-by-Estate basis differs from $245,906.55. The Trustee proposed to retain $50,000.00 of that balance as an operating reserve for ongoing Collateral costs and to remit the remainder to BOA, which he did on September 24, 2026.

23. Of the $1,181,357.18 identified in the Motion, $393,368.23 represents costs actually paid (Bank Fees, Bond Fees, Hill Archive, the paid Server Access costs), $542,082.40 represents amounts reserved but not yet paid (Insurance Extension, NetSuite, and the reserved Server Access costs, and the reserve for the Cabot Costs excess), and $245,906.55 represents the consolidated residual cash balance after reserves described above.

**D. The September 24, 2026 Remittance**

24. On September 24, 2026, the Trustee remitted $310,423.88 to BOA by wire transfer. The remittance is reflected in the September Report, which shows cumulative payments to BOA under the Sharing Agreement of $9,781,923.88, compared to $9,471,500.00 in the August Report.

25. MCT calculated the $310,423.88 as the Collateral proceeds on hand after reserving for (a) the Insurance Extension ($261,451.04), (b) the $100,000.00 of Cabot Costs within the paragraph 12(iv) cap, (c) NetSuite ($150,000.00), (d) server access ($15,000.00), and (e) $50,000.00 for ongoing Collateral costs. BOA's counsel had identified the undisputed amount as $311,537.95. The $1,114.07 difference reflects activity after July 31, 2026: accounts receivable collections of $3,750.00, net of Trustee fees and the Carve-Out on those collections, less storage costs and bank fees of $4,388.23.

26. Since September 24, 2026, the Trustee has not used the disputed cash. As of September 30, 2026, the Collateral proceeds column of the September Report reflects a consolidated balance after reserves of $148,053.85, which includes the $50,000.00 operating reserve and Collateral proceeds collected in September 2026.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 27th day of October 2026, at Philadelphia, Pennsylvania.

*/s/ Matthew Tomlin*
Matthew Tomlin
Partner, Miller Coffey Tate LLP

**Exhibit 1**

| **Cumulative Period As-of Date** | **Date Sent** | **Notes** |
|---|---|---|
| 12/13/2024 | 12/26/2024<br>2/20/2025<br>2/26/2025 | Formatting of reporting discussed with BOA and BRG and revised. Activity subsequent to 12/13/24 included in reporting as of 3/15/26. |
| 3/15/2025 | 4/2/2025 | Emailed report to BRG |
| 4/30/2025 | 6/6/2025 | Emailed report to BRG |
| 5/31/2025 | 6/24/2025 | Emailed report to BRG |
| 6/30/2025 | 7/22/2025 | Emailed report to BRG |
| 8/31/2025 | 9/18/2025 | Emailed report to BRG |
| 11/30/2025 | 12/4/2025 | Emailed report to BRG |
| 12/31/2025 | 1/14/2026 | Emailed report to BRG |
| 5/31/2026 | 6/8/2026 | Emailed report to BRG |
| 7/15/2026 | 7/24/2026 | Emailed report to BRG |
| 7/31/2026 | 8/20/2026 | Short period report requested by BRG to show BOA payments made on 7/21/26 |
| 8/31/2026 | 10/21/2026 | Requested by BRG 10/15/26; delivered by Trustee's counsel to BOA's counsel |
| 9/30/2026 | 10/21/2026 | Requested by BRG 10/15/26; delivered by Trustee's counsel to BOA's counsel; reflects 9/24/26 payment of $310,423.88 to BOA |